# *VIRGINIA:*

*In the Court of Appeals of Virginia on*  **Tuesday**  *the*  **29th**  *day of*  **June, 2010**.

Dustin Allen Turner,                                                    Petitioner,

 against              Record No. 1836-07-1

Commonwealth of Virginia,                                              Respondent.

Upon a Rehearing En Banc

Upon a Petition for a Writ of Actual Innocence

Before Chief Judge Felton, Judges Elder, Frank, Kelsey, McClanahan,
Haley, Petty, Powell, and Alston

David B. Hargett (Hargett Law, PLC, on briefs), for petitioner.

Robert H. Anderson, III, Senior Assistant Attorney General (William C.
Mims, Attorney General, on brief), for respondent.

Dustin Allen Turner petitioned this Court for a writ of actual innocence based upon
newly-discovered, non-biological evidence, pursuant to Chapter 19.3 of Title 19.2 of the Code of
Virginia, alleging that his 1996 convictions for the abduction with intent to defile and murder of
Jennifer L. Evans should be vacated because in 2002 Billy Joe Brown, who was convicted of these same
crimes,[1] confessed that he acted alone in killing Evans.  This Court remanded the matter to the circuit
court to certify findings regarding factual issues in dispute.  The circuit court conducted a hearing in this
matter and supplied this Court with its certified findings of fact, including its finding that Brown was
"credible in his assertion that he acted independently in murdering the victim and . . . Turner played no
role in the murder or in the restraining of the victim."

A divided panel of this Court held that Turner met his burden of proving, by clear and
convincing evidence, that the recantation was truthful and that, had the statement been produced at trial,

---

[1] Brown was also convicted of the attempted rape of Evans.

"no rational trier of fact could have found proof of guilt [of felony murder and abduction with intent to defile] beyond a reasonable doubt[,]" granted his petition for a writ of actual innocence, vacated Turner's convictions for first-degree murder and abduction with intent to defile, and remanded the matter to the circuit court with instructions to modify the order of conviction to reflect Turner's conviction for being an accessory after the fact.  See Turner v. Commonwealth, 54 Va. App. 458, 680 S.E.2d 312 (2009).  We granted the Commonwealth's petition for rehearing *en banc* and stayed that order.

On rehearing *en banc*, we hold that Brown's credible recantation does not provide this Court with clear and convincing evidence that no rational fact finder could have found that Turner used deception to abduct Evans with the intent to have sexual intercourse with her against her will.  Therefore, we dismiss Turner's petition for a writ of actual innocence and vacate the August 4, 2009 order issued by a panel of this Court.

## I.  Background

On June 18, 1995, Brown, a Navy SEAL trainee, spent much of the day drinking.  Over the course of the day, Brown consumed six beers and eight to ten shots of Jim Beam in his room at the barracks.  That night, Brown decided to go to a Virginia Beach nightclub called The Bayou with Turner, a fellow trainee.  While Turner drove to the nightclub, Brown drank six more beers.

That same night, Jennifer Evans, who was vacationing in Virginia Beach with her friends, Michelle McCammon and Andria Burdette, decided around 11:00 p.m. to go to The Bayou.  While at the nightclub, Evans noticed Turner, whom she had not previously met, and began talking with him.  Throughout the remainder of the night, she alternated between socializing with her friends and speaking with Turner.  Though Evans met Brown briefly, she did not spend time talking with him.

Around midnight, Burdette wanted to leave, but Evans stalled to continue talking with Turner.  Turner and Evans appeared to be getting along very well, so well that at one point Turner sat in a chair

while Evans perched on the armrest. About an hour later, Evans finally agreed to leave but not before writing the phone number at the home where she was staying on a napkin for Turner.

Burdette and McCammon then left the nightclub with Turner and Evans trailing behind. As the women entered their vehicle, Turner leaned against the back door and continued talking to Evans through the open window. Turner offered to drive Evans home, but Burdette refused. Burdette and McCammon eventually agreed to leave Evans at the nightclub and return at 2:00 a.m. to take her home. After this agreement was reached, Turner opened Evans' door with "surprising force." Evans appeared happy with this arrangement and returned to the nightclub with Turner.

Around 1:15 a.m., Turner approached Karen Bishop, Brown's ex-girlfriend, and asked her to give Brown a ride home if Turner did not return to the bar before it closed. Bishop reluctantly agreed. Between 1:15 and 1:30 a.m., the lights came on signaling that it was almost closing time. After the lights came on, Julio Fitzgibbons, a Navy SEAL who had met Brown and Turner that night, approached Turner to see whether Turner had any plans for that night.[2] Turner said that he and Brown were going to have a threesome with Evans. Evans was approximately fifteen yards away at this time. Within a few seconds of this, Evans approached and Turner introduced her to Fitzgibbons as she stood next to Brown. Fitzgibbons then gave them the thumbs up sign, which Turner returned with a smile on his face.

At approximately 1:35 a.m., Bishop saw Turner and Evans, who were holding hands, leave the nightclub. Brown was with Bishop and one of her friends at this time. At approximately 1:45 a.m., Brown indicated that he wanted to leave, but Bishop told him that she needed to wait a few minutes for her friend.

Brown had consumed an additional eight to ten beers, eight to ten shots, and twelve mixed drinks while at the nightclub. He was noticeably intoxicated and on the verge of losing consciousness.

---

[2] Fitzgibbons admitted that he was drinking that night, but could not remember how much he consumed other than less than twelve beers.

Brown, indicating an unwillingness to wait for Bishop's friend, left the nightclub. Bishop followed him out of the bar at approximately 1:50 a.m. and told him that she would wait for a few minutes to give him a ride home in case he was unable to find Turner. Around 2:10 or 2:15 a.m., Bishop went back inside the bar, found her friend, and went to her car. Bishop and her friend drove around the parking lot looking for Brown but left after not seeing him.

When Burdette and McCammon returned to the nightclub at approximately 1:50 a.m., Evans was not in the parking lot where she had promised to meet them. They searched for several hours but could not find Evans. The women filed a missing persons report with the police the next day. After reading about Evans' disappearance, Bishop contacted the police to tell them that she had seen Turner and Brown with Evans on the night Evans disappeared.

At approximately 9:00 p.m. on June 21, 1995, Special Agents Thomas L. Carter and Robert Elliott of the Federal Bureau of Investigation interviewed Turner to try to determine what Turner did the weekend Evans disappeared. Notably, Turner told the agents that on Sunday night, he and Brown went to The Bayou where they stayed until closing time before returning to the barracks by themselves. When asked for more details, Turner said he had a conversation with some other SEAL trainees that he met there. He also told the agents that he met two women that evening: one was a tall woman whose name he could not recall and the other was a woman, who the agents later learned was Evans, who was at the nightclub with two female friends. The agents specifically asked Turner about the second woman, and he said he could not recall her name but that they talked for a while. He said that her two companions decided to leave and return around closing time to pick her up. Turner said he continued to talk with her for a while before he left to speak with other people that he knew. He told the agents that he spoke to her again around last call. The woman told him that she would be there for the week and wanted him to call her. She wrote her name and phone number on a cocktail napkin for him. Turner said that he and Brown left while she was waiting for her friends.

After the agents suggested several possible names for the woman, Turner said he might be able to provide her name because he thought that he still had the cocktail napkin in his barracks. Then, Turner and Special Agent Elliott went to Turner's barracks so that Turner could retrieve the napkin. The napkin had the name Jennifer and a phone number written on it.

Once the agents verified that Turner had spent time with Evans, they continued to question him about her, and he repeated that he had met her and her friends at the bar. He told the agents that at some point in the evening, he believed that Evans might agree to leave the bar with him. Based on this belief, he asked Brown to ride home with Bishop so that he was free to leave with Evans. Turner said that Brown told him that he did not want to ride home with Bishop. Turner told investigators that when he realized that he would not be able to be alone with Evans that night, he told her that he would try to contact her later in the week. He stated that he left Evans standing at the bar and returned to the barracks with Brown. Turner told the investigators that neither man had been drinking. He stated that they woke up around 9:00 a.m. on Monday and jointly signed a lease on an apartment before driving back to the base. During the entire interview, the agents thought that Turner was very calm and collected and that his answers seemed very forthright.

Sergeant Thomas Baum, a member of the Virginia Beach Police Department's homicide unit, participated in a subsequent interview of Turner at FBI headquarters in Richmond, Virginia. During that interview, Turner said he and Brown went to The Bayou, where he saw some other SEALS and spent most of the night talking with one of them, a Mexican or Puerto Rican man whose name Turner did not know. Turner also said that Bishop and one of her friends were there. He said he didn't start talking to Evans until around midnight or 12:30 a.m. Turner told the sergeant that he introduced himself to Evans while she was standing with her friends. Turner said they spoke for only a few minutes before he returned to Brown and the other SEALS.

Turner told Sergeant Baum that he resumed talking with Evans around 1:00 a.m. while her friends were still there. Soon, her friends wanted to leave, so he walked the women to their car. Evans

sat in the back seat, but the door was not closed. He said that he told Evans and her friends that they should stay because the nightclub closed in one hour. Evans agreed to stay, and her friends agreed to pick her up in front of The Bayou at closing. He said that he and Evans returned inside to talk as her friends drove away. When the lights came on in the nightclub, he asked Evans for her number. Turner told Sergeant Baum that he spoke with Evans for a few more minutes before returning to Brown. He said that he saw Evans talking with two unknown men. Turner told Sergeant Baum that he and Brown left around 1:45 or 2:00 a.m. without Evans.

Shortly after Sergeant Baum finished interviewing Turner, Detectives John T. Orr and Al Byrum, also of the Virginia Beach Police Department, interviewed Turner. The detectives noticed that as they did so, Turner's original story began to change and "his denials became weaker and weaker." Eventually, Turner said that he would speak to the detectives after he talked with his chief warrant officer. After allowing him to do so, the detectives asked Turner where they could find Evans' body, and Turner agreed to take them to it. In response to direct questioning, Turner stated that he was not the person who killed Evans but that he was present when Brown killed her in Turner's car. He explained that Brown choked Evans until she was dead while they were in the parking lot of The Bayou. Turner agreed to provide police with his car and clothing from that night.

When Brown was interviewed, he told investigators that Turner spent the entire night talking with Evans but that Brown was not interested. Brown stated that Turner indicated that he was "hooking up" with Evans, and he confirmed that Turner had arranged for Bishop to give Brown a ride home. Brown did not want a ride home from Bishop because he was concerned that he would have sexual intercourse with her and that would ruin his current relationship. Brown said that when he left the nightclub and headed out into the parking lot, he saw Turner jump out of his car and order Brown to get into the car. Brown saw Evans laying in the backseat with blood coming out of her nose and her clothes torn open. According to Brown, Turner told him, "I think I fucking killed her." Turner then implemented a plan to dispose of Evans' body and cover up the murder.

Turner's trial for murder and abduction with intent to defile began in August of 1996. Charlotte Lowe, the forensic supervisor who analyzed the crime scene, testified that Evans' body was in an advanced state of decomposition and skeletalization, such that many of her bones were exposed. The vest Evans had been wearing on the night she disappeared was pulled back and her bra was pushed up, exposing her breasts. Her shorts and underwear had been pulled down so that they were around only one leg. Lowe examined Turner's vehicle for semen, urine, fingerprints, and other physical evidence but found nothing of forensic value in the vehicle.

Dr. Leah Bush, Assistant Chief Medical Examiner for the Commonwealth of Virginia in the Tidewater district, performed the autopsy on Evans' body and opined that it was impossible to determine Evans' exact cause of death due to the severe skeletalization but concluded that manual strangulation was a possibility. Dr. Bush described the various chokeholds that could have led to Evans' death and how long each method would likely take to have killed her. Dr. Bush conclusively ruled out a broken neck as a cause of death because Evans' spinal cord did not show signs of fracture.

Todd Ehrlich, a Navy SEAL who completed some training with Brown and Turner, also testified against Turner. He told the jury about Turner and Brown's reputations for engaging in group sexual encounters.[3] Specifically, he testified that he recalled seeing the two men socializing with two women on June 16, 1995. According to Ehrlich, Turner alternated between talking to one of the young women and then talking to Brown to give him a "progress report." He could not recall the specifics of the conversation between Turner and Brown but said it involved the two of them attempting to get the young women to go home with them. Ehrlich testified that the two women left together without Turner and Brown. Ehrlich further testified about an incident where he witnessed Brown and Turner engage in group sexual intercourse with a woman while the three were stationed in California. Ehrlich told the

---

[3] Several other witnesses also testified that Turner and Brown had a reputation for having group sexual encounters.

jury that he later had a conversation with Turner and Brown in which they bragged about repeating the group sexual intercourse with that woman.

Turner took the stand in his own defense and declared that he never intended to have sex with Evans. According to Turner, his original plan was to take Evans to the beach to continue talking. He testified that he abandoned that idea because it would have been impossible to do so and still return by 2:00 a.m. to meet Evans' friends. Turner testified that, instead, he and Evans went to his vehicle to wait for Evans' friends. While waiting, Turner saw Brown approach and told Evans to "pay no attention to this guy. He's drunk. Don't believe a word he says." Brown then entered the vehicle and sat in the back seat directly behind Evans.

Brown began cursing and making belligerent remarks about Turner and Bishop. Although Turner stated that he could not remember many details of the night, he recalled that Brown shifted his attention towards Evans and began making crude remarks to her. Specifically, Brown asked her whether she was a virgin and whether she had ever had sex with a "frogman." Out of the corner of his eye, Turner saw Brown touch Evans, and she slapped his hand away. At that moment, Turner saw Brown reach around and make a jerking motion with both arms. According to Turner, Brown had both arms locked around Evans' neck and was making a squeezing motion. Turner testified that he tried to pry Brown's arms from her neck but could not. After a minute, Brown let go, and Turner checked Evans' vital signs but could not find a pulse. Brown yelled at Turner to drive, and Turner complied.

As Turner drove away, Brown reached beneath Evans' shorts until Turner yelled at him to stop. Brown then passed out. Turner drove to a secluded area near some woods where he and Brown removed Evans' body from the vehicle. Turner went back to the vehicle to look for a shovel, and when he returned, he found Brown lying on top of Evans' body. Turner pulled Brown off, and Brown said, "It doesn't matter because I couldn't get it -- a hard on anyway." They left after covering Evans' body with leaves. Before returning to the military base, they went to a diner. The next day, Turner and Brown signed a lease to be roommates for the coming year.

In response to Ehrlich's testimony about group sexual intercourse in California, Turner stated that "it all center[ed] around one incident and bragging about that one incident." He confirmed talking to Fitzgibbons on the night of June 18, 1995, but he denied talking about engaging in a threesome with Brown and Evans. Turner reiterated that he "did not actively try to sleep with [Evans]" because "she wasn't that type of girl at all."

On September 5, 1996, the jury, after having been instructed on the legal theories of concert of action as well as principal in the first and second degrees, found Turner guilty of abduction with intent to defile, in violation of Code § 18.2-48, and murder, in violation of Code § 18.2-32. The trial court imposed a prison sentence of 82 years. Both this Court and the Supreme Court of Virginia denied Turner's petitions for appeal.

On July 2, 2002, Brown, who did not testify at Turner's trial, provided a tape-recorded interview in which he avowed that he had lied to investigators about Turner's involvement in Evans' death and testified falsely about those events at his own trial. Brown stated that he spontaneously choked Evans and then blamed Turner because Turner had betrayed him by telling investigators what happened and where Evans' body was hidden. On February 28, 2003, Brown signed an affidavit that memorialized this interview.

Based on Brown's affidavit, Turner filed a petition for a writ of actual innocence based upon newly-discovered, non-biological evidence. In his petition, Turner relied upon Brown's 2002 admission and 2003 affidavit in which Brown stated that he alone killed Evans and that Turner played no part in it. Turner asserted that other evidence in the record supported Brown's statement absolving Turner. The Commonwealth filed a motion to dismiss Turner's petition, alleging that the petition was without merit because Brown's confession was not credible and even if it was credible, the other evidence against Turner was sufficient to find him guilty either as a principal in the second degree or under the felony-murder doctrine.

Upon consideration of Turner's petition, the Attorney General's motion to dismiss, Turner's reply thereto, and the record, this Court denied the motion to dismiss and remanded the matter to the circuit court to certify findings of fact regarding factual issues in dispute.[4]  Specifically, this Court instructed the circuit court to answer four questions:

> 1) whether Brown's recanted testimony is credible in his assertion that he testified falsely at his own trial,
>
> 2) if the answer to Question #1 is "yes," did Brown testify falsely as to any material fact,
>
> 3) if the answer to Question #1 is "yes," was Brown's recantation testimony unknown or unavailable to the petitioner or his counsel at the time the conviction became final, or could such recantation testimony, through the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction, [and]
>
> 4) is Brown credible in his assertion that he acted independently in murdering the victim and that Turner had no role in the murder or any restraint of the victim?[5]

---

[4] The concurring opinion states that

> [p]rior to its decision to grant the writ of actual innocence, the three-judge panel of this Court made two preliminary decisions that were critical to the ultimate outcome.  The first was to defer ruling on the Commonwealth's motion to dismiss.  The second was to remand the case to the circuit court for a factual finding regarding the credibility of the testimony of Billy Brown.

This opinion repeatedly refers to "the panel."  As set forth by statute, "[e]ach panel [of this Court] shall hear and determine, *independently* of the others, . . . the other cases assigned to that panel."  Code § 17.1-402(C) (emphasis added).  Thus, it must be noted that the divided panel that granted Turner's petition for a writ of actual innocence was a separate panel from the one that referred the matter to the circuit court for factual findings.  The concurring opinion relies upon the position that the first panel did not rule on the Commonwealth's motion to dismiss.  Contrary to this position, the referring panel did not defer ruling on the Commonwealth's motion to dismiss.  "Motion to Dismiss" is the style that the Commonwealth gave its response to Turner's petition for a writ of actual innocence.  Indeed, the relief sought by the Commonwealth was that this Court "should not order an evidentiary hearing but should dismiss the petition."  Thus, by referring the matter to the circuit court for an evidentiary hearing and ultimately sending the matter on to be heard on its merits, the referring panel implicitly denied the Commonwealth's motion to dismiss.

[5] This Court posed this fourth question to the circuit court upon a motion by Turner.

On May 28, 2008, the circuit court conducted an evidentiary hearing in which Brown testified that on the night of June 18, 1995, he did not want to engage in sexual intercourse and purposefully consumed excessive amounts of alcohol. He stated that he recalled briefly talking to Evans and claimed he did not know Turner's intentions concerning Evans aside from Turner's wanting to spend more time with her. Brown confirmed Turner's prior testimony that Bishop was to give Brown a ride home but that Brown did not want to wait for Bishop's friend to arrive. Brown admitted that, by this point, he was extremely intoxicated and on the verge of passing out. He testified that he found Turner's vehicle and climbed into the back seat behind Evans. Brown recalled saying something vulgar but could not remember specifically what he said. Brown testified that "one minute [he] was normal and the next minute [he] snapped and [he] started choking [Evans,]" by putting his left arm against her neck and holding it with his right arm.[6]

---

[6] It appears that there are two versions of an affidavit signed by Brown. In one version, which was notarized and presented in support of Turner's petition, Brown stated that Evans died instantly, and in the other, Brown stated that she revived and he choked her a second time killing her. At oral argument, the Commonwealth asserted that the existence of the two differing versions was critically important to the circuit court's determination of Brown's credibility. Specifically, the Commonwealth argued that it was entirely possible that the circuit court would have found Brown not to be credible if it had known of the two versions. Even though both versions of the affidavit were not physically before the circuit court, the fact that a discrepancy existed between them was before the circuit court. The Commonwealth questioned Brown at the evidentiary hearing about the version of the affidavit in which Brown said that he had to strangle Evans twice to kill her and his earlier testimony at the hearing that Evans died instantly. More specifically, during cross-examination, the following was said:

> [Commonwealth:] Let me read you a few sentences of this affidavit you signed. . . . He did not encourage me in any way and, in fact, I remember one instance while I was choking Jennifer[,] Dustin tried to pull my hands away. Jennifer became unconscious and I believed she was dead. I fell back in the seat, and she woke up. I then choked her again until blood came out of her nose and am certain she was dead at that time. We were still in the parking lot. I do not know why I did it.

> \*      \*      \*      \*      \*      \*      \*

> That statement reflects, does it not, that she was not killed instantly or rendered helpless instantly but, in fact, revived and you had to choke her a second time, correct?
>
> [Brown:] Yes.

-11-

Brown testified that when he realized that Evans was dead, he instructed Turner to drive. He further told the circuit court that he removed Evans' vest and pulled her pants down before passing out. Brown also testified that he attempted to have sex with Evans' body after he and Turner placed it in the woods.

Brown acknowledged having given conflicting accounts of how the murder occurred. He admitted that he lied to the police and that he repeated the lies at his own trial. He testified that he fabricated Turner's involvement in the murder because he was angry with Turner for telling the police where Evans' body was located. He stated that at the time, he perceived no difference between telling one lie and telling several lies. In explaining his recent recantation, Brown stated that his conversion to Christianity was his primary reason for his coming forward. Brown said that as long as he truthfully confessed to what had happened that night, he did not care whether his testimony would help exonerate Turner.

Upon considering the testimony from the evidentiary hearing and the transcripts from the original trials of Turner and Brown, the circuit court found that Brown "is credible in his assertion that he testified falsely at his own trial," that Brown "testified falsely as to a material fact in the case," that "Brown's recantation of his earlier testimony was unknown and unavailable to the petitioner in this proceeding . . . at the time of his conviction and at the time his conviction became final," and that Brown "is credible in his assertion that he acted independently in murdering the victim and that . . . Turner played no role in the murder or in the restraining of the victim."

---

Brown then responded affirmatively when asked by the Commonwealth: "[W]as there a period where [Evans] was seemingly unconscious or worse and then revived and then you had to assault her a second time?"

Despite these contradictions, the circuit court found that Brown's testimony in that proceeding was credible, and we are bound by that determination.

II.  Analysis

A.  Standard of Review

Code § 19.2-327.10 confers original jurisdiction upon the Court of Appeals of Virginia to

consider a petition for a writ of actual innocence based on newly-discovered, non-biological evidence

filed by any individual "convicted of a felony upon a plea of not guilty."  See also Carpitcher v.

Commonwealth, 273 Va. 335, 342, 641 S.E.2d 486, 490 (2007).  "The writ shall lie to the court that

entered the conviction . . . ."  Code § 19.2-327.10.

To obtain a writ of actual innocence, a petitioner must allege, *inter alia*, that the

newly-discovered evidence

>(1) "was previously unknown or unavailable to the petitioner or his trial
>attorney of record at the time the conviction became final in the circuit
>court;" Code § 19.2-327.11(A)(iv),
>
>(2) " is such as could not, by the exercise of diligence, have been
>discovered or obtained before the expiration of 21 days following entry of
>the final order of conviction by the court;" Code § 19.2-327.11(A)(vi),
>
>(3) "is material and when considered with all of the other evidence in the
>current record, will prove that no rational trier of fact could have found
>proof of guilt beyond a reasonable doubt;" Code § 19.2-327.11(A)(vii),
>and
>
>(4) "is not merely cumulative, corroborative or collateral," Code
>§ 19.2-327.11(A)(viii).

Carpitcher, 273 Va. at 343-44, 641 S.E.2d at 491.  The parties agree that the newly-discovered,

non-biological evidence at issue in this case is Brown's confession that he alone restrained and killed

Evans.  Brown provided this confession six years after Turner's conviction.  Thus, of the four elements

listed above, only the third is at issue in this case:  Whether Turner has carried his burden of proving, by

clear and convincing evidence,[7] (a) that Brown's new confession is "material" and (b) that, when

_____

[7] The concurrence avers that "the new evidence must *conclusively* show that the petitioner's guilt
is *a factual impossibility*."  (Emphases added).  It attempts to draw a distinction based on the level of
certainty of guilt provided by DNA evidence as compared to what it views as the lesser degree of
certainty provided by testimonial evidence.  The concurring opinion views after-discovered testimonial

-13-

considering Brown's confession with all the other evidence in the current record, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."[8] Code § 19.2-327.11(A)(vii).

In analyzing Turner's petition, we must first determine whether Brown's statement is "material." In order to be "material" within the meaning of Code § 19.2-327.11(A)(vii), "evidence supporting a petition for a writ of actual innocence based on non-biological evidence must be true." Carpitcher, 273 Va. at 345, 641 S.E. 2d at 492. If the circuit court cannot determine whether the original testimony, the recantation testimony, or some other version of events is true, the petitioner has not met his burden of proving materiality because "the General Assembly intended to provide relief only to those individuals who can establish that they did not, as a matter of fact, commit the crime for which they were convicted"

---

evidence as "uncertain" because "when a witness testifies to a fact," he "could be telling the truth as he understands it, but he could be mistaken due to poor eyesight or poor memory," or he "[could] appear entirely credible[] but actually be lying." It posits, as a result, that "testimony can be credible—that is, believable—without being factually dispositive of the issue of innocence." Although this statement is certainly true in the abstract, the concurrence implies that the circuit court's finding on referral that Brown's testimony is credible does not mean we must accept Brown's testimony over other evidence, presented at trial, with which it conflicts.

What the concurrence fails to acknowledge is that both our legal system in general and the actual innocence statutes in particular equate credibility with truth. If the fact finder—in this case the circuit court to which the matter was referred for additional findings—concludes the testimony given on referral is credible, we treat that testimony as "the truth." See Johnson v. Commonwealth, 273 Va. 315, 323-24, 641 S.E.2d 480, 484-85 (2007) (using the terms "truth" and "credibility" interchangeably in analyzing the impact of the circuit court's findings on referral); see also, e.g., Molina v. Commonwealth, 272 Va. 666, 671, 636 S.E.2d 470, 473 (2006) (holding that on direct appellate review, "we must 'regard as *true* all the *credible* evidence favorable to [the party who prevailed below]'" (quoting Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphases added))). Further, no practical distinction exists in our jurisprudence between "truth" based on testimonial evidence and "truth" based on scientific evidence such as DNA. Just as the accuracy of eyewitness testimony depends on factors such as perception, memory, and credibility, DNA evidence depends upon the qualification and credibility of the analyst and the quality control and other procedures of the laboratory.

[8] This confession is a recantation because it unequivocally repudiates the version of events implicating Turner that Brown gave to investigators in 1995 and under oath at his own trial in 1996. See Black's Law Dictionary 1295 (8th ed. 2004) (defining the term "recant" as "[t]o withdraw or renounce *prior statements* or testimony formally or publicly") (emphasis added). It is immaterial that Brown did not testify at Turner's trial, especially in light of the sworn testimony Brown had previously given at his own trial, which clearly demonstrated his intent to incriminate Turner if he were called. Brown's recantation testimony was unavailable at the time of Turner's original trial, and the Commonwealth does not contend otherwise.

-14-

and not to those "who merely produce evidence contrary to the evidence presented at their criminal trial." Id. "Because the Court of Appeals cannot hold its own evidentiary hearing to assess a witness' credibility, but must ultimately determine whether a recantation is true, Code § 19.2-327.12 provides a mechanism to assist the Court of Appeals in this task." Johnson v. Commonwealth, 273 Va. 315, 322, 641 S.E. 2d 480, 484 (2007). Pursuant to that code section,

> [i]f the Court of Appeals determines . . . that a resolution of the case *requires* further development of the facts, the court may order the circuit court in which the order of conviction was originally entered to conduct a hearing . . . to certify findings of fact with respect to such issues as the Court of Appeals shall direct.

Code § 19.2-327.12 (emphasis added).

To determine the credibility of Brown's statement, we ordered the circuit court in which the order of conviction was originally entered to conduct a hearing on the credibility of Brown's recantation testimony and issue certified findings of fact.[9] See Code § 19.2-327.12; see also Johnson,

---

[9] The concurrence asserts that it was unnecessary to remand this matter to the circuit court for an evidentiary hearing. As previously mentioned, two separate panels addressed different issues in this case. It is the decision by the second panel, the merit panel, that is before this Court sitting *en banc*. As set forth by the General Assembly, this Court

> shall sit en banc (i) when there is a dissent in the panel to which the case was originally assigned and an aggrieved party requests an en banc hearing and at least four judges of the court vote in favor of such a hearing or (ii) when any judge of any panel shall certify that in his opinion a decision of such panel of the court is in conflict with a prior decision of the court or of any panel thereof and three other judges of the court concur in that view. The court may sit en banc upon its own motion at any time, in any case in which a majority of the court determines it appropriate to do so.

Code § 17.1-402(D). Contrary to the view expressed by the concurrence, the issue of whether the referring panel needlessly sent the matter back to the circuit court for factual findings is not an issue on which either party sought review, nor is it an issue granted by this Court for consideration *en banc*. The panel's decision to remand the case for factual findings was unanimous, and no judge has certified that the panel decision was in conflict with a prior decision of this Court. Moreover, this Court has made no motion, joined by a majority of the Court, to sit *en banc* to reconsider the referring panel's decision to remand the matter to the circuit court. Therefore, the referring panel's decision is not before this Court sitting *en banc*. To determine at this juncture that the decision to remand was improper, without complying with Code § 17.1-402(D), or allowing the parties to brief the issue, would be inappropriate.

273 Va. at 322-23, 641 S.E. 2d at 484 (involving a referral of the recantation of a co-defendant, which

the circuit court found was not credible). After conducting an evidentiary hearing, as well as

reviewing in detail the evidence that was presented in the prior trials of both Brown and Turner, the

circuit court expressly found Brown credible both in his assertion that he testified falsely to a

"material" fact at his own trial and in his present statement that "he acted independently in murdering

[Evans] and that Turner played no role in the murder or any restraint of the victim."

Code § 19.2-327.13 then provides, in relevant part:

> [u]pon consideration of the petition, the response by the Commonwealth,
> previous records of the case, the record of any hearing held under this
> chapter and, if applicable, *any findings certified from the circuit court
> pursuant to an order issued under this chapter*, the Court of Appeals, if it
> has not already summarily dismissed the petition, shall either dismiss the
> petition for failure to state a claim or assert grounds upon which relief
> shall be granted; or the Court shall (i) dismiss the petition for failure to
> establish previously unknown or unavailable evidence sufficient to justify
> the issuance of the writ, or (ii) only upon a finding that the petitioner has
> proven by clear and convincing evidence all of the allegations contained in
> clauses (iv) through (viii) of subsection A of § 19.2-327.11, and upon a
> finding that no rational trier of fact could have found proof of guilt beyond
> a reasonable doubt, grant the writ, and vacate the conviction . . . .

(Emphasis added). The plain language of this code section requires that we give "consideration" to "any

findings certified from the circuit court pursuant to an order issued [under Code § 19.2-327.12]." See

Marble Techs., Inc. v. City of Hampton, 279 Va. 409, 418, 690 S.E.2d 84, 88 (2010) ("'Legislative

intent is determined from the plain meaning of the words used.'" (quoting City of Richmond v. Confrere

Club of Richmond, 239 Va. 77, 80, 387 S.E.2d 471, 473 (1990))).

Moreover, in explaining how the "factual findings certified by the circuit court in response to the

Court of Appeals' order referring certain factual issues pursuant to Code § 19.2-327.12" should be

treated by Virginia's appellate courts, the Supreme Court of Virginia established the analytic framework

---

This case is in a different procedural posture from that of Startin v. Commonwealth, 56 Va. App. 26,
690 S.E.2d 310 (2010) (*en banc*), in which this Court most recently overruled a prior panel decision. In
Startin, this Court was specifically asked on brief to consider the continuing viability of Sprouse v.
Commonwealth, 19 Va. App. 548, 453 S.E.2d 303 (1995).

to be applied, mandating that "[s]uch factual findings are similar to circuit court findings made under Code § 8.01-654(C) in habeas corpus cases in which [the Supreme Court] ha[s] original jurisdiction and ha[s] referred certain factual issues to the circuit court for an evidentiary hearing."[10] Carpitcher, 273 Va. at 342-43, 641 S.E.2d at 490 (citations omitted). In habeas corpus cases, "[t]he circuit court's factual findings . . . are entitled to deference and are binding upon [the Supreme] Court unless plainly wrong or without evidence to support them." Hedrick v. Warden, 264 Va. 486, 496, 570 S.E.2d 840, 847 (2002); see also Yarbrough v. Warden, 269 Va. 184, 195, 609 S.E.2d 30, 36 (2005); Lovitt v. Warden, 266 Va. 216, 229, 585 S.E.2d 801, 808 (2003). The rationale for this framework is that a determination of a witness' credibility hinges on more than his mere words.

> As the trier of fact, the circuit court is charged with the responsibility of considering various factors, including the witness' demeanor, his opportunity for knowing the things about which he has testified, his bias, and any prior inconsistent statements relating to the subject of his present testimony. In addition, the circumstances of a particular case may raise other factors that the circuit court deems relevant in assessing a witness' credibility.

Johnson, 273 Va. at 323, 641 S.E.2d at 485 (citations omitted). These observations are available only through live witness testimony. This Court is not authorized to hear testimony and, as a result, we are not equipped to judge the credibility of a witness' testimony based on his demeanor. Despite our

---

[10] Because the concurrence asserts that it was unnecessary to remand this matter to the circuit court, it further contends that the credibility determinations made by that circuit court are irrelevant. Specifically, in footnote 36, the concurring opinion states that in Carpitcher, 273 Va. at 342-43, 641 S.E.2d at 490, the Supreme Court of Virginia recited "the standard of review that *it* would apply in its appellate function of reviewing this Court's dismissal of an actual innocence petition" and held that the circuit court's "factual findings pursuant to Code § 19.2-327.12 are only binding if they are approved by the Court of Appeals." This interpretation of Carpitcher considers only part of the pronouncement by the Supreme Court of Virginia and ignores the analytical framework clearly outlined by the Supreme Court.

Contrary to the concurring opinion's position that the Supreme Court of Virginia was referring only to the standard of analysis that it would apply to factual findings as approved by this Court, clearly the Supreme Court was also indicating that because factual findings referred to and made by the circuit court under the Writ of Actual Innocence code sections are similar to those in habeas corpus cases, the same standard of deference, i.e., that findings are binding unless plainly wrong or without evidence to support them, applies to our treatment of the circuit court's findings.

original jurisdiction and the unique nature of the writ, we simply cannot sit as a fact finder in the same sense that a jury or circuit court does. Therefore, like the Supreme Court of Virginia when it sits with original jurisdiction in habeas corpus cases and reviews factual findings made by a circuit court pursuant to Code § 8.01-654(C),[11] we must accept the circuit court's factual findings made pursuant to Code § 19.2-327.12 unless they are plainly wrong or without evidence to support them. In other words, we may not simply ignore the circuit court's findings as though they had never been made, as the concurrence advocates.

Here, the order of referral stated as follows: "Upon consideration of the petition, the response of the Attorney General [entitled "Motion to Dismiss"], petitioner's reply, the records of prior proceedings in this case, and the other exhibits, this Court finds that a resolution of the case *requires* further development of the facts." (Emphasis added). Thus, as previously stated, the initial panel that decided to refer Turner's case to the circuit court for an evidentiary hearing implicitly denied the Commonwealth's motion to dismiss and made preliminary determinations as to materiality and relevance. On rehearing *en banc*, we may reject the initial panel's legal conclusions related to relevance and materiality but not the factual findings made by the circuit court at the panel's instruction. See Carpitcher, 273 Va. at 342-43, 641 S.E.2d at 490; Johnson, 273 Va. at 323, 641 S.E.2d at 485. Therefore, we are bound to accept the circuit court's determinations that Brown "is credible in his assertion that he testified falsely at his own trial," that Brown "testified falsely as to a material fact in the case," that "Brown's recantation of his earlier testimony was unknown and unavailable to the petitioner in this proceeding . . . at the time of his conviction and at the time his conviction became final," and that

---

[11] Code § 8.01-654(C)(1) confers exclusive jurisdiction upon the Supreme Court of Virginia to consider and award writs of habeas corpus in cases where the petitioner is held under a sentence of death. In such cases, the Supreme Court of Virginia may order the circuit court to conduct an evidentiary hearing to make necessary factual findings as instructed by the Supreme Court.

-18-

Brown "is credible in his assertion that he acted independently in murdering the victim and that . . .

Turner played no role in the murder or in the restraining of the victim."[12]

Moreover, we reject the Commonwealth's contention that the circuit court's factual findings

were fatally incomplete and conclusory. On referral to the circuit court for factual findings, "[t]here is

no mandatory formula for a circuit court's consideration of the credibility of a particular witness."

Johnson, 273 Va. at 323, 641 S.E. 2d at 485 (citations omitted). Here, the circuit court clearly answered,

albeit briefly, the four questions referred by this Court and thus fulfilled its obligations under Code

§ 19.2-327.12. Having fully considered the record in this case, we cannot say that the circuit court's

---

[12] Although the *en banc* Court may revisit the legal significance of the circuit court's findings on referral, the concurrence's position that the statute requires us to view Brown's recantation testimony as "just another piece of evidence that the jury would have considered" strips the statute of its primary purpose in allowing for referral to the circuit court and flies in the face of the holdings in Carpitcher and Johnson. A fundamental issue in dispute at this stage of our review of Turner's petition is our treatment of the circuit court's findings. This Court is bound by the plain language of Code § 19.2-327.13, which dictates that we are to give "consideration" to "any findings certified from the circuit court pursuant to an order issued [under Code § 19.2-327.12]." See Marble Techs., Inc., 279 Va. at 418, 690 S.E.2d at 88. We, therefore, must consider, at this stage of the proceedings, the circuit court's findings regarding the credibility of Brown's confession, along "with all of the other evidence in the current record," to reach our ultimate decision of whether Turner has "prove[d] that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Code § 19.2-327.11. In other words, we may not simply ignore the circuit court's findings as though they had never been made, as the concurrence advocates. Upon our referral, *the circuit court* acted as the fact finder to determine whether Brown's most recent statement was his definitive testimony regarding what happened rather than just "one more in a series of conflicting and unreliable tales." The concurring opinion, in noting it is "quite reasonable to conclude that a hypothetical juror would have chosen to ignore Brown's testimony in its entirety and decide the case on the same evidence considered by the original jury," mistakenly ignores the fact that the circuit court, with regard to the questions referenced from this Court, became the fact finder, i.e., the hypothetical juror of which the concurrence speaks—a substitute for the original trial jury—and concluded that Brown's recantation testimony should be credited in the context of the questions posed to it.

Here, because the circuit court found Brown's recantation testimony that he alone restrained and killed Evans to be credible in the context of the entire record, we must evaluate the record by rejecting all evidence that is in conflict with the circuit court's findings before assessing whether "no rational trier of fact could have found proof of guilt beyond a reasonable doubt" upon the evidence that remains. Code § 19.2-327.11(A)(vii).

factual findings are plainly wrong or without evidence to support them and, therefore, we are bound by these findings.

## B.  Turner's Role in Evans' Death

Next, we must consider whether Brown's credible confession, "when considered with all of the other evidence in the current record,  . . . prove[s] that no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Code § 19.2-327.11(A)(vii).  Turner was convicted of abduction with intent to defile, in violation of Code § 18.2-48, and murder, in violation of Code § 18.2-32, under the felony-murder doctrine.  Thus, Brown's recantation must obviate Turner's participation in killing Evans and sever the causal connection between Brown's conduct and the underlying crime that gave rise to Evans' murder.

Turner argues that we cannot arbitrarily disregard Brown's recantation and that all other evidence must be viewed in the context of Brown's assuming sole responsibility for the murder.  To that end, Turner asserts that the Commonwealth's evidence against him is merely circumstantial and does not exclude the reasonable hypothesis of innocence that Brown acted independently in murdering Evans and that Turner had no role in the murder or restraint of Evans.  The Commonwealth responds that, based on all of the evidence, a reasonable fact finder could find that Turner abducted Evans with the intent to defile her and, therefore, is not entitled to a writ of actual innocence.

Before this Court may properly grant the writ of actual innocence that Turner seeks, he must demonstrate by clear and convincing evidence that based on all of the evidence in the record, "*no rational trier of fact could* have found proof of guilt beyond a reasonable doubt."  Code § 19.2-327.11(A)(vii) (emphasis added); accord Carpitcher, 273 Va. at 344, 641 S.E.2d at 491.  This analysis is not as simple as merely accepting the circuit court's determination that Brown testified credibly that he acted alone when he physically committed the murder and that Turner played no role in

-20-

murdering or restraining Evans.[13] The relevant question is not whether Brown acted alone in killing Evans, but whether Turner abducted her with the intent to defile her.[14] If he did, the fact that Brown may have acted alone in restraining Evans and in murdering her does not absolve Turner of his guilt. In order to be granted a writ of actual innocence, Turner must produce clear and convincing evidence that he did not abduct Evans with the intent to defile her and, therefore, that he is not guilty of felony murder. It is this Court's statutory duty to examine the entire record, including Brown's credible confession to Evans' murder, to determine whether Turner has met his burden. See Code §§ 19.2-327.11 to 19.2-327.14. Having examined the entire record,[15] we conclude that Turner has not met his statutory burden. From the record, a rational fact finder could have found that Turner abducted Evans by deception—meaning no finding of force or restraint would have been required—and that the abduction ended with Evans' murder. Therefore, we dismiss Turner's request for a writ of actual innocence and deny his request to vacate his convictions for murder and abduction with intent to defile.

---

[13] The dissent states that "[i]f X says that he did it and that Y did not participate in any way, and the jury believes X, there is no legal way to convict Y." This analysis grossly oversimplifies the question of Turner's guilt because the fact finder in Turner's original trial was instructed as to felony murder, contrary to the dissent's assertion that this is a novel theory, and Brown's most recent recitation of events that has been accepted as credible states only that Turner did not participate in restraining or murdering Evans. Brown's confession is silent, as it necessarily must be, as to *Turner's intent at the time that he left the club with Evans*. Thus, based on the theory of this case presented to the fact finder—i.e., felony murder predicated on Turner's abduction of Evans with the intent to defile her—it cannot be said that there is "no legal way to convict" Turner.

[14] The dissent's determination that "[t]he circuit court, by referring to the murder and the restraint in the disjunctive, contemplated Brown's recantation in light of both the actual killing and the underlying crime of abduction" is unsupported and requires an inferential leap.

[15] We have received correspondence from the Commonwealth alleging that it has discovered evidence that would call into question the credibility of Brown's recantation and tend to support a finding of Turner's guilt. The Commonwealth has neither made a formal motion nor asked anything of this Court in light of this alleged evidence. Assuming, without deciding, that this information is credible, it would only strengthen our position. Therefore, even if the Commonwealth properly asked this Court to consider the alleged new evidence, it would at best be cumulative and not change the disposition of Turner's petition for a writ of actual innocence.

A defendant is guilty of first-degree murder under Code § 18.2-32 where the killing occurs "in the commission of, or attempt to commit, arson, rape, forcible sodomy, inanimate or animate sexual penetration, robbery, burglary or abduction." This legislation codifies the common law doctrine of felony murder and "elevate[s] to murder a homicide committed during the course of a felony by imputing malice to the killing." King v. Commonwealth, 6 Va. App. 351, 354, 368 S.E.2d 704, 705 (1988). "[T]he felony murder statute applies where the initial felony and the homicide were parts of one continuous transaction, and were closely related in point of time, place, and causal connection." Berkeley v. Commonwealth, 19 Va. App. 279, 286, 451 S.E.2d 41, 45 (1994) (holding that a fact finder could reasonably infer that an abduction with intent to rape continued until the victim's death and, therefore, felony murder occurred). Abduction is a continuing offense and "'it [is] for the fact finder to determine in each case . . . whether the [abduction] had been terminated within the purview of [Code § 18.2-32].'" Barnes v. Commonwealth, 33 Va. App. 619, 629, 535 S.E.2d 706, 711 (2000) (quoting Haskell v. Commonwealth, 218 Va. 1033, 1043, 243 S.E.2d 477, 483 (1978)). Thus, to determine whether Turner committed felony murder, we must first decide whether the evidence in the record is such that a rational finder of fact could conclude that Turner abducted Evans with the intent to defile her.

A person commits abduction when he "[b]y force, intimidation or deception and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such person of his personal liberty . . . ." Code § 18.2-47.[16] Abduction requires proof of asportation or detention, either of which may be accomplished by force, intimidation, or deception. Jerman v. Dir. of the Dep't of Corr., 267 Va. 432, 439, 593 S.E.2d 255, 259 (2004) (citing Scott v. Commonwealth, 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984)). The accused need not have used any physical force or restraint against the victim. Kent v. Commonwealth, 165 Va. 840, 841-42, 183 S.E.

---

[16] The penalty is enhanced "for the abduction of any person with the intent to defile such person."

177, 177-78 (1936).[17] Virginia case law is clear that, under Code § 18.2-47, an abduction includes a taking away or detention of a person induced by fraud or deception. Jerman, 267 Va. at 439, 593 S.E.2d at 259.

In Jerman, the Supreme Court of Virginia found that an abduction occurred where the evidence proved that one of the petitioner's confederates convinced the victim to come with her under the ruse of selling illegal narcotics to her and petitioner when their true intent was to harm the victim. Id.; see also Taylor v. Commonwealth, 260 Va. 683, 688, 537 S.E.2d 592, 595 (2000) (holding that the appellant accomplished the abduction through the use of both deception and intimidation). The Supreme Court of Virginia made no mention of any "restraint" upon the victim in the first abduction in Jerman; rather, the fact that the victim was tricked into getting into the vehicle and traveling with the co-conspirator was enough to prove abduction. 267 Va. at 439, 593 S.E.2d at 259.

Similarly in Kent, the defendant kidnapped the victim with intent to extort money for pecuniary benefit. 165 Va. at 842, 183 S.E. at 178. The evidence showed that the defendant induced the victim to accompany him to Washington, D.C., on the assurance that he would obtain money to satisfy a debt he owed her. Id. at 842, 183 S.E. at 177-78. The defendant argued that he could not be found guilty of kidnapping because the evidence failed to show any force or restraint was used by the accused in taking the victim with him. Id. at 841, 183 S.E. at 177. The Supreme Court of Virginia disagreed with the defendant and held that he was guilty of kidnapping because the evidence showed that the accused took the victim with him under "such circumstances [that] amounted to fraud and coercion on [the defendant's] part and for the purpose of pecuniary benefit . . . ."[18] Id. at 842, 183 S.E. at 178.

---

[17] The dissent refers to Kent and Jerman as cases where the appellants told "specific lies" to accomplish the abductions. However, Code §§ 18.2-47 and 18.2-48 do not require that the deception be verbalized and, certainly, it is well settled that one's intention, such as the intent to deceive, may and often must be proven through the use of circumstantial evidence. Williams v. Commonwealth, 278 Va. 190, 194, 677 S.E.2d 280, 282 (2009) (reiterating that "[a]bsent a direct admission by the defendant, intent . . . must necessarily be proved by circumstantial evidence").

[18] When Kent was convicted the then in effect statute stated, "[i]f any person seize, take or secrete any other person with intent to extort money, or pecuniary benefit, he shall be punished with

Thus, if based on all of the evidence before this Court, any rational fact finder could have concluded that Turner deceived Evans into leaving the club while at the same time intending to defile her, then a writ of actual innocence should not issue.

The intent to defile element requires proof that the perpetrator intended to engage in sexual contact against the victim's will. See, e.g., Code §§ 18.2-61 (rape), 18.2-67.1 (forcible sodomy), 18.2-67.3 (aggravated sexual battery), and 18.2-67.1 (sexual battery). To prove that Turner abducted Evans with the intent to defile, the Commonwealth was required to prove that he had the specific intent to sexually molest her. Simms v. Commonwealth, 2 Va. App. 614, 617, 346 S.E.2d 734, 735 (1986). "Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case." Ridley v. Commonwealth, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979). Code §§ 18.2-47 and 18.2-48 do not require that the deception be verbalized and, certainly, it is well settled that one's intention, such as the intent to deceive, may and often must be proven through the use of circumstantial evidence. See Williams v. Commonwealth, 278 Va. 190, 194, 677 S.E.2d 280, 282 (2009) (reiterating that "[a]bsent a direct admission by the defendant, intent . . . must necessarily be proved by circumstantial evidence").

> "There is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence." Muhammad v. Commonwealth, 269 Va. 451, 479, 619 S.E.2d 16, 31-32 (2005), cert. denied, 547 U.S. 1136 (2006). Our Supreme Court has held that "'circumstantial evidence is competent and is entitled to as much weight as direct evidence[,] provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" Finney v. Commonwealth, 277 Va. 83, 89, 671 S.E.2d 169, 173 (2009) (quoting Dowden v. Commonwealth, 260 Va. 459, 468, 536 S.E.2d 437, 441 (2000)). Furthermore, circumstantial evidence "is not viewed in isolation." Muhammad, 269 Va. at 479, 619 S.E.2d at 32. "While no single piece of evidence may be sufficient, the combined force of many

---

death, or within the discretion of the jury be confined in the penitentiary not less than eight nor more than twenty years." The holding in Kent points out the error in the dissent's position that every abduction necessarily includes restraint. Indeed, that was the very defense advanced by Kent—that he could not be found guilty of kidnapping because the evidence failed to show force or restraint. The Supreme Court of Virginia disagreed, holding that the evidence was sufficient because he took the victim by fraud or coercion.

-24-

> concurrent and related circumstances, each insufficient in itself, may lead
> a reasonable mind irresistibly to a conclusion." Id. (citation omitted).

Brown v. Commonwealth, 54 Va. App. 107, 119, 676 S.E.2d 326, 332 (2009).

Turner's acts, conduct, and statements may be considered to discern his state of mind. Long v. Commonwealth, 8 Va. App. 194, 198, 379 S.E.2d 473, 476 (1989). "The fact finder may consider the conduct of the person involved and all the circumstances revealed by the evidence." Wynn v. Commonwealth, 5 Va. App. 283, 292, 362 S.E.2d 193, 198 (1987). "When weighing the evidence, the fact finder is not required to accept entirely either party's account of the facts. The fact finder may reject that which it finds implausible, yet accept other parts which it finds to be believable." Barnes v. Commonwealth, 33 Va. App. at 630, 535 S.E.2d at 711-12 (2000) (citing Barrett v. Commonwealth, 231 Va. 102, 107, 341 S.E.2d 190, 193 (1986)).

Because it is Turner's intent that is relevant, Brown's credible confession to killing Evans cannot be found to be dispositive of what Turner was thinking when he left the club with Evans. Indeed, Brown's confession only establishes what occurred after he got into the car with Turner and Evans.[19] Thus, Brown's confession does not change the evidence of Turner's intent to defile that was before the jury in Turner's trial. The jury was instructed that abduction with the intent to defile could be accomplished by, *inter alia*, deception and could have found that Turner deceived Evans into leaving the bar, his nefarious intent unbeknownst to her.[20] Accordingly, it cannot be said that *no* rational trier of fact *could* have found Turner guilty beyond a reasonable doubt as the jury did.

---

[19] In his confession, Brown reiterates his prior statements that he did not intend to have sex that night. His recent confession, however, has no bearing on what a reasonable fact finder could conclude about Turner's and Brown's sexual intent prior to Brown joining Evans and Turner in Turner's car because Brown's confession and the credibility finding made by the circuit court focused on the details of how he killed Evans and what followed after he met them in the car. Indeed, Brown's protestations that he was not sexually interested in Evans are belied by his interview with Turner's attorney and by his own testimony at the evidentiary hearing where he recounted his sexual overtures toward Evans immediately upon getting into Turner's car and admitted to trying to have intercourse with Evans' corpse twice.

[20] Though the record, unfortunately, is devoid of the closing arguments made to the jury in Turner's trial, it is clear from the trial court's ruling on Turner's motion to strike and from the jury

Moreover, contrary to the dissent's contention that "the record is devoid of any evidence that Turner ever engaged or intended to engage in any sexual activity *against the will* of" Evans, a review of the entire record before this Court reveals that it is replete with evidence from which a rational finder of fact could reach a conclusion that Turner deceived Evans into leaving the club with him for stated innocent purposes while his true intent was to defile her. Turner testified that he only wanted to talk with Evans and that he had no sexual interest in her. Turner's actions and, more tellingly, his own words, belie his claim that he did not intend to have sex with Evans. Turner arranged for Bishop to give Brown a ride home if Turner did not return to the club by closing time. During that conversation, Bishop asked Turner if she needed to give Brown a ride home because Turner "was going home with [Evans], and [Turner] said yes." When Bishop warned Turner that "if that's what [he's] going to do, use a condom," Turner just smirked and laughed in response.[21]

---

instructions specifically stating that Turner could have used "force, intimidation or deception [to] seize, take, transport, detain or secrete . . . Evans" that the abduction by deception theory was advanced in the trial court. In ruling on Turner's motion to strike, the trial court held that there was sufficient evidence from which a fact finder could conclude that Evans did not "knowingly and willingly [go] with . . . Turner to the parking lot or to his car for the purposes of engaging in a threesome or what has been discussed as group sex with [Turner] and . . . Brown; but we certainly know from the evidence in this case that that was the defendant's intent. . . . It's clear from all the circumstances in evidence in this case that the defendant had a sexual mode; and, of course, his specific intent to defile or sexually molest . . . can be derived not only from his conduct *but from his statements as well*." (Emphasis added).

[21] Bishop testified as such in Brown's trial. Code § 19.2-327.11(C) permits the Commonwealth's response to a petition for a writ of actual innocence to "contain a proffer of any evidence pertaining to the guilt of the petitioner that is not included in the record of the case, including evidence that was suppressed at trial." Moreover, "[t]he Court of Appeals may inspect the record of any trial or appellate court action, and the Court may, in any case, award a writ of certiorari to the clerk of the respective court below, and have brought before the Court the whole record or any part of any record." Code § 19.2-327.11(D). Here, the Commonwealth requested and the circuit court ordered, without objection from Turner's counsel, that the entire record in Brown's trial be made a part of the record in Turner's petition for a writ of actual innocence. Thus, all of the testimony given in Brown's trial may be considered by this Court when determining whether a writ of actual innocence should issue.

The most telling piece of evidence is Turner's conversation with Fitzgibbons in which Turner stated that he and Brown were going to have a "threesome" with Evans.[22] Within a few seconds of this, Evans approached and Turner introduced her to Fitzgibbons as she stood next to Brown. Before leaving, Fitzgibbons gave them the thumbs up sign, which Turner returned with a smile on his face.[23]

While Turner denies having made this statement, his petition for a writ of actual innocence supports this sequence of events and the fact that there was an exchange with him, Brown, and Fitzgibbons regarding a "threesome." In paragraph forty-seven of his petition, Turner states under oath

> Petitioner was happy with Bishop's response and he went to tell Brown about the arrangements. Petitioner remarked that the plan was if he wasn't back by 2:00 a.m., Bishop should take Brown home. Brown asked Petitioner where he was going with "that chick," and Petitioner explained. Brown was slurring his words and asked Petitioner what the chances were for him to "get it on with her *too*." At that moment, [Fitzgibbons] walked up to them and asked what their plans were for the night. Brown said something to the effect, "I'm going to get a threesome going."

(Emphasis added).

Turner confirms that he talked with Brown after he arranged for Bishop to take Brown home. Based on Turner's own version of events, it is clear that Turner planned to have a sexual encounter with Evans as Brown's response was to inquire about the chances for him to "get[] it on with her *too*." (Emphasis added). The evidence is also clear that the plan was formulated for both Turner and Brown to have sex with Evans as Fitzgibbons was told that they were going to have a "threesome." While Turner tries to attribute the "threesome" comment to Brown, Fitzgibbons was clear that it was a declaration made by Turner. Clearly, Brown and Turner made a plan before either left the club to have sex with Evans.

---

[22] Fitzgibbons testified that he understood "threesome" to mean a sexual encounter involving Turner, Brown, and a woman, in this instance, Evans.

[23] According to the evidence in the record, Turner arranged a ride for Brown around 1:15 a.m. Sometime later, around 1:30 a.m., Turner and Brown are together and make the threesome comment to Fitzgibbons. Fifteen minutes would have been more than enough time for their plan to have changed.

Turner's intent to have sex with Evans despite that he did not believe Evans would agree is also clear from Evans' character. Evans' friend, Burdette, described Evans as a woman who would not speak to anyone using sexual overtures. Burdette also testified that she believed that Evans would not have been speaking to Turner had he made any sexual invitations to Evans. Evans' other friend, McCammon, similarly believed that Evans had no intent to have a "romantic interlude" that night. As further proof of his intent to defile Evans, Turner confirms these descriptions of Evans. He testified that during the course of the evening, he never discussed sex with her. He also echoed Evans' friends with regard to her character. Specifically, he stated that in the short time he spent with her, Evans was not the kind of woman who would have engaged in a "threesome." Yet, he spoke to two different people about having sex with her, although she and he had not discussed it. Moreover, he unreservedly declared that he was going to have a "threesome" with Evans and Brown, even though he did not believe she would have willingly engaged in a "threesome." From this, a rational trier of fact could conclude that Evans was unaware of Turner's sexual plans for her and would not have willingly engaged in a "threesome," despite that being his intention.

The record also contains evidence of Turner's aggressive nature, especially when things were not going his way. Burdette testified that Turner was "exceptionally rude" to her and McCammon and that he spoke to them in a "horribly belligerent tone[.]" Burdette told the jury that Turner "pulled the [car] door open with surprising force" when he and Evans finally prevailed in devising the plan for Evans to stay with Turner for one additional hour.

Moreover, statements and conduct of an accused after the events that constitute the charged crime also are relevant circumstantial evidence of intent. See Canipe v. Commonwealth, 25 Va. App. 629, 645, 491 S.E.2d 747, 754 (1997). Here, Turner's callous disregard for Evans, displayed after her murder, is consistent with a finding that he intended to defile her before she was murdered. The evidence demonstrates that within minutes of Brown killing Evans, Turner *alone* took the lead in finding an isolated spot to dispose of her body, as both men testified that Brown passed out seconds after he

-28-

killed Evans.  Rather than making known what occurred, Turner drove from Virginia Beach to a secluded area in a Newport News city park where it was unlikely that Evans' body would be found. After finding the appropriate spot, he then woke Brown up to assist him in moving and covering Evans' body.  The day after Turner witnessed Brown end a young woman's life without any provocation, Turner still desired to rent an apartment with Brown.  Additionally, a few days after the police and FBI agents interviewed Turner and Brown at the naval base, Turner and Brown had occasion to peruse the current, local newspaper covering Evans' death.  One of the newspapers contained a composite sketch purportedly of Turner.  Throughout the meal, Turner and Brown repeatedly laughed and joked that the sketch looked nothing like Turner.

Turner's aptitude for being convincing even when being deceptive is also demonstrated by the record.  An FBI agent interviewing Turner found him to be "very calm, very collected" and his answers seemed very forthright while Turner repeatedly lied to police and FBI officials about leaving the club separately from Evans.  Another police officer present for the interview said that Turner "seemed calm, cool.  Had his thoughts about him and talked very straightforward."

Thus, the record provides ample evidence of Turner's art of deception, determination to spend time with Evans, aggressive demeanor toward her friends, and unremorseful reaction after witnessing Brown end Evans' life.  There is also significant, contradictory evidence of Turner's claim that he had no interest in having sexual relations with Evans and his attempts to facilitate such relations.  The evidence further proves that Turner walked Evans to his car on the pretext of waiting for her friends.  He did not disclose to her his stated intention to Fitzgibbons to have a "threesome" with her and Brown. Certainly, the act of engaging in a "threesome" does not, in and of itself, provide evidence of Turner's intent to defile Evans.  However, the evidence in the record when considered as a whole—including Turner's belief that Evans would not be receptive to sexual advances, Turner's claims that he had no interest in having sexual relations with Evans, and his declaration to Fitzgibbons that he intended to

have a "threesome" with Evans—enables a rational trier of fact to infer that Turner intended to have sexual relations with Evans against her will.

As discussed above, the record *in toto* provides more than sufficient evidence from which a rational trier of fact could conclude that Turner deceived Evans into going to his car with the true intent of both he and Brown having a "threesome" with Evans against her will. Moreover, the fact finder could also reasonably find that this was a shared intent as Brown was present when Turner told Fitzgibbons that he and Brown intended to have a "threesome" with Evans. The evidence also demonstrates that when Turner saw Brown approaching, he cautioned Evans not to believe a word Brown said. The evidence further shows that when Brown joined Evans and Turner in Turner's car, Brown asked Evans whether she was a virgin and whether she had ever had sex with a "frogman" immediately before "snapping" and killing her. From all of this evidence, a rational trier of fact *could* conclude that Brown and Turner intended to forcibly have sexual relations with Evans and that Brown killed Evans when she rebuffed his advances. The trier of fact could have found that because of this shared sexual desire, the abduction had not ended prior to Evans' murder.

### III. Conclusion

Based on all of the evidence in the record, it cannot be said that Brown's credible recantation provides this Court with clear and convincing evidence that no rational fact finder could have found that Turner used deception to abduct Evans with the intent to have sexual intercourse with her against her will. Therefore, Turner was properly convicted of abduction with intent to defile and murder. Accordingly, we dismiss his petition for a writ of actual innocence and vacate the August 4, 2009 order issued by a panel of this Court.

---

Petty, J., concurring, with whom Kelsey and Haley, JJ., join.

While I concur that a writ of actual innocence should not issue in this case, my rationale for this conclusion is quite different from that to which the majority subscribes. Therefore, I write separately.

Before we can address the merits of Turner's petition, I believe that we must address the distinct procedural posture of this case. Prior to its decision to grant the writ of actual innocence, the three-judge panel of this Court made two preliminary decisions that were critical to the ultimate outcome. The first was to defer ruling on the Commonwealth's motion to dismiss. The second was to remand the case to the circuit court for a factual finding regarding the credibility of the testimony of Billy Joe Brown. Before this Court sitting *en banc* can address the merits of the petition, we must address whether those two decisions are binding upon the full court. For me, the answer to that question is no. I believe that once this Court granted the Commonwealth's motion for a rehearing *en banc*, it did more than just stay the panel's decision that the writ should issue. I believe our grant of rehearing *en banc* also effectively vacated the other two decisions made by the panel. Thus, I believe that the full Court is bound by neither the panel's decision that further development of the facts by way of a remand is required, nor the panel's order to the circuit court setting out the specific factual findings to be made by that court. For this reason, I believe that Turner's petition for a writ of actual innocence based on non-biological evidence as well as the motion to dismiss filed by the Attorney General are now before this Court, sitting *en banc*, for our *de novo* consideration.

I further conclude that in considering Turner's petition and the supporting affidavit, we are bound by the General Assembly's manifest intent that the writ was to be an extraordinary measure granting extraordinary relief. The General Assembly did not choose to call this the "writ of more likely than not innocent," or even the "writ of probably innocent." It chose the phrase the "writ of actual innocence" because it intended for this writ to issue only when the newly-discovered evidence was of such a compelling nature that no reasonable juror would disagree that the defendant was both factually and legally innocent. Because I believe that the evidence that Turner has offered falls woefully short of the extremely high burden of proof established by the General Assembly, I believe this Court need go no further than to grant the Attorney General's motion and dismiss the petition.

## I. Procedural Posture

At the outset, I note that both the majority and the dissent refer to the "standard of review" to be used in analyzing this case. This is an example of how this Court has conflated our traditional appellate role with our role as the court having original jurisdiction in this case. There is no "standard of review" because we are not reviewing anything. We, the Court of Appeals sitting *en banc*, are charged by statute with assessing the weight to be assigned to the evidence before us and making the initial decision on whether the writ should issue.[24] Neither the majority nor the dissent have addressed this unique procedural posture—how does a multi-panel appellate court, sitting *en banc*, consider a matter of original jurisdiction? I believe that this fundamental procedural Gordian knot must be unraveled before we can begin to consider the merits of the petition.

In doing so, we need to recognize why this case is unique among other cases that come before us. First, the General Assembly vested this Court—not the circuit court—with original jurisdiction over cases involving actual innocence petitions based on non-biological evidence. Code § 19.2-327.10.[25] Original jurisdiction is the "jurisdiction to take cognizance of a case at the outset, to try it, and to decide

---

[24] This is why the majority is incorrect in its assertion that "the issue of whether the referring panel needlessly sent the matter back to the circuit court for factual findings is not an issue on which either party sought review, nor is it an issue granted by this Court for consideration en banc." Supra at 15 n.9. We do not sit to review the decision of either the panel or of the circuit court—we sit to decide the issue before us.

[25] When developing the writ of actual innocence based on non-biological evidence, the General Assembly surveyed the post-conviction relief available to actual innocence claimants in all fifty states, and rejected the approaches of states that vested trial-level courts with original jurisdiction in cases involving claims of actual innocence. See Writ of Actual Innocence Based on Non-Biological Evidence, Rep. of the Va. State Crime Comm'n (2004), App'x 5 (hereinafter Crime Comm'n Rep.). Some states vest their trial courts with this authority by statute, see, e.g., N.Y. C.P.L. § 440.30 (Consol. 2010) (setting forth procedures for motions to vacate judgment or to set aside sentence on the basis of after-discovered evidence, including DNA evidence); Ill. Comp. Stat. § 116.3 (2007) (setting forth a specific procedure for actual innocence claimants to follow in the trial court), while others do so by decision, see, e.g., Summerville v. Warden, 641 A.2d 1356, 1369 (Conn. 1994) ("[A] substantial claim of actual innocence is cognizable by way of a petition for a writ of habeas corpus, even in the absence of proof by the petitioner of an antecedent constitutional violation that affected the result of his criminal trial.").

the issues." Bryan A. Garner, <u>A Dictionary of Modern Legal Usage</u>, 626 (2d ed. 1995). One group of issues we are responsible for deciding are the factual findings that ultimately determine the outcome of the case. These factual findings include both the credibility of the witnesses and the weight of the evidence. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (The trier of fact has "the responsibility . . . fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."). And, the term "[t]he weight of the evidence refers to a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other." <u>Tibbs v. Florida</u>, 457 U.S. 31, 37-38 (1982) (internal quotation marks and citations omitted). To be clear, the General Assembly's grant of original jurisdiction to decide cases involving writs of actual innocence to this Court means that this Court sits as a trial court in these cases.[26] Just like the Supreme Court of Virginia, when exercising its original jurisdiction, this Court "considers the evidence and makes factual determinations *de novo*." <u>Judicial Inquiry & Review Comm'n v. Lewis</u>, 264 Va. 401, 405, 568 S.E.2d 687, 689 (2002). Thus, it is this Court's ultimate responsibility to make both the findings of fact and conclusions of law necessary to determine whether a writ should issue.[27]

---

[26] Indeed, the delineation between original and appellate jurisdiction is one of the most basic—and longstanding—in American jurisprudence. <u>See</u> <u>Marbury v. Madison</u>, 5 U.S. 137, 175-76 (1803) (discussing the difference between original and appellate jurisdiction and noting that "the essential criterion of appellate jurisdiction" is "that it revises and corrects the proceedings in a cause already instituted, and does not create that cause" and that to "issue . . . a writ . . . . seems not to belong to appellate, but to original jurisdiction").

[27] Of course, we recognize that there are situations where an evidentiary hearing will be required to resolve certain issues. For those situations, the General Assembly provided a mechanism in Code § 19.2-327.12 for the taking of additional evidence in the circuit court to enable this Court to ultimately determine the exonerating nature of the proffered evidence. For instance, DNA analysis may conclusively establish that the biological sample did not come from the defendant. However, its exonerating nature may well depend on where the sample was found. Blood found on a victim's body may well be quite probative of innocence; blood found on the street a block away, perhaps not. Similarly, before this Court could evaluate the probative value of an after-discovered video recording apparently showing another individual committing the crime, an evidentiary hearing might be necessary to authenticate the recording. This does not mean, however, that all factual findings, including

-33-

Additionally, when this Court granted the Attorney General's petition for rehearing *en banc*, it vacated the panel opinion in this case. Glenn v. Commonwealth, 49 Va. App. 413, 423 n.3, 642 S.E.2d 282, 287 n.3 (2007) (*en banc*). "The grant of *en banc* review *vacates* the prior panel opinion *in toto*." Id. (emphasis added), cited with approval in Moore v. Commonwealth, 276 Va. 747, 755, 668 S.E.2d 150, 155 (2008). This view of the effect of a grant of a rehearing *en banc* is consistent with that employed by a majority of the United States Courts of Appeals, which employ an *en banc* process similar to that employed by this Court. Compare 28 U.S.C. § 46 (c); Fed. R. App. P. 35 with Code § 17.1-402(D) (setting forth the procedures for *en banc* review in the United States Courts of Appeal and this Court, respectively); see also Hon. George C. Pratt, 20A-355 Moore's Fed. Practice – Civil § 335.11 ("The effect of an order granting *en banc* rehearing on the panel's decision depends on local practice.").

The Fourth Circuit falls within this majority, United States v. Moye, 454 F.3d 390, 394 (4th Cir. 2006) ("Granting of rehearing *en banc* vacates the previous panel judgment and opinion."), along with eight other federal circuits. See, e.g., SEC v. Tambone, 597 F.3d 436, 450 (1st Cir. 2010) (reinstating portions of panel opinion that were vacated upon grant of rehearing); Guilmette v. Howes, Rec. No. 08-2256 (6th Cir. Ct. App. Mar. 12, 2010) (granting rehearing *en banc*, and noting that Local Rule 35(a) of the Sixth Circuit Court of Appeals provides that "[t]he effect of granting a hearing *en banc* shall be to vacate the previous opinion and judgment of this court, to stay the mandate and to restore the case on the docket sheet as a pending appeal"); Wis. Cmty. Servs. v. City of Milwaukee, Rec. No. 04-1966 (7th Cir. Ct. App. Aug. 31, 2005) (granting rehearing *en banc*, vacating the panel's decision and judgment, staying the mandate, and restoring the case to the docket as a pending appeal); Scoop-Gonzalez v. INS, 272 F.3d 1176, 1186 n.8 (9th Cir. 2001) ("The Court's decision to rehear a case *en banc* effectively means that the original three-judge panel never existed. . . . [T]he *en banc* court acts as if it were hearing the case on appeal for the first time."); 5th Cir. R. 41.3 ("Unless otherwise expressly

credibility, need be referred to the circuit court. If the proffered testimony is sufficiently incredible on its face, we are perfectly capable of making that determination.

provided, the granting of a rehearing *en banc* vacates the panel opinion and judgment of the court and stays the mandate."); 11th Cir. R. 35.11 ("Unless otherwise expressly provided, the effect of granting a rehearing *en banc* is to vacate the panel opinion and to stay the mandate."); but see United States v. Cavera, 550 F.3d 180 (2d Cir. N.Y. 2008) (noting that the panel opinion was vacated *after* the *en banc* hearing); 10th Cir. R. 35.6 ("The grant of rehearing *en banc* vacates the judgment, stays the mandate, and restores the case on the docket as a pending appeal. The panel decision is not vacated unless the court so orders.").

Because the decision to rehear a case *en banc* "effectively means that the original three judge panel never existed," Scoop-Gonzalez, 272 F.3d at 1186 n.8, logic dictates that decisions of the panel that were critical to the ultimate outcome of the case are vacated as well. Otherwise, those members of this Court who were not members of the panel would be precluded from exercising their independent judgment regarding the merits of the entire petition. Hence, this Court, sitting *en banc*, is not bound by any of the panel's decisions in this case. All of those decisions were a component of the panel's final order that was nullified by this Court's decision to grant a rehearing in this case. Therefore, as the Court with original jurisdiction, this Court, sitting *en banc*, has both the authority and the duty to decide the issues presented in this case as if the panel proceedings had never occurred.

The majority's reliance on what appears to be an application of the interpanel accord doctrine,[28] see supra at 10, n.4; 15-16 n.9, ignores the fact that this case is before us for consideration by the full court. The majority notes that the panel that determined to certify this case for a credibility finding was separate from the panel that ultimately granted the writ in this case, and to address the first panel's

---

[28] Under Virginia law, a decision of one panel "becomes a predicate for application of the doctrine of *stare decisis*" and cannot be overruled except by the Court of Appeals sitting *en banc* or by the Virginia Supreme Court. Johnson v. Commonwealth, 252 Va. 425, 430, 478 S.E.2d 539, 541 (1996).

decision at this time would be "inappropriate." [29]  While it is true that two separate panels were involved

in this case, it cannot be said that the first panel's decision was final or binding. This was an

interlocutory order reflecting the initial panel's decision to take further evidence, not a disposition of the

case. [30]  Further, even if the initial panel's remand order were a final decision, this Court, sitting *en banc,*

"may overrule any previous decision by any panel or of the full court."  Code 17.1-402(D).  And it

matters not whether the decision to be overruled is from the case on which we granted *en banc* review,

or a previous decision of another panel.  Startin v. Commonwealth, 56 Va. App. 26, 39-40, 690 S.E.2d

310, 316 (2010) (Powell, J.) (finding "a mistake exist[ed] in our prior decisions"  and "exercis[ing] our

authority under Code § 17.1-402(D) [to] overrule [that decision]" (citations and internal quotation marks

omitted)).

Thus, I believe that my colleagues' position that we are now bound by the original panel's

decision to certify this case to the circuit court for a credibility determination, as well as the results of

that credibility determination, is mistaken.  The Commonwealth petitioned this Court to rehear the case.

When we granted that petition, we completely vacated the panel's order.  Upon the grant of rehearing

*en banc*, the panel's decision, and all that went along with it, was nullified, and we must determine this

---

[29] I note that the panel that entered the order sending this matter to the circuit court for specific fact finding consisted of two active members of this Court and one senior judge.  If the majority is correct in its assertion that this decision is binding on the full court, it would mean that all but two of the members of this *en banc* Court would be denied the opportunity to opine on this critical decision.  When the General Assembly granted original jurisdiction to this Court, it is my belief that it intended all the members of the Court, when sitting *en banc,* to participate equally in *all* of the decisions that determine whether this extraordinary writ should issue.

[30] This Court frequently enters preliminary orders during the adjudication of our appellate cases. See, e.g., Woody v. Commonwealth, 53 Va. App. 188, 193, 670 S.E.2d 39, 42 (2008) (explaining that this Court directed the trial court to clarify inconsistencies in its final order prior to our deciding the appeal).  Adopting an approach whereby each of these orders could become the subject of rehearings *en banc* could bog this Court down in an endless cycle of interlocutory rehearings.

-36-

case anew. Accordingly, I conclude that this case is in the same posture before this Court *en banc* as a misdemeanor conviction appealed from a district court to a circuit court—we start over.[31]

## II. Background

In 1996, a jury convicted Dustin Turner of acting in concert with Billy Joe Brown in the abduction with intent to defile and the murder of Jennifer Evans. In an earlier jury trial, Brown had been convicted of the same crimes, as well as one count of attempted rape. This Court affirmed Brown's convictions, Brown v. Commonwealth, 28 Va. App. 315, 504 S.E.2d 399 (1998), and, in an unpublished order, denied Turner's petition for appeal on the issues of sufficiency and admissibility of evidence, Turner v. Commonwealth, Rec. No. 0381-97-1 (Va. Ct. App. Jan. 23, 1998). The Virginia Supreme Court also denied both Turner and Brown's petitions for appeal. Turner v. Commonwealth, Rec. No. 980220 (Va. May 29, 1998); Brown v. Commonwealth, Rec. No. 982174 (Va. Feb. 23, 1999).

Four years later, Brown provided a new version of the events of the crime that was inconsistent with his testimony at his own trial and the sundry other versions of the crime to which he had previously subscribed.[32] At that time, in an interview with Turner's attorney, Brown stated that he acted alone in

---

[31] A *de novo* appeal vacates the decision of the lower court as if it had never occurred and provides for a wholly new trial in the circuit court. See, e.g., Peterson v. Commonwealth, 5 Va. App. 389, 398, 363 S.E.2d 440, 445 (1987) ("An appeal taken in accordance with Code § 16.1-132 is, in effect, a statutory grant of a new trial to the accused. 'It annuls the judgment of the inferior tribunal as completely as if there had been no previous trial.'" (quoting Gaskill v. Commonwealth, 206 Va. 486, 490, 144 S.E.2d 293, 296 (1965))).

[32] The first two times Brown was questioned by law enforcement regarding Jennifer Evans' disappearance, he denied having any knowledge of her. A few days later, Brown and Turner were both taken to the FBI office in Richmond for questioning. At that time, in the space of five hours, Brown told law enforcement officers three different stories regarding Jennifer Evans' death. First, he told FBI agents that he did not have any knowledge of what happened to Jennifer Evans. Second, Brown stated that he and Turner took Jennifer Evans to an area near some beach houses and, when she began to struggle, jointly killed her—Turner choking her while Brown held her arms and legs. Third, Brown told law enforcement that he came out to the car, from the bar, and found that Turner had killed Jennifer Evans when she resisted his sexual advances. Brown's sworn testimony at his own trial essentially tracked his third statement—that Turner acted alone in killing Jennifer Evans—and is inconsistent with his sworn affidavit and his sworn testimony before the circuit court in this action. Brown also explained in his statement to Turner's attorney that Brown originally told his own attorney in 1999 that he acted alone in killing Jennifer Evans. Brown's attorney did not believe him. A few weeks later, Brown

killing Jennifer Evans. This newest version of the facts was consistent with, and apparently based on, Turner's testimony at Turner's trial. At that time, Turner testified that he and Jennifer Evans had been sitting together in the front seat of his car, which was parked in a busy parking lot of a bar. Brown came out of the bar and sat in the back seat behind Evans. According to Turner, Brown became enraged and suddenly reached around the seat and choked Jennifer Evans until she died. Turner testified that he was in shock, had made a futile attempt to pull Brown's arms off of Evans, and, when commanded to by Brown, had driven away. Turner maintained that Evans died almost instantaneously.[33]

The transcript of Brown's 2002 interview was filed by Turner as support for his petition. It begins with Brown explaining that during the days and weeks leading up to the murder, he engaged in heavy alcohol, steroid, and marijuana use. On the actual day of the murder, Brown consumed a large quantity of alcohol as well. Because of Brown's self-destructive behavior, he could only remember "bits and pieces" of the events on the night Jennifer Evans died, both because of his impaired memory and because he had blacked out several times that night.

While Brown's new statement is consistent with Turner's testimony at Turner's trial, it is important to note that this "newly discovered testimony" is simply a version of the facts that had been presented to, and rejected by, Turner's jury. In fact, three times in his recorded statement, Brown indicated that portions of his "memories" of that night came from reading Turner's statement. First, Brown could not recall how he came to be in Jennifer Evans' presence:

> I left [the bar] and went to find [Turner]. I saw him in the car, him and
> Jennifer was [sic] sitting in the car. I had gotten in the car and they let me

recanted his story. Finally, as the Attorney General points out, in 2000 through 2001 Brown asserted in his *pro se* habeas corpus pleadings that *Turner* acted alone in killing Jennifer Evans, and that at most, Brown was guilty of being an accessory after the fact to Jennifer Evans' murder.

[33] At Turner's trial, the jury was also presented evidence from the medical examiner who indicated that it typically takes three-to-five minutes of constant pressure on the carotid artery to deprive the brain of sufficient oxygen and blood flow to cause death by manual strangulation. Moreover, the security guard who patrolled the parking lot in which Turner claimed his car was parked at the time of the murder testified at Turner's trial. According to the security guard, he patrolled the parking lot during the relevant time and saw nothing amiss.

in the back seat and I began talking with them and *I read Dustin* [sic] testimony and honestly I don't remember all the bits and pieces, I only remember bits and pieces, I don't remember all the details.

(Emphasis added). Second, when Turner's attorney asked Brown what he, Turner, and Evans discussed while all three of them were in the car, Brown's memory failed him: "Honestly I vaguely remember. I think I was making rude comments to her. What [sic] *I read the report that Dusty had given* and I was making comments to her." (Emphasis added). Finally, when Turner's attorney asked Brown what Turner was doing while Brown was choking the victim—a critical question considering that Turner's conviction was predicated on a concert of action theory— Brown responded, "Honestly, I vaguely remember a little bit *but I read in his [Turner's] report* that he had tried to pull my hand away and I think I do recall, I believe at one point, I believe I recall his hand on my arm." (Emphasis added).

Turner's attorney subsequently had the recorded statement reduced to an affidavit for the purposes of Turner's petition for actual innocence. In the version of the affidavit[34] that was submitted with the petition for actual innocence, Brown described the act of Evans' murder as follows:

---

[34] Brown's affidavit, upon which Turner is basing his petition, is surrounded by inconsistencies. In fact, there are, inexplicably, two versions of the affidavit that are identical except for an altered second page. It is apparent upon examining the altered page that the font size has been changed to ensure that the altered second page ends at the same point as the unaltered second page. The altered version was attached to Turner's petition, and includes the following testimony from Brown:

> We were sitting there talking and next thing you know I reached up and choked Jennifer. I did this on my own without prior discussion with Dustin Turner. He did not encourage me in any way and in fact, I remember one instance while I was choking Jennifer, Dustin trying to pull my hands away. Jennifer became unconscious and I am certain she was dead at that time.

The other affidavit, which had been provided to the Attorney General's office by Turner, stated the following:

> We were sitting there talking and next thing you know I reached up and choked Jennifer. I did this on my own without any prior discussion with Dustin Turner. He did not encourage me in any way and in fact, I remember one instance while I was choking Jennifer, Dustin trying to pull my hands away. Jennifer became unconscious *and I believed that she was dead. I fell back in the seat, and she woke up. I then choked her again*

-39-

I left the bar and went to find Dusty. I saw him in the parking lot. He and Jennifer were sitting in the car. I had gotten in the car and they let me in the back seat and I began talking with them. I was being vulgar and I vaguely recall [sic]. We were sitting there talking and next thing you know I reached up and choked Jennifer. I did this on my own without any prior discussion with Dustin Turner. He did not encourage me in any way and in fact, I remember one instance while I was choking Jennifer, Dustin trying to pull my hands away. Jennifer became unconscious and I am certain she was dead at that time. We were still in the parking lot. I do not know why I did it.

Turner, relying on the affidavit, then filed a petition for a writ of actual innocence in this Court pursuant to Code §§ 19.2-327.10 through 19.2-327.13. The Attorney General filed a motion to dismiss, arguing that Brown's inherently incredible statement could not meet the burden of proof imposed on Turner by Code § 19.2-327.13. Upon consideration of the pleadings and the record, a panel of this Court, without acting on the Commonwealth's motion to dismiss, certified this case to the circuit court, pursuant to Code § 19.2-327.12,[35] with instructions to assess Brown's credibility. Because the circuit court found Brown's statement credible,[36] the panel granted Turner's petition. Turner v. Commonwealth, 54 Va. App. 458, 491-92, 680 S.E.2d 312, 329 (2009).

---

*until blood came out of her nose and am certain that she was dead at that time.*

[35] Code § 19.2-237.12 states, in pertinent part:

If the Court of Appeals determines . . . that a resolution of the case requires further development of the facts, the court may order the circuit court in which the order of conviction was originally entered to conduct a hearing . . . to certify findings of fact with respect to such issues as the Court of Appeals shall direct.

[36] I note that other members of the Court believe that these factual findings are conclusively binding on this Court. Although my view of the procedural posture of this case means that these factual findings are now irrelevant to the case before us, I do take issue with this view of the circuit court's factual findings. The Supreme Court discussed the standard of review for factual findings made pursuant to Code § 19.2-327.12 in Carpitcher:

This is the first occasion we have had to state the standard of review we will apply in this Court to an appeal of a final judgment of the Court of Appeals disposing of a petition for a writ of actual innocence based on non-biological evidence. The judgment before us in this appeal is based

Upon the Commonwealth's petition for rehearing, this Court granted an *en banc* hearing to consider Turner's petition. As discussed above, because this Court has original jurisdiction in cases involving writs of actual innocence based on non-biological evidence, it is our responsibility to determine both the scope of the evidence before us and the merits of Turner's petition. Code § 19.2-327.10. Finally, this Court sitting *en banc* must now "consider and decide the case" and in doing so we "may overrule any previous decision of any panel or of the full court." Code § 17.1-402(D).

> partly on factual findings certified by the circuit court in response to the Court of Appeals' order referring certain factual issues to the circuit court pursuant to Code § 19.2-327.12. Such factual findings are similar to circuit court findings made under Code § 8.01-654(C) in habeas corpus cases in which we have original jurisdiction and have referred factual issues to the circuit court for an evidentiary hearing. Therefore, we will apply to the factual findings contained in the record of the Court of Appeals a standard of review similar to the standard we apply to factual findings entered in our original jurisdiction habeas corpus proceedings. We will be bound by the factual findings in the present record *as approved by the Court of Appeals*, unless they are plainly wrong or without evidence to support them.

Carpitcher v. Commonwealth, 273 Va. 335, 342-43, 641 S.E.2d 486, 490 (2007) (emphasis added) (citing Yarbrough v. Warden, 269 Va. 184, 195, 609 S.E.2d 30, 36 (2005); Lovitt v. Warden, 266 Va. 216, 229, 585 S.E.2d 801, 808 (2003); Hendrick v. Warden, 264 Va. 486, 496, 570 S.E.2d 840, 846 (2002)).

A careful examination of this language from Carpitcher reveals two things. First, the Virginia Supreme Court was stating the standard of review *it* would apply in its appellate function of reviewing this Court's dismissal of an actual innocence petition. Second, the circuit court's factual findings pursuant to Code § 19.2-327.12 are only binding if they are approved by the Court of Appeals.

Our Supreme Court's use of the word "approved" is consistent with this Court's role as the ultimate finder of fact in cases involving the writ. We are not required to rubber-stamp the circuit court's credibility determination made pursuant to Code § 19.2-327.12. Instead, we must independently review the record, and make the necessary factual findings ourselves. See, e.g., Hudson v. Clark, 200 Va. 325, 329, 106 S.E.2d 133, 136 (1958) (A chancellor retains his authority to reject the findings of a commissioner in chancery if they are plainly wrong or at odds with the weight of the evidence); Higgins v. Higgins, 205 Va. 324, 328-29, 136 S.E.2d 793, 796 (1964) ("When a cause is referred to a commissioner in chancery the chancellor does not delegate his judicial function to him. . . . It is the duty of the chancellor to weigh the evidence according to correct principles of law and arrive at his own conclusions."). See also Judicial Inquiry & Review Comm'n v. Peatross, 269 Va. 428, 444, 611 S.E.2d 392, 400 (2005) (In exercising its original jurisdiction, our Supreme Court "independently review[s] the record created by the Commission [to] determine whether there is clear and convincing evidence of [an ethical] violation . . . ." ).

## III. Discussion

I believe that the record before us is sufficient to decide the case and no further development of the facts is necessary. Upon consideration of that record, I believe we must grant the Attorney General's motion to dismiss Turner's petition. The evidence upon which Turner exclusively relies—Brown's affidavit and statement—simply does not meet the high burden of proof set forth in Codes §§ 19.2-327.11 and 19.2-327.13. Brown's highly impeachable and dubious statement does not, and never could, prove that Turner is factually and legally innocent of the crime for which the jury convicted him. Hence, as the subsequent discussion shows, there is no reason for this Court to remand the case to the circuit court for an evidentiary hearing. This Court is perfectly capable of evaluating the petition and supporting affidavit in light of the statutory burden of proof. Simply put, Turner's proffered after-discovered evidence simply is not of the requisite conclusive nature to warrant granting the writ of actual innocence.

"Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears . . . ." Herrera v. Collins, 506 U.S. 390, 399-400 (1993). Accordingly, "in the eyes of the law, petitioner does not come before the Court as one who is 'innocent,' but, on the contrary, as one who has been convicted by due process of law of [a] brutal murder[]." Id. In order to overcome the fact that he is, as a matter of law, guilty of Jennifer Evans' murder, Dustin Turner must meet quite possibly the heaviest burden the law imposes. According to Code § 19.2-327.11, a petitioner must produce evidence that is not only material to the issue of actual innocence, but is also the kind of evidence that "when considered with all of the evidence in the current record . . . *prove[s]* that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Code § 19.2-327.11(A)(vii) (emphasis added).

This Court is required to apply Code § 19.2-327.11(A)(vii) in a manner that is "harmonious with its legislative purpose and [to] avoid any construction defeating that purpose." Carpitcher v. Commonwealth, 273 Va. 335, 345, 641 S.E.2d 486, 492 (2007). To that end, we must "consider the words the legislature has employed, the subject matter of the statutes governing writs of actual

-42-

innocence based on non-biological evidence, the statutes' apparent object, and the legislative purpose in enacting the statutes[.]" Id. (citing Esteban v. Commonwealth, 266 Va. 605, 609, 587 S.E.2d 523, 526 (2003); Commonwealth v. Bruhn, 264 Va. 597, 602, 570 S.E.2d 866, 869 (2002); Lucy v. County of Albemarle, 258 Va. 118, 129-30, 516 S.E.2d 480, 485 (1999); Mapp v. Holland, 138 Va. 519, 527-28, 122 S.E. 430, 432-33 (1924)). The history of both the biological and non-biological writs of actual innocence is instructive as to the General Assembly's purpose in enacting them. Hence, a discussion of that history can guide this Court in applying the law in accordance with the General Assembly's intent.

A. Statutory History

1. Development of the Writ

Approximately a decade ago, scientific advances and Virginia's twenty-one-day rule collided. At that time, an individual who had been convicted of a crime could only challenge his conviction on the basis of after-discovered evidence within twenty-one days of the trial court's entry of final judgment—regardless of whether the evidence completely exonerated him. See Rule 1:1. Advances in the preservation, extraction, and analysis of human biological evidence, commonly referred to as DNA evidence, highlighted a flaw in the application of the twenty-one-day rule. Using DNA evidence, several convicts, including one on death row,[37] were able to conclusively prove that they did not commit the crimes for which they had been convicted. In each of these cases, the proof of innocence often was only obtained well after the twenty-one-day period had run. See, e.g., William J. Dinkin and Cullen D. Seltzer, Criminal Law and Procedure, 35 U. Rich L. Rev. 537, 561-64 (2001); Marjorie A. Shields, DNA Evidence as Newly Discovered Evidence Which Will Warrant Grant of New Trial or Other Postconviction Relief in Criminal Cases, 125 A.L.R. 5th 497 (collecting cases, statutes, and court rules). Virginia was thus placed

---

[37] On October 2, 2000, Former Governor James S. Gilmore, III pardoned Earl Washington, a death-row inmate who had been convicted of rape and capital murder. Governor Gilmore pardoned Washington on the basis of after-discovered DNA evidence because "a jury afforded the benefit of the DNA evidence and analysis available today would have reached a different verdict regarding the guilt of Earl Washington, based on reasonable doubt." Rep. to the Gen. Assemb., "List of Pardons, Reprieves, and Other Forms of Clemency," Sen. Doc. No. 2 (2001).

in the indefensible position of prohibiting an individual who was demonstrably and factually innocent of a crime from seeking judicial relief from his incarceration.

In response to that situation, our General Assembly created an exceedingly narrow exception to Virginia's twenty-one-day rule:  the writ of actual innocence based on after-discovered biological evidence (biological evidence writ).  2001 Va. Acts ch. 873, 874; see also 35 U. Rich L. Rev. at 562 (discussing the passage of the writ of actual innocence based on after-discovered biological evidence); Crime Comm'n Rep. at 5 (discussing the twenty-one-day rule).[38]

Following the enactment of the biological evidence writ, members of the General Assembly recognized that there could be other conclusive, exonerating evidence besides DNA evidence, and proposed the creation of a writ of actual innocence based on non-biological evidence.  Crime Comm'n Rep. at 7, 12.  According to the Crime Commission's Report, the proposed legislation was designed to "use[] *the same high level of proof* that must be met in order to obtain relief" under the biological evidence writ.  Id. at 16 (emphasis added).  The Commission's proposed legislation, which eventually became the writ for actual innocence based on non-biological innocence, Code §§ 19.2-327.10 through 19.2-327.13, closely tracked the language of the biological evidence writ and, just like the biological evidence writ, reflected Virginia courts' long-held suspicion of after-discovered evidence.  Crime Comm'n Rep. at 13.  Because the General Assembly relied "on Virginia's traditional treatment of

---

[38] According to Code § 30-156(A), The Virginia State Crime Commission is a part of the legislative branch of the Commonwealth of Virginia.

> The purpose of the Commission shall be to study, report and make recommendations on all areas of public safety and protection . . . . The Commission shall make such recommendations as it deems appropriate with respect to the foregoing matters, and shall coordinate the proposals and recommendations of all commissions and agencies as to legislation affecting crimes, crime control and criminal procedure.

Thus, the Crime Commission's report on the need for a non-biological evidence writ of actual innocence is a vital resource in ascertaining the General Assembly's purpose in enacting the statutes we seek to apply in this case.

after-discovered evidence," Id. at 7 & 7 n.13, the writs reflect the deference with which Virginia has always viewed the final judgment of a trial court, Carpitcher v. Commonwealth, 47 Va. App. 513, 526, 624 S.E.2d 700, 706 (2006) ("A verdict resulting from a trial, during which the evidence has been tested by the adversarial process, is presumed to be correct, and, thus, a heavy burden is placed upon those seeking to overturn it.").

## 2. After-Discovered Evidence Standard

As part of that deference for the finality of judgment, Virginia law views motions for a new trial based on after-discovered evidence with disfavor. They "are considered with special care and caution, and are awarded with great reluctance." Commonwealth v. Tweed, 264 Va. 524, 528, 570 S.E.2d 797, 800 (2002). This is so because the law "give[s] every litigant one, and only one, opportunity of presenting his case to the jury or before the court, and when this has been had, the results of the trial will not usually be disturbed . . . ." Pauley v. Commonwealth, 151 Va. 510, 518, 144 S.E. 361, 363 (1928). It is well settled in Virginia law that a new trial will be granted on the grounds of after-discovered evidence only if the moving party can prove that: 1) the evidence was discovered since the trial; 2) the evidence could not, by the exercise of reasonable diligence, have been discovered before the trial terminated; 3) the evidence is material and such as ought to produce a different result on the next trial; and 4) the evidence is not merely cumulative, corroborative, or collateral. See, e.g., Avent v. Commonwealth, 279 Va. 175, 206, 688 S.E.2d 244, 261 (2010).

However, in recognition that the relief sought by actual innocence petitioners is complete exoneration and release from prison—instead of a new trial—the burden of proof an actual innocence petitioner must meet with his after-discovered evidence is much higher. Criminal defendants seeking a new trial need only show that the after-discovered evidence would *likely* lead to a different result upon retrial. In sharp contrast, actual innocence petitioners must produce clear and convincing evidence that proves that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt" in light of the newly-discovered evidence, taken together with the rest of the evidence in the case. Code

-45-

§§ 19.2-327.3(A)(vii); 19.2-327.11(A)(vii). In other words, the new evidence must conclusively show that the petitioner's guilt is a factual impossibility.

The General Assembly, as reflected in the language of the statute and the purpose of the legislation, intended that an actual innocence petitioner—regardless of whether he proceeds under the biological evidence writ or the non-biological evidence writ—meet a burden of showing not merely evidence that *could* call his conviction into question, but evidence that actually exonerates him of the crime for which he was convicted.[39] Indeed, our Supreme Court has specifically recognized this high burden:

> By enacting these provisions, the General Assembly intended to provide relief only to those individuals who can establish that they did not, *as a matter of fact*, commit the crimes for which they were convicted. . . . [The writ was] not intended to provide relief to individuals who merely produce evidence contrary to the evidence presented at their criminal trial.

Carpitcher, 273 Va. at 345, 641 S.E.2d at 492 (emphasis added).

Because the General Assembly adopted the same requirements for the non-biological writ as it did for the biological evidence writ, the General Assembly clearly demonstrated its intent to limit the application of the writ to newly-discovered evidence of the same conclusive nature as DNA evidence. Thus, the writ at issue in this case establishes, and was intended by the General Assembly to establish, an extraordinarily high burden. Although there is no restriction on the type of evidence upon which a petitioner may rely in his attempt to prove his actual innocence, see Code § 19.2-327.11; Crime Comm'n Rpt. at 16, only "a truly persuasive demonstration of actual innocence made after trial" will provide "the necessarily . . . extraordinarily high" "threshold showing" required to demonstrate actual innocence. Herrera, 506 U.S. at 417-18 (O'Connor, J., concurring) (discussing the assumed due process right a prisoner would have to challenge a capital sentence with after-discovered evidence of

---

[39] The General Assembly surveyed the available post-conviction relief under the laws of all fifty states when developing the non-biological evidence writ. See Crime Comm'n Rpt. at App'x. 3 & 4. Thus, the General Assembly considered and rejected approaches favored by other states, including awarding a retrial, using state habeas review as a vehicle for actual innocence claims, or applying a lesser standard of proof that would merely call the petitioner's conviction into question, rather than require the petitioner to demonstrate his factual innocence.

-46-

actual innocence). A truly persuasive demonstration of actual innocence, then, will prove to be a difficult task, because evidence that will meet the high standard required by Code § 19.2-311(A)(vii) is of necessity limited.

## B. Burden of Proof

Unless the petitioner proffers after-discovered evidence that can prove, by clear and convincing evidence, that "no reasonable trier of fact could have found proof of guilt beyond a reasonable doubt," upon consideration of the new evidence along with the evidence presented at trial, Code § 19.2-327.11(A)(vii), our inquiry should end, and we should dismiss the petition. Code § 19.2-327.13. If the proffered evidence cannot conclusively establish innocence, there is simply no reason to proceed further; factual findings are not "require[d]." Code § 19.2-327.12.

Of course, the General Assembly did not create this Court's function in determining whether the after-discovered evidence can support the petitioner's claim out of whole cloth. Again, this procedure is similar to that employed by a circuit court in deciding whether to grant a motion for a new trial based on after-discovered evidence. "When . . . evidence supporting the new trial motion is contradicted by evidence in opposition to the motion, the circuit court is not permitted to presume that the moving party's evidence is true but is required to weigh all the evidence presented . . . ." Orndorff v. Commonwealth, 271 Va. 486, 505, 628 S.E.2d 344, 354 (2006) (citations omitted). In sorting through that conflicting evidence, "the court's role resembles that of a fact finder in determining whether the evidence is such that it should produce an opposite result on the merits at a new trial." Id.

However, unlike a circuit court's evaluation of after-discovered evidence proffered in support of a motion for a new trial, this Court must evaluate the probative value of uncorroborated, after-discovered witness testimony in an actual innocence proceeding through the prism of the incredibly high burden of proof set by the General Assembly. Effectively, we must ask ourselves whether this new testimony would produce the certainty of opinion in the minds of jurors that the

statute demands. This type of witness testimony is problematic because it is, by its very nature, uncertain.

When a witness testifies to a fact, he is testifying not to what that fact actually is, but rather his belief in or perception of that fact. See Judicial Inquiry & Review Comm'n v. Peatross, 269 Va. 428, 445-46, 611 S.E.2d 392, 401 (2005) (determining that evidence of credibility was in equipoise when three witnesses gave conflicting evidence based on each witness' "honest[] . . . recollection of the events . . . ."). The witness could be telling the truth as he understands it, but he could be mistaken due to poor eyesight or poor memory. Or, the witness can appear entirely credible, but actually be lying. Either way, testimony can be credible—that is, believable—without being factually dispositive of the issue of innocence. That is why our criminal justice system allows twelve jurors, as triers of fact, to individually assess and weigh testimony and assign it such credence as each individual juror determines appropriate. Jurors are instructed that they may "accept or disregard all or part of the testimony of a witness as [they] think proper" and that they may "determine which witnesses are more believable and weigh their testimony accordingly." 1-2 Virginia Model Jury Instructions, Criminal Instruction No. 2.500 (2009). Hung juries are proof positive that there are times when reasonable jurors do not agree on whether to believe a witness' testimony. [40]

---

[40] The majority contends that our jurisprudence "equate[s] credibility with truth." Supra at 14 n.7. The majority relies on Johnson v. Commonwealth, 273 Va. 315, 323-24, 641 S.E.2d 480, 484-85 (2007), and Molina v. Commonwealth, 272 Va. 666, 671, 636, S.E.2d 470, 473 (2006) for this statement. In Johnson, as discussed infra, the ultimate issue upon which Johnson's "actual innocence" hung was whether a key trial witness had lied at trial, or had lied in his subsequent recantation. Were the witness telling the truth when he recanted his trial testimony, then there would be no evidence linking Johnson with the crime of which he was convicted. Hence, in that context, it was appropriate—if confusing— to use the terms "truth" and "credibility" interchangeably. And while the term "credible evidence" means "[e]vidence that is worthy of belief; trustworthy evidence," Black's Law Dictionary 637 (9th ed. 2004), it does not logically follow that all of the "believable" evidence is of necessity true. If that were the case, the English language would not require two different words for the concepts of "credibility" and "truth."

Molina stands for the proposition that we must, on appellate review, "'regard as *true* all the *credible* evidence favorable to [the party who prevailed below.]'" 272 Va. at 671, 636 S.E.2d at 473 (quoting Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphases added)). This principle is inapplicable in this case for two reasons. First, as explained above, this case does not involve an appellate review. The Court of Appeals is the court of original jurisdiction for cases involving the writ of actual

-48-

That is not to say that a newly-discovered witness' testimony can *never* be conclusive enough to survive a motion to dismiss the petition. However, to reach that point, the after-discovered testimonial evidence must "undermine[] the prosecution's entire case." In re Clark, 855 P.2d 729, 734 (Cal. 1993). "It is not sufficient that the evidence might have weakened the prosecution case or presented a more difficult question for the judge or jury." Id. at 739. Nor is it sufficient that the new evidence, when combined with other evidence favorable toward the petitioner, put the evidence as to the petitioner's guilt or innocence in equipoise. See Peatross, 269 Va. at 446, 611 S.E.2d at 402 (holding that evidence which is in equipoise cannot satisfy the clear and convincing burden of proof). Instead, only evidence that "casts fundamental doubt on the accuracy and reliability of the proceedings . . . [and] undermine[s] the entire prosecution case and point[s] unerringly to innocence[,]" In re Clark, 855 P.2d at 739, needs to be further examined for credibility.

That is exactly the situation that was before the Supreme Court in both Carpitcher and Johnson v. Commonwealth, 273 Va. 315, 641 S.E.2d 480 (2007). In both of those cases, the after-discovered testimony consisted of the recantation of testimony presented at trial and without which the petitioner could not have been convicted. If the recantation were true, there would have been no evidence that the petitioner committed the crime for which he was convicted. Or, put another way, if the only evidence supporting the convictions proved to be false, no reasonable juror could have convicted the petitioners in those cases.

---

innocence based on non-biological evidence. Second, the prevailing party in this case was the Commonwealth—Turner comes to us as a person convicted of a brutal murder by a jury of his peers. We owe Turner's proffered evidence not one bit of deference.

In fact, credibility often has nothing to do with the truth. Credible simply means "believable." Bryan A. Garner, A Dictionary of Modern Legal Usage, 235 (2d ed. 1995). As we now know, innocent individuals have been convicted based on entirely credible, but wrong, testimony. In 1982, Arthur Lee Whitfield was convicted of two rapes based on the highly credible testimony of the two victims, both of whom positively identified Whitfield as their attacker. In 2004, DNA evidence exonerated Whitfield of both crimes and identified a convicted rapist as the actual assailant. Whitfield was subsequently pardoned by the governor in 2009. See Rep. to the Gen. Assemb., "List of Pardons, Reprieves, and Other Forms of Clemency," Sen. Doc. No. 2 (2010); see also In re: Arthur Lee Whitfield, Rec. Nos. 042086 & 042087 (Va. Oct. 21, 2005).

-49-

In Carpitcher, the complaining witness recanted her trial testimony that Carpitcher sexually abused her. 273 Va. at 340, 641 S.E.2d at 489. The complaining witness was "the Commonwealth's only witness during the trial, and, thus, *the jury predicated Carpitcher's convictions solely upon her testimony*." Carpitcher, 47 Va. App. at 517-18, 624 S.E.2d at 702 (2006) (emphasis added). Thus, because the *only* evidence supporting Carpitcher's conviction would have been eliminated had the recantation testimony been true, no reasonable juror could have convicted Carpitcher. Carpitcher, 273 Va. 345-46, 641 S.E.2d at 492-93.

There, the Supreme Court affirmed this Court's determination to certify two specific questions to the circuit court: first, "[w]hether the victim in this case has recanted the testimony she gave at trial in any material way with regard to the culpability of the petitioner;" and second, "if such material recantation of her trial testimony has taken place, whether or not such recantation is the product of duress, undue influence or inappropriate pressure from others." Id. at 341, 346, 641 S.E.2d at 489, 493. The Supreme Court also affirmed this Court's subsequent decision to dismiss the petition upon the circuit court's finding that the victim was no longer a credible witness because "she had testified inconsistently about the same issues on three separate occasions" and had been subjected to threats and intimidation designed to elicit her recantation. Id. at 341, 348-49, 641 S.E.2d at 489-90, 494.

The Supreme Court came to a similar conclusion in Johnson. There, the petitioner was convicted of capital murder and conspiracy to commit capital murder for hire. 273 Va. at 318, 641 S.E.2d at 482. One of Johnson's co-conspirators, Smith, testified at Johnson's trial and established that "Johnson asked Smith to kill [the victim] or find someone to kill her. According to Smith, Johnson stated that he would 'give his next paycheck' to any person willing to kill [the victim]." Id. at 319, 641 S.E.2d at 482. Smith's testimony provided the critical link between Johnson and the crime for which Johnson was convicted. Several weeks after the trial, however, Smith recanted his trial testimony, and Johnson relied upon that recantation in pursuit of a writ of actual innocence. Id. at 319-20, 641 S.E.2d at 482-83. This Court certified the question of Smith's credibility to the circuit court. Id. at 320, 641 S.E.2d at 483. After the circuit court found that

Smith's testimony was "neither logical or believable," this Court dismissed the petition, and our Supreme Court affirmed. Id.

This case is distinguishable from Carpitcher and Johnson in that Brown's most recent statement in no way undermines the Commonwealth's entire case at trial. First and foremost, Brown did not testify at Turner's trial—thus, his new statement, unlike the recantations in Carpitcher and Johnson—did not reduce the quantum of evidence presented at trial and with which the Commonwealth met its burden.[41] Second, in a related point, the Commonwealth did not rely on Brown to make the critical link between Turner and the crime. Instead, the Commonwealth relied upon extensive direct and circumstantial evidence[42] to carry its burden of proving that Turner participated in the murder and abduction of Jennifer Evans. Finally, Brown's proffered testimony is simply a repetition of the testimony Turner gave at trial—testimony that was specifically rejected by the jury that heard the case.

## C. Evaluating the Evidence

Thus, in evaluating the petition, this Court should view Brown's affidavit along with the other evidence in the record to determine whether Turner's newly-discovered evidence could possibly be conclusive on the issue of his innocence. Code § 19.2-327.11(A)(vii) ("[W]hen considered with all of the other evidence in the current record [the after-discovered evidence] will prove that no rational trier

---

[41] Both the majority and dissent refer to Brown's affidavit as a "recantation." I reject that characterization. While he may have recanted the statements he gave to the police and his testimony at this own trial, Brown did not testify at Turner's trial and, thus, there was no testimony in this proceeding for him to recant. Unlike Carpitcher and Johnson, Turner was not convicted based solely on testimony that the witness later claimed was false. In the context of the matter before us, Brown's new version of the events of that fatal night should be analyzed the same way trial courts deal with the garden-variety after-discovered alibi witness testimony that prompts motions for new trials on a daily basis.

[42] Although it is axiomatic, it seems worth repeating that "[c]ircumstantial evidence is as acceptable to prove guilt as direct evidence, and in some cases, . . . it is practically the *only* method of proof." Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis in the original) (citing Turner v. Commonwealth, 218 Va. 141, 145-56, 235 S.E.2d 357, 360 (1977); Toler v. Commonwealth, 188 Va. 774, 780, 51 S.E.2d 210, 213 (1949)).

of fact could have found proof of guilt beyond a reasonable doubt."). If the newly-presented evidence is not of such a clear and convincing nature that we can say that no reasonable juror would have voted to convict, he has failed to state a claim and we must dismiss the petition.

To determine whether Turner stated a claim, this Court need only evaluate the evidence he proffered. This Court must then must weigh the proffered after-discovered evidence with the evidence in the trial record and decide whether the after-discovered evidence is so absolute and compelling that no reasonable juror would have voted to convict the accused in light of that evidence. See House v. Bell, 547 U.S. 518, 538 (2006) (discussing claims of actual innocence in the federal habeas corpus context) ("Because [an actual innocence] claim involves evidence the trial jury did not have before it, the inquiry requires the . . . court to assess how reasonable jurors would react to the overall, newly supplemented record.").

Hence, it is our proper function to evaluate the probable effect this evidence would have had on a jury. When properly viewed through the prism of the statute, Brown's statement becomes just another piece of evidence that the jury would have considered. Even though Brown was undeniably an eyewitness to the crime, it is quite foreseeable that a reasonable juror would have considered Brown's statement as what it was—simply one more in a series of conflicting and unreliable tales emanating from the steroid and alcohol impaired memory of a self-confessed murderer. It is quite reasonable to conclude that a hypothetical juror would have chosen to ignore Brown's testimony in its entirety and decide the case on the same evidence considered by the original jury. In fact, finders of fact are explicitly allowed to do just that under our jurisprudence.[43] See Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986) (The finder of fact may accept or

---

[43] The majority suggests that this "mistakenly ignores the fact that the circuit court . . . became the fact finder, i.e., the hypothetical juror" and a "substitute for the original trial jury." Supra at 19 n.12. This statement is irrelevant to my analysis that we can decide this case without resort to further factual findings. However, I do reject the notion that either our jurisprudence or our General Assembly would sanction the idea that a circuit court could substitute its factual findings for those of the jury whose findings both this Court and the Supreme Court have affirmed.

reject a witness' testimony in whole or in part.); see also Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (A fact finder is at liberty to reject the conflicting evidence presented on behalf of the accused.). Furthermore, Brown's many inconsistent prior statements, which would have certainly been used to impeach his testimony, make his statement the very antithesis of the kind of evidence that can support a petition for a writ of actual innocence: that is, rock-solid evidence that has the same unquestionable, conclusive nature as DNA evidence.

## IV. CONCLUSION

It is incumbent upon an actual innocence petitioner to present clear and convincing evidence proving that his guilt is a factual impossibility. The writ was "not intended to provide relief to individuals who merely produce evidence contrary to the evidence presented at their criminal trial." Carpitcher, 273 Va. at 345, 641 S.E.2d at 492. Even assuming that Brown's testimony would have been consistent with his affidavit, that testimony is not, either by its nature or its weight, sufficient to convince me that no reasonable juror would have voted to convict Turner had they heard it. Therefore, in my opinion, Turner has not met the high standard of proof set by the General Assembly in Code § 19.2-327.11(A)(vii). I would grant the Commonwealth's motion and dismiss Turner's petition pursuant to Code § 19.2-327.13.

_____

Elder, J., concurring in part, dissenting in part, and dissenting from the judgment.

I concur in Parts I and II(A) of Judge Powell's opinion. However, I believe applying the proper standard of review,[44] as set out in Part II(A), to the facts in this case compels the granting of the petition

_____

[44] The concurrence accuses the majority and my dissent of "conflat[ing] our traditional appellate role with our role as the court having original jurisdiction in this case" because we refer to the "standard of review." The concurrence reads too much into our use of traditional jurisprudential nomenclature. As the majority clearly explains, the "standard of review" in this case simply refers to the deference we must give to the credibility findings of the circuit court juxtaposed with the totality of the evidence in the record. See supra at 19 n.12. The standard of review sets forth the analytical framework within which we "consider[] . . . the petition, the response by the Commonwealth, previous records of the case . . . and

-53-

for a writ of actual innocence. Thus, for the reasons stated below, I respectfully dissent from the remainder of the opinion.

The foregoing opinions dismissing the petition for a writ provide a lengthy recitation of facts and many paragraphs of heart-wrenching, emotional narrative. There is no denying that this case involves a horrible crime that has had an unimaginable impact on the victim's family. However, that is not what this petition for actual innocence concerns. We are not charged with determining whether Dustin Turner is without moral fault. He is not. We are not charged with determining whether he reacted in a morally or legally proper way when Billy Joe Brown ended Jennifer Evans' life. He did not. Instead, we are charged with applying the existing legal framework to determine if Turner is "actual[ly] innocen[t]" of the murder and abduction for which he was previously convicted. I believe the record before us compels the conclusion that he is.[45]

In the previous panel majority, I discussed at length the detailed legal rationale for the panel's decision—a rationale I continue to follow and explain more fully in the pages below. This case has taken many twists and turns and involves a complex record of conflicting evidence. However, we instruct jurors they are entitled to use their common sense. I suggest the fact that we normally write in

. . . [the] findings certified from the circuit court pursuant to an order issued under this chapter" for the purpose of evaluating Turner's petition for a writ of actual innocence. Code § 19.2-327.13.

[45] As the majority mentions, "[w]e have received correspondence from the Commonwealth alleging that it has discovered evidence that would call into question the credibility of Brown's recantation and tend to support a finding of Turner's guilt." See supra at 22 n.16. The Commonwealth has not provided this information in the form of a sworn statement; these new allegations are wholly unverified and contain multiple levels of hearsay. This Court may not accept the alleged informant's statements at face value without first obtaining the assurance of their credibility via formal fact-finding procedures pursuant to Code § 19.2-327.12, particularly in light of the alleged informant's status as a previously convicted felon awaiting sentencing on four additional felonies. Furthermore, the Commonwealth does not allege "good cause" for extending the 60-day deadline imposed on it to file "any information pertinent to the petitioner's guilt, including proffers of evidence outside the trial court record." Rule 5A:5(b)(7). Given the absence of a request from the Commonwealth to take *any* action relative to these new allegations, this Court has chosen not to refer the matter to the circuit court for a credibility determination. Accordingly, this alleged new information is not a part of the record and has no bearing on my dissent.

great detail—with many citations to legal authority—does not negate the fact that we, too, should apply a commonsense approach. There is no denying that this petition is of a most serious nature. Having said that, and no matter how many novel legal theories we apply to this case, the issue before us is really quite simple.

First, a clear majority of this Court agrees on the proper standard of review, as enunciated in Carpitcher v. Commonwealth, 273 Va. 335, 641 S.E.2d 486 (2007). A panel of this Court referred this matter to the circuit court for fact finding pursuant to Code § 19.2-327.12, and we are bound by that decision. The Supreme Court of Virginia could not have been clearer in setting out the relevant legal principles in Carpitcher and Johnson v. Commonwealth, 273 Va. 315, 322, 641 S.E.2d 480, 484 (2007) (giving "the Court of Appeals *broad discretion* to certify to the circuit court issues of fact that must be resolved before deciding the merits of a petition" (emphasis added)).

Second, the circuit court found that "Brown [was] credible in his assertion that he acted independently in murdering the victim and that Turner had no role in the murder or any restraint of the victim." Because the referring panel determined that Brown's recantation was material to Turner's petition for a writ of actual innocence and, therefore, that referral to the circuit court was required, we must accept the circuit court's findings of fact in that regard unless plainly wrong. See Carpitcher, 273 Va. at 342-43, 641 S.E.2d at 640 (binding this Court "by the factual findings in the present record . . . unless they are plainly wrong or without evidence to support them"). Much is made of the contention that "credibility" and "truth" are not necessarily the same. While this is an accurate assessment of reality, our judicial system has always been based on credibility findings made by the trier of fact. I am aware of no legal concept that allows an appellate court, even one acting on a matter over which it has original jurisdiction, to ignore a credibility finding because it *might* not be "the truth," unless the record meets the higher burden of establishing that credibility finding is plainly wrong. Although the search for real truth is elusive, it is abundantly clear in this case that the trier of fact credited Brown's testimony that he alone restrained and killed the victim with *no* participation from Turner.

-55-

Third, the question then becomes whether any rational fact finder could convict Turner of the victim's murder and abduction when told it had to accept the above finding as credible—that is, that the fact finder was *required* to believe Brown's *most recent testimony*. The answer to that question is obvious: If X says that he did it and that Y did not participate in any way, and the jury believes X, there is no legal way to convict Y. A rational fact finder simply cannot apply *any* interpretation to the remaining circumstantial evidence that will allow it to find Y guilty in light of this direct credible evidence.

Because Brown's credible recantation prevents a finding that Turner participated *directly* in Evans' murder, the majority applies a novel theory of abduction by deception in order to manufacture the intent to defile, a required element a rational fact finder would need to find Turner guilty of felony murder. However, the record is devoid of any evidence that Turner ever engaged or intended to engage in any sexual activity *against the will* of the participant. Turner's mere *desire* to engage in sexual activity with Evans cannot serve as the basis for concluding he would have used force if she did not consent. Applying the theory of abduction by deception in this fashion lends itself to abuse.

Dustin Turner deserves no accolades for his behavior on the terrible night of the victim's death, but based on the circuit court's findings regarding Brown's credibility in the context of the entire record, the evidence proves Turner did not restrain or murder the victim. He has been incarcerated for fourteen years for a crime the fact finder has found he did not commit. The petition should be granted.

TURNER'S PARTICIPATION IN THE CRIMES

My disagreement with the majority stems from its holding that "a rational fact finder could have found that Turner[, acting with intent to defile,] abducted Evans by deception—meaning no finding of force or restraint would have been required—and that the abduction ended with Evans' murder." The majority first errs by not considering, in light of Brown's credible recantation, whether Brown acted alone in killing Evans. While the majority properly recognizes that we must "reject[] all evidence that is in conflict with the circuit court's findings," I believe Brown's recantation has a more far-reaching

-56-

impact on the circumstantial evidence relevant to demonstrating Turner's intent than the majority acknowledges. I would conclude Brown's testimony on referral compels us to reject any evidence that suggests Brown and Turner acted in concert to engage in sexual intercourse with Evans against her will. Second, and central to my dissent, I believe no rational fact finder could find Turner guilty of abduction with intent to defile and felony murder based on the remaining circumstantial evidence contained in the record.

Where two or more parties engage in criminal concert of action, one who participates in the initial felony giving rise to the homicide may be found guilty of murder whether or not he was the one who actually dealt the killing stroke. See Rollston v. Commonwealth, 11 Va. App. 535, 543, 399 S.E.2d 823, 828 (1991) (recognizing the application of concert of action in felony murder cases); see also Wooden v. Commonwealth, 222 Va. 758, 762, 284 S.E.2d 811, 814 (1981); Berkeley v. Commonwealth, 19 Va. App. 279, 286-87, 451 S.E.2d 41, 45 (1994) (holding that the victim's death resulted from her abduction so that the defendant's participation in the continuing transaction provided sufficient evidence to affirm his conviction of first-degree murder). "Concerted action is defined as '[a]ction that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme.'" Rollston, 11 Va. App. at 542, 399 S.E.2d at 827 (quoting Black's Law Dictionary 262 (5th ed. 1979)).

"[W]hen the homicide is within the *res gestae* of the initial felony and is an emanation thereof, it is committed in the perpetration of that felony." King v. Commonwealth, 6 Va. App. 351, 354, 368 S.E.2d 704, 705 (1988). Our courts have interpreted this concept to prohibit application of the felony-murder doctrine where the killing merely coincided with the underlying felony and was not a consequence thereof. [46] See id. at 356, 368 S.E.2d at 707 (citing Commonwealth v. Redline, 137 A.2d

_____

[46] The underlying crime used to support Turner's conviction for felony murder is abduction with intent to defile. "Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such

-57-

472, 476 (Pa. 1958)); see also Griffin v. Commonwealth, 33 Va. App. 413, 425, 533 S.E.2d 653, 659 (2000) (requiring evidence that the killing "resulted from an act which was an *integral* part of the felony or an act in *direct* furtherance of or *necessitated* by the felony" (emphases added)).

As a result of Turner's petition for a writ of actual innocence, this Court ordered the circuit court to make factual findings on four questions, only one of which related directly to the specific offenses for which Turner had been convicted, murder and abduction with intent to defile: "4) [I]s Brown credible in his assertion that he acted independently in murdering the victim and that Turner had no role in the murder or *any* restraint of the victim?" (Emphasis added). In response to that question, the circuit court determined Brown was "credible in his assertion that he acted independently in murdering the victim and that . . . Turner played no role in the murder *or* in the restraining of the victim." (Emphasis added). By assuming Brown's recantation "has no bearing on what a reasonable fact finder could conclude about Turner's . . . sexual intent," the majority does not view both the question and the answer in the context of the convictions Turner challenges—for murder and abduction with intent to defile.

The circuit court, by referring to the murder and the restraint in the disjunctive, contemplated Brown's recantation in light of both the actual killing and the underlying crime of abduction. "Restrain" means "'[t]o control'" or "'[t]o take away freedom or liberty of.'" United States v. Stokely, 881 F.2d 114, 116 (4th Cir. 1989) (quoting Webster's Second New Riverside University Dictionary (1984)); see also Black's Law Dictionary 1340 (8th ed. 2004) (defining "restraint" as "[c]onfinement," "limitation," or "[p]rohibition of action"). The legislature has provided that abduction as defined in Code § 18.2-47 is synonymous with kidnapping, see Code § 18.2-47(C), which is not separately defined in the Virginia Code. At common law, kidnapping required proof of both "an unlawful restraint" and an asportation. See State v. Dix, 193 S.E.2d 897, 899 (N.C. 1973).

---

other person of his personal liberty . . . shall be guilty of 'abduction.'" Code § 18.2-47. Code § 18.2-48 provides an enhanced penalty "for the abduction of any person with intent to defile such person."

Relying on <u>Jerman v. Dir. of the Dep't of Corr.</u>, 267 Va. 432, 593 S.E.2d 255 (2004), and <u>Kent v. Commonwealth</u>, 165 Va. 840, 183 S.E.2d 177 (1936), the majority concludes "[t]he accused need not have used any physical force *or restraint* against the victim" in order to uphold a conviction for abduction. (Emphasis added). Although our legislature, like many others, now permits a conviction for abduction upon proof of a detention without any asportation, <u>see, e.g.</u>, <u>Scott v. Commonwealth</u>, 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984), the statutory language provides no indication the legislature has removed the "restraint" requirement. To the contrary, one who "seizes, takes, transports, detains or secretes the person of another," as those terms are used in Code § 18.2-47, "restrains" that person under the accepted legal definition of the term. The Supreme Court has recognized that a conviction for abduction under Code § 18.2-47 requires proof of restraint of the victim either by asportation or detention and that the asportation or detention may be accomplished by force, intimidation, or deception. <u>Jerman</u>, 267 Va. at 439, 593 S.E.2d at 259; <u>see</u> John L. Costello, <u>Virginia Criminal Law and Procedure</u> § 5.1[6] (2009) ("[A]bduction consists of *restraints* on the personal liberty of another." (Emphasis added)). Thus, an asportation by force or deception is a type of restraint[47] and, if the other statutory elements are proved, constitutes abduction in violation of Code § 18.2-47.

Based on the crimes for which Turner was convicted, the wording of the question posed by this Court to the circuit court, and the accepted "assum[ption] that trial judges have knowledge of the Commonwealth's laws and properly apply those laws" absent clear evidence to the contrary, <u>Wilson v.</u>

---

[47] Other states have incorporated such definitions into their statutes. <u>See, e.g.</u>, <u>State v. Wilcox</u>, 758 A.2d 824, 838 (Conn. 2000) (noting that Conn. Gen. Stat. § 53a-91 requires proof of restraint to support a conviction of abduction and defines "'restrain' . . . as 'restricting a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty [either (1)] by moving him from one place to another [asportation], or [(2)] by confining him either in the place where the restriction commences or in a place to which he has been moved [detention], without consent'"); <u>People v. Valero</u>, 521 N.Y.S.2d 527, 528 (N.Y. App. Div. 1987) (holding an abduction is a "serious form of restraint" under New York law); <u>Romero v. State</u>, 34 S.W.3d 323, 325 (Tex. Crim. App. 2000) (noting that under Tex. Pen. Code Ann. § 20.01 abduction requires proof of restraint, which means "to restrict a person's movements without consent, so as to interfere substantially with her liberty, [(1)] by moving her from one place to another [asportation] or [(2)] by confining her [detention]").

Commonwealth, 23 Va. App. 318, 326 477 S.E.2d 7, 10 (1996), I would hold the circuit court's use of the word "restraint" constitutes a finding that Turner did not participate with Brown in an abduction by either force or deception. I would therefore reject the theory that Turner and Brown engaged in any criminal concert of action such that any rational fact finder could believe any causal connection existed between Turner's conduct and Evans' death.

In light of the circuit court's acceptance of Brown's testimony that Turner did not participate in the murder or the abduction leading to the murder, the hypothetical fact finder must necessarily reject any evidence or interpretation thereof that suggests an agreement between Turner and Brown existed to undertake these acts.[48] Specifically, I would reject the majority's conclusion that Fitzgibbons' testimony, heavily relied upon by the majority, implies a formulated plan between Turner and Brown to engage in group sex with Evans against her will. A plain reading of the record compels such a rejection. At approximately 1:15 a.m., Turner made arrangements with Kate Bishop to take Brown home if Turner did not return to the club in time to do so himself. Then, at approximately 1:30 a.m., Turner spoke to Fitzgibbons and indicated that he, Brown, and Evans were going to have a "threesome." The majority posits that "[f]ifteen minutes would have been more than enough time for their plan [to have sex with Evans] to have changed[,]" but it inexplicably ignores the fact that at approximately 1:45 a.m., Bishop approached Brown to take him home. According to Bishop's testimony, Brown refused to accompany her because he did not want to wait for Bishop's friend to arrive and not because he had alternate plans with Turner to engage in sexual intercourse with Evans. It is a stretch of the imagination to believe a rational fact finder could conclude Turner made arrangements to have sex with Evans without Brown, changed the plans to include Brown in the sexual activity, changed his mind again to have Brown ride

---

[48] As the circuit court noted, the evidence establishing Turner's guilt was largely circumstantial. Brown did not testify at Turner's trial and did not provide his false inculpatory testimony to the jury. All of the Commonwealth's eyewitness testimony confirmed that Evans was last seen with Turner on the night of her death, a fact Turner readily concedes. There are, however, no eyewitnesses—besides the two convicted men—who identified the actual killer.

home with Bishop, and finally returned to the original plan of engaging in a threesome, all in the span of thirty minutes. Under the same logic, we cannot interpret Brown's salacious request to "get [] it on with [Evans] too" as evidence of a nefarious agreement between him and Turner. No rational fact finder could infer from this evidence that an agreement between Turner and Brown existed to engage in a threesome with Evans against her will.

In the absence of such an agreement, no rational trier of fact could find the men acted in concert to abduct or kill Evans. Because the two men each acted of their own volition, Turner's conduct and Brown's entry into the vehicle and subsequent killing were not "interdependent objects of a common criminal design." Edmonds v. Commonwealth, 229 Va. 303, 310, 329 S.E.2d 807, 813 (1985). Indeed, Turner's waiting with Evans in his vehicle merely accounted for his "presence at the location of the [murder], and nothing directly related to the commission of the felony that caused the [murder]." King, 6 Va. App. at 358, 368 S.E.2d at 708 (finding no causal connection between flying a plane containing marijuana as part of a drug smuggling operation and the death of a co-felon caused by crashing the plane into a mountain); see Rollston, 11 Va. App. at 542, 399 S.E.2d at 827 ("Mere presence during the commission of a crime is not sufficient to render one criminally liable."). Whatever intentions Turner possessed when he left the club with Evans, the circuit court's findings on referral compel the conclusion that he did not act in concert with Brown to lure her into leaving the club for the purpose of engaging in sexual intercourse against her will. Those findings instead compel the conclusion that Brown acted as an independent and superseding force so that his actions constituted a separate—and completely coincidental—enterprise with no causal connection to Turner's own conduct.

Not only has Brown's recantation severed Turner from the criminal enterprise leading to Evans' murder, but, in light of the circuit court's acceptance of Brown's recantation, I believe a rational trier of fact could not have concluded beyond a reasonable doubt that Turner abducted Evans with intent to defile prior to and separate from Brown's acts of restraint and murder. The majority takes the opposite view that "a rational fact finder could have found that Turner abducted Evans by

deception." It is at this critical juncture where the majority premises its dismissal of Turner's petition for a writ of actual innocence and where the heart of my dissent lies.

Under Code § 18.2-47, abduction requires proof of an asportation or detention. See Scott, 228 Va. at 526, 323 S.E.2d at 576. The accused need not have used any actual force against the victim in order to sustain a conviction. Kent, 165 Va. at 841-42, 183 S.E. at 177-78. Instead, restraint for purposes of abduction includes a taking away or detention induced by fraud or deception. See Code § 18.2-47; Jerman, 267 Va. at 439, 593 S.E.2d at 259; Kent, 165 Va. at 841-42, 183 S.E. at 177-78; Costello, supra, § 5.1[6]. However, the evidence must show that the accused effected such deception with the specific intent to defile the victim. See Johnson v. Commonwealth (Johnson II), 221 Va. 872, 879, 275 S.E.2d 592, 597 (1981); see also Simms v. Commonwealth, 2 Va. App. 614, 617, 346 S.E.2d 734, 735 (1986) (equating "defile" with "sexually molest"). This intent-to-defile element requires proof of an intent to engage in sexual contact against the will of the claimed victim. See, e.g., Code § 18.2-61 (rape), 18.2-67.1 (forcible sodomy), 18.2-67.3 (aggravated sexual battery), 18.2-67.4 (sexual battery).

"'Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case.'" Hughes v. Commonwealth, 18 Va. App. 510, 519, 446 S.E.2d 451, 457 (1994) (quoting David v. Commonwealth, 2 Va. App. 1, 3, 340 S.E.2d 576, 577 (1986)). The state of mind of an accused may be shown by his conduct and by his statements. Long v. Commonwealth, 8 Va. App. 194, 198, 379 S.E.2d 473, 476 (1989). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided [the evidence as a whole] is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). In its role of judging witness credibility, the fact finder is entitled to disbelieve, in whole or in part, the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt. Speight v. Commonwealth, 4 Va. App. 83, 88, 354 S.E.2d 95, 98 (1987) (*en banc*). The rejection of that testimony, however, does not provide

substantive evidence that the opposite is true. Tarpley v. Commonwealth, 261 Va. 251, 256-57, 542 S.E.2d 761, 764 (2001).

In both Kent and Jerman, the Court determined that the abductions occurred when the defendants told a specific lie that induced or coerced their respective victims into going places they would not otherwise have gone. In this case, by contrast, no rational fact finder could find beyond a reasonable doubt that Turner made any statement or engaged in any act showing an intent to deceive Evans for the purpose of sexually molesting her against her will. Although the evidence does not preclude the *possibility* that Turner had such an intent, reasonable hypotheses of innocence flow from the evidence, thereby precluding any rational trier of fact from finding Turner guilty beyond a reasonable doubt of abduction with intent to defile. To support its conclusion, the majority applies a novel theory of abduction by deception to manufacture the intent to defile that a rational fact finder would require to find Turner guilty of felony murder. In essence, the majority concludes that it is rational to find that any rude individual who desires sex also harbors an intent to defile.[49] The record contains neither legal authority nor factual support for such a conclusion.

In Johnson II, the Supreme Court of Virginia reversed the defendant's conviction of abduction where his acts of restraint were "done in furtherance of his sexual advances and not with the intent to deprive [the victim] of her personal liberty."[50] 221 Va. at 879, 275 S.E.2d at 597. In that case, the

---

[49] The majority further suggests that because the jury at Turner's original trial was "instructed that abduction with the intent to defile could be accomplished by, *inter alia*, deception and could have found that Turner deceived Evans into leaving the bar," and apparently so found, "it cannot be said that *no* rational trier of fact *could* have found Turner guilty beyond a reasonable doubt." In other words, the majority says that a rational trier of fact could have found the petitioner guilty because the original jury did. However, to say that a rational trier of fact could have found the petitioner guilty because the original jury did fails to take into consideration the new evidence found credible on referral and would mandate the dismissal of every petition for a writ of actual innocence.

[50] The defendant in Johnson II was charged with abduction with intent to defile, but the jury convicted him of abduction. 221 Va. at 873, 877, 275 S.E.2d at 593, 595. The Court clarified its ruling by stating that "the evidence did not support a finding that Johnson intended either to defile his victim or to deprive her of her personal liberty." Scott, 228 Va. at 525, 323 S.E.2d at 576 (footnote omitted).

defendant followed the victim into her kitchen after knocking on her door. He grabbed the victim from behind, attempted to kiss her, and rubbed his hips against her buttocks. When the victim's landlady responded to her cries for help, the defendant released the victim and walked rapidly out of the apartment. The Court held that the defendant clearly "entered the apartment with the intention of having sexual intercourse with the [victim] and that the advances he made, however limited and fleeting, were designed to accomplish that purpose. However, his assault was frustrated by her resistance and stopped short of constituting an attempted rape." Id. at 879, 275 S.E.2d at 596-97. On those facts, the evidence did not prove the defendant acted with the separate intent to deprive the victim of her personal liberty with the intent to defile.

Similarly here, the circumstantial evidence "fails 'to form an unbroken chain which links [Turner] to the crime beyond a reasonable doubt,'" Hickson v. Commonwealth, 258 Va. 383, 388, 520 S.E.2d 643, 645 (1999) (quoting Bishop v. Commonwealth, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984)), because a rational trier of fact could find Turner acted with an intent to defile Evans, i.e., to engage in sexual contact against her will, only by "resorting to speculation and surmise," Patterson v. Commonwealth, 215 Va. 698, 699, 213 S.E.2d 752, 753 (1975). Turner's stated purpose for leaving the club with Evans was to wait with her in his vehicle for her friends Andria Burdette and Michelle McCammon to return. Although a rational fact finder could have rejected Turner's testimony regarding his purpose, such a rejection does not support a finding that he acted instead with the requisite criminal intent to abduct Evans with an intent to defile. See Tarpley, 261 Va. at 256-57, 542 S.E.2d at 764. Indeed, even if a rational fact finder could conclude Turner lied to Evans about his purpose in going with her to his car and that he actually hoped to have some form of sexual contact with her, the record contains no indication that Turner acted with the intent to have that sexual contact by force if Evans had refused. The evidence provided by Andria Burdette, Michelle McCammon, and Turner himself indicating that Evans would have refused such advances does not bridge that gap in logic. Moreover, it defies rationality to suggest that displaying poor manners toward an individual's friends and opening a

door with "surprising force" could indicate an intent to defile. In fact, the record contains no evidence that Turner overbore Evans' will at any point during their encounter. Turner did not force Evans to stay behind; she willingly agreed to remain with him at the club and to meet her friends later that night. Turner did not make Evans uncomfortable; to the contrary, she appeared to have enjoyed his company. The evidence of the condition in which Evans' body was found supports a finding that she had been sexually molested because her pants and underwear had been removed and her vest had been pushed up. However, Brown's recantation, credited by the circuit court on referral, accounts for this because he fully admitted to defiling Evans' body after he had killed her. In a similar vein, Turner's callous behavior after Evans' murder goes toward his guilt of being an accessory after the fact, a crime he conceded to have committed.

In sum, the majority makes a fatal leap in logic from Turner's possible desire to engage in sexual intercourse to his alleged intent to defile Evans. In light of Brown's recantation, the evidence proves beyond a reasonable doubt, at most, that when Turner invited Evans to wait with him in his vehicle for her friends, he did so with the hope of persuading her to have consensual sexual contact. The record is devoid of evidence supporting a rational finding that Turner acted with the intent to force Evans into having sex against her will. Brown's recantation negates the inculpatory evidence against Turner to such an extent that no rational trier of fact could have found Turner guilty beyond a reasonable doubt of abduction with intent to defile.

CONCLUSION

For these reasons, I would conclude Turner has met his burden of proving, by clear and convincing evidence, that Brown's recantation is truthful and, consequently, that no rational trier of fact could have found proof beyond a reasonable doubt of abduction with intent to defile and felony murder. Code § 19.2-327.11(A)(vii). For the reasons stated in the panel majority opinion, I would further "accept Turner's concession that he is guilty of being an accessory after the fact." Turner v. Commonwealth, 54 Va. App. 458, 491, 680 S.E.2d 312, 328 (2009). Accordingly, I would grant

Turner's petition for a writ of actual innocence and vacate his convictions for abduction with intent to defile and first-degree murder.  I respectfully dissent.

─────────────────────────

Because the issues addressed herein are of first impression and potential litigants and members of the bar may benefit from the directives herein, we direct the Clerk to publish this order.

The Commonwealth shall recover of the petitioner the costs in this Court.  The Attorney General shall recover of the petitioner his costs expended herein.

Costs due the Commonwealth
 by petitioner in Court of
 Appeals of Virginia:

   Costs of transcripts, briefs, and appendices, pursuant to
    Court's November 6, 2008 and December 16, 2008 orders

Attorney General's costs:

   Attorney's fee            $50.00

A Copy,

Teste:

*original order signed by the Clerk of the
Court of Appeals of Virginia at the direction
of the Court*

Clerk

# VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **25th** *day of* **August, 2009**.

Dustin Allen Turner, Petitioner,

against        Record No. 1836-07-1

Commonwealth of Virginia, Respondent.

Upon a Petition for Rehearing En Banc

Before Chief Judge Felton, Judges Elder, Frank, Kelsey, McClanahan, Haley, Petty, Powell and Alston

On August 18, 2009 came the respondent, by the Attorney General of Virginia, and filed a petition requesting that the Court set aside the judgment rendered herein on August 4, 2009, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof, the petition for rehearing *en banc* is granted with regard to the issue(s) raised therein, the order entered herein on August 4, 2009 is stayed pending the decision of the Court *en banc*, and the petition for writ of actual innocence is reinstated on the docket of this Court.

Notwithstanding the provisions of Rule 5A:35, the following briefing schedule hereby is established:  Petitioner shall file an opening brief upon rehearing *en banc* within 21 days of the date of entry of this order; respondent shall file an answering brief upon rehearing *en banc* within 14 days of the date on which the opening brief is filed; and petitioner may file a reply brief upon rehearing *en banc* within 14 days of the date on which the answering brief is filed.  The petitioner shall attach as an

addendum to the opening brief upon rehearing *en banc* a copy of the order previously rendered by the

Court in this matter.  It is further ordered that the respondent shall file twelve additional copies of the

appendix previously filed in this case.


A Copy,

Teste:

Cynthia L. McCoy, Clerk

By: *original order signed by a deputy clerk of the Court of Appeals of Virginia at the direction of the Court*

Deputy Clerk

# VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **4th** *day of* **August, 2009**.

Dustin Allen Turner,                                    Petitioner,

 against              Record No. 1836-07-1

Commonwealth of Virginia,                          Respondent.

Upon a Petition for a Writ of Actual Innocence

Before Judges Elder, Powell and Senior Judge Coleman

David B. Hargett (Hargett Law, PLC, on brief), for petitioner.

Robert H. Anderson, III, Senior Assistant Attorney General
(Robert F. McDonnell, Attorney General, on brief), for respondent.

Dustin Allen Turner (Turner) petitions this Court for a Writ of Actual Innocence Based Upon Non-biological Evidence pursuant to Chapter 19.3 of Title 19.2 of the Code of Virginia. Turner was convicted of the abduction with intent to defile and murder of Jennifer L. Evans in the Circuit Court of the City of Virginia Beach on September 5, 1996. In a prior proceeding, Billy Joe Brown was convicted of these same crimes, as well as attempted rape. In 2002, Brown gave a taped interview in which he confessed to acting alone in killing Evans. Brown signed an affidavit in 2003 memorializing his statements from the taped interview. Based on Brown's new confession, Turner claims he is innocent of the offenses for which he was convicted.

Upon consideration of Turner's petition, the Attorney General's motion to dismiss, Turner's reply thereto, and the record, this Court remanded the matter to the circuit court to certify findings of fact regarding factual issues in dispute. The circuit court conducted a hearing in this matter and supplied this Court with its certified findings of fact, including its finding that Brown was "credible in his assertion that he acted independently in murdering the victim and that . . . Turner played no role in the

murder or in the restraining of the victim." Applying the mandatory statutory standard to these findings and the non-conflicting evidence adduced at Turner's trial, we conclude no rational trier of fact could have found Turner guilty of murder or abduction with intent to defile. While Turner's conduct creates a suspicion of guilt, the evidence, viewed in the context of Brown's recantation, cannot support findings of guilt beyond a reasonable doubt. We therefore grant petitioner's request for a writ of actual innocence, vacate his convictions for murder and abduction with intent to defile, find him guilty of being an accessory after the fact, and remand the matter to the circuit court with instructions to modify the order of conviction accordingly, pursuant to Code § 19.2-327.13.

## I.

## BACKGROUND

### A.

### FACTS ADDUCED AT TRIAL

On June 18, 1995, while vacationing in Virginia Beach, Evans and two friends, Andria Burdette and Michelle McCammon, drove to a local nightclub called the Bayou. Turner and Brown, Navy SEAL trainees at the time, were also at the Bayou during a break in their training. Evans noticed Turner, whom she had not previously met, and the two struck up a conversation. Throughout the night, Evans alternated between talking with her friends and socializing with Turner. She briefly met Brown, but did not have a sustained conversation with him. From all appearances, Evans and Turner were getting along very well. Throughout the night, Brown drank considerable amounts of alcohol until he was on the verge of losing consciousness.

Around midnight, Burdette wanted to leave, but Evans expressed her desire to stay in order to continue talking with Turner. At 1:00 a.m., Evans agreed to leave with her friends and wrote her telephone number on a napkin that she gave to Turner. Burdette and McCammon went to the restroom before leaving and returned to find Turner sitting in a chair with Evans sitting on the armrest.

-2-

Burdette and McCammon left the club with Turner and Evans trailing behind.  Burdette, McCammon, and Evans entered their vehicle, and Turner leaned against the back door to continue talking to Evans through the open window.  Turner expressed his desire to continue socializing with Evans, and Burdette and McCammon eventually agreed to leave Evans at the club and return at 2:00 a.m. to take her home.  Evans appeared happy with this arrangement and got out of the vehicle to return to the club with Turner.

Kristen Bishop, an ex-girlfriend of Brown, testified that she saw Turner and Brown at the club on June 18.  She briefly socialized with Brown before leaving to go to another club.  When she returned to the Bayou, she noticed Turner talking to Evans and her friends.  At approximately 1:15 a.m., Turner approached Bishop and asked her to give Brown a ride home if he was not back by 2:00 a.m.  Bishop reluctantly agreed.  Between 1:25 and 1:30 a.m., the lights came on, announcing last call.  At approximately 1:35 a.m., Bishop saw Turner and Evans leave the club holding hands.  At approximately 1:45 a.m., Bishop told Brown she would give him a ride home but they had to first wait for Bishop's friend to return.  Brown, who was noticeably intoxicated by this point, did not agree to this arrangement and left the club to find Turner.  Bishop caught up with Brown in the parking lot and agreed to wait to make sure he had found Turner before leaving.  Bishop did not see Brown again after this conversation and left a few minutes later.

Julio Fitzgibbons, a Navy SEAL commander, testified that he first met Turner and Brown at the Bayou on June 18.  He talked briefly with them regarding the SEAL training process.  He next met up with Turner at last call when the lights came on.  He approached Turner to find out what he was doing that night after leaving the bar.  Turner responded "that him and Brown . . . were going to have a threesome."  Brown was standing nearby as Turner made this remark.  Evans approached Turner at this point, and he introduced her to Fitzgibbons.  As Evans and Turner left, Fitzgibbons "gave him a thumbs up for good-bye and left."  Turner responded by giving Fitzgibbons a "thumbs up" and smiling.

Officer K.C. Reilly was assigned to patrol the parking lot and general area surrounding the clubs to detect illegal activity, including underage drinking, fighting, and public urination. At 1:24 a.m., Reilly left his vehicle to inspect the parking lot on foot for suspicious activity, specifically people lingering in their vehicles. Reilly did not make any arrests for illegal activity and signed back into his vehicle at 1:51 a.m. Bruce Moore also testified in his capacity as a contract security officer for the nearby hotel. He conducted a similar patrol of the parking lot and encountered no suspicious activity.

Burdette and McCammon returned to the club at approximately 1:50 a.m., but Evans was not in the parking lot where she had promised to meet them. They searched for several hours but could not find Evans. They filed a missing persons report with the police the next day. Bishop read about Evans' disappearance and contacted the authorities with the information she had regarding seeing Evans with Turner and Brown on the night of her disappearance.

The authorities interviewed Turner and Brown on multiple occasions in the subsequent week. Turner initially denied leaving the club with Evans but eventually agreed to lead the authorities to her body. He told the police that Brown choked Evans to death in his vehicle while they sat in the parking lot of the Bayou. When confronted with Turner's confession, Brown accused Turner of murdering Evans.

Both men were indicted for various crimes related to Evans' death. Brown was tried first in June 1996. He chose to take the stand and testified that he did not want to receive a ride back to the military base from Bishop, so he went outside to look for Turner. According to Brown, Turner leapt out of the vehicle as Brown approached and ordered him to get in. Brown testified, under oath, that Turner stated he had killed Evans in the vehicle and that it was solely Turner's idea to defile and dispose of Evans' body. Brown was subsequently convicted of abduction with intent to defile, attempted rape, and murder.

Turner's trial began in August 1996. Charlotte Lowe, the forensic supervisor who analyzed the crime scene, testified that Evans' body was in an advanced state of decomposition and skeletalization,

such that many of the bones were exposed. Evans' vest had been pulled back around the shoulders and over the chest, and her bra was pushed up, exposing her breasts. Her shorts and underwear had been pulled down so that they were attached to only one leg. Lowe also examined Turner's car for semen, urine, fingerprints, and other physical evidence, but could not find anything of forensic value in the car.

Dr. Leah Bush performed the autopsy on Evans' body and confirmed that the rate of decomposition was significantly accelerated by the heat and outdoor conditions. In her expert opinion, it was impossible to determine the exact cause of death due to the severe skeletalization, but manual strangulation was a possibility. Dr. Bush described the various chokeholds that could lead to death. Specifically, she said the carotid sleeper hold, commonly performed by squeezing the neck, causes death within three to five minutes by restricting blood flow to the brain. She also testified that the bar-arm chokehold—in which the assailant presses a solid object, such as a police baton or a forearm, against the windpipe—could cause death in less than a minute due to the heightened risk of crushing the airway. Dr. Bush further explained that bracing the victim's head against a solid object could assist an assailant in performing the bar-arm chokehold.

Dr. Bush conclusively ruled out a broken neck as a cause of death because the spinal cord did not show signs of fracture. Significant to Dr. Bush's conclusion was that the headrest in the car would have greatly hindered hyperextension of the neck. While she acknowledged that she relied only on x-rays of Evans' neck to form her conclusions, Dr. Bush stated that an extensive autopsy was unnecessary due to the decomposition fully exposing the spinal cord.

Todd Ehrlich testified as to Turner and Brown's reputation for engaging in group sex. Specifically, he recalled seeing the two men socializing with two women on June 16 while stationed at Fort AP Hill, Virginia. According to Ehrlich, Turner alternated between talking to one of the young women and then talking to Brown to give him a "progress report." He could not recall the specifics of the conversation but said it involved Turner and Brown attempting to get the young woman to go home with them. Ehrlich testified that the two women left together without Turner and Brown, and Turner did

not follow them or attempt to restrain them in any way. Ehrlich further recalled a conversation he had with Turner and Brown regarding group sex while stationed in California. Specifically, Ehrlich claimed to have witnessed Turner and Brown engage in group sex with a woman and later heard them brag about the incident. Ehrlich affirmed that there was no indication that the incident of group sex occurred against the woman's will.

Turner testified in his own defense and asserted that he never intended to have sex with Evans. According to Turner, his original plan was to take Evans to the beach to continue talking, but he abandoned that idea because it would have been impossible to do so and still return by 2:00 a.m. to meet Evans' friends. Instead, Turner testified that he and Evans went to his vehicle to wait there for Burdette and McCammon to return.

While waiting, Turner saw Brown approach and told Evans to "pay no attention to this guy. He's drunk. Don't believe a word he says." Brown then entered the vehicle and sat in the back seat directly behind Evans. He began cursing and making belligerent remarks towards Turner and Bishop. Turner testified that he could not remember details, but he recalled that Brown shifted his attention towards Evans and began making crude remarks to her. Out of the corner of his eye, Turner saw Brown touch Evans, and she slapped his hand away. At that moment, Turner saw Brown reach around and make a jerking motion with both arms. From Turner's description, Brown had both arms locked around Evans' neck and was making a squeezing motion. Turner tried to pry Brown's arms from her neck but could not. After a minute, Brown let go and Turner checked Evans' vital signs, but he could not find a pulse. Brown yelled at Turner to drive, and he complied.

As Turner drove away, Brown reached beneath Evans' shorts until Turner yelled at him to stop. Brown then passed out. Turner drove to a secluded area near some woods where he and Brown took Evans' body out of the vehicle. Turner went back to the vehicle to look for a shovel, and when he returned, he found Brown lying on top of Evans' body. Turner pulled Brown off, and Brown said, "It doesn't matter because I couldn't get it – a hard on anyway." They drove off after covering Evans' body

with leaves, ate at a diner, and then returned to the military base. The next day, Turner and Brown woke up and signed a lease to be roommates for the next year.

Responding to Ehrlich's testimony regarding the incident of group sex in California, Turner stated that "it all center[ed] around one incident and bragging about that one incident." He confirmed talking to Fitzgibbons on the night of June 18, but he denied talking about engaging in a threesome with Brown. Turner reiterated that he "did not actively try to sleep with [Evans,]" and that "she wasn't that type of girl at all."

On September 5, 1996, the jury found Turner guilty of abduction with intent to defile, in violation of Code § 18.2-48, and murder, in violation of Code § 18.2-32. The trial court imposed a prison sentence of 82 years. Both this Court and the Virginia Supreme Court denied Turner's petitions for appeal.

## B.

## BROWN'S RECANTATION

On July 2, 2002, Brown, who did not testify at Turner's trial, provided a tape-recorded interview in which he stated he had lied to investigators about Turner's involvement in Evans' death and testified falsely about those events at his own trial. Brown admitted in the interview that he spontaneously choked Evans and then blamed Turner because Turner had betrayed him by telling investigators what happened and where Evans' body was hidden. On February 28, 2003, Brown signed an affidavit that memorialized this interview. Turner then filed in this Court a petition for a writ of actual innocence based upon newly-discovered, non-biological evidence. In his petition, Turner relied upon Brown's 2002 admission and 2003 affidavit in which Brown stated that he alone killed Evans and that Turner played no part in it. Turner averred that other evidence in the record supported Brown's statement absolving Turner. The Commonwealth filed a motion to dismiss Turner's petition, alleging that the petition was without merit because Brown's confession was not credible and because even if it was

-7-

credible, the other evidence against Turner was sufficient to find him guilty either as a principal in the second degree or under the felony-murder doctrine.

Pursuant to Code § 19.2-327.12, this Court ordered the circuit court to conduct an evidentiary hearing and to make factual findings as to four certified questions:

> 1) whether Brown's recanted testimony is credible in his assertion that he testified falsely at his own trial;
>
> 2) if the answer to Question #1 is "yes," did Brown testify falsely as to any material fact;
>
> 3) if the answer to Question #1 is "yes," was Brown's recantation testimony unknown or unavailable to the petitioner or his counsel at the time the conviction became final, or could such recantation testimony, through the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction; and
>
> 4) is Brown credible in his assertion that he acted independently in murdering the victim and that Turner had no role in the murder or any restraint of the victim?[1]

On May 28, 2008, the circuit court conducted an evidentiary hearing. Brown testified that on the night of June 18, he did not want to engage in sexual intercourse and purposefully consumed excessive amounts of alcohol. He recalled briefly talking to Evans and claimed he did not know Turner's intentions concerning Evans aside from his wanting to spend more time with her. Brown confirmed Turner's prior testimony that Bishop was to give Brown a ride home but that he did not want to wait for Bishop's friend to arrive. Brown admitted that, by this point, he was on the verge of passing out due to intoxication. He found Turner's vehicle and climbed into the back seat behind Evans. Brown recalled saying something vulgar, but could not remember specifically what he said. Brown testified that "one minute [he] was normal and the next minute [he] snapped and [he] started choking [Evans,]" by putting his left arm against her neck and holding it with his right arm. He recalled that Evans' head was up against the headrest.

---

[1] This Court posed the fourth question to the circuit court upon motion by Turner.

-8-

Brown confirmed telling Turner to drive. He further admitted to pulling Evans' vest off and then pulling her pants down before passing out. Brown also confirmed he attempted to have sex with Evans' body after he and Turner placed it in the woods.

Brown acknowledged having given conflicting accounts of how the murder occurred. He admitted that he lied to the police and repeated the lie at his own trial. He explained that he fabricated Turner's involvement in the murder because he was angry with Turner for telling the police where Evans' body was located. He stated that at the time, he perceived no difference between telling one lie and telling several lies. In explaining his recent recantation, Brown clarified that his conversion to Christianity was the main reason for his coming forward. Brown stated that so long as he truthfully confessed to what had happened that night, he did not care whether his testimony would help exonerate Turner.

Upon considering the testimony from the evidentiary hearing and the transcripts from the original trials of Turner and Brown, the circuit court found that Brown "is credible in his assertion that he testified falsely at his own trial," that Brown "testified falsely as to a material fact in the case," that "Brown's recantation of his earlier testimony was unknown and unavailable to the petitioner in this proceeding . . . at the time of his conviction and at the time his conviction became final," and that Brown "is credible in his assertion that he acted independently in murdering the victim and that . . . Turner played no role in the murder or in the restraining of the victim."

## II.

## ANALYSIS

## A.

## STANDARD OF REVIEW

Code § 19.2-327.10 confers original jurisdiction upon the Court of Appeals of Virginia to consider a petition for a writ of actual innocence based on newly-discovered, non-biological evidence filed by any individual "convicted of a felony upon a plea of not guilty." See also Carpitcher v.

-9-

Commonwealth, 273 Va. 335, 342, 641 S.E.2d 486, 490 (2007). "The writ shall lie to the court that entered the conviction . . . ." Code § 19.2-327.10.

To obtain a writ of actual innocence, a petitioner must allege, *inter alia*, that the newly-discovered evidence

> (1) "was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction became final in the circuit court," Code § 19.2-327.11(A)(iv);
> (2) " is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction by the court," Code § 19.2-327.11(A)(vi);
> (3) "is material and when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt," Code § 19.2-327.11(A)(vii); and
> (4) "is not merely cumulative, corroborative or collateral," Code § 19.2-327.11(A)(viii).

Carpitcher, 273 Va. at 343-44, 641 S.E.2d at 491. The parties agree that the newly-discovered, non-biological evidence at issue in this case is Brown's confession—given six years after Turner's conviction—that he alone killed Evans. Of the four elements listed above, only the third is at issue in this case: Whether Turner has carried his burden of proving, by clear and convincing evidence, (a) that Brown's new confession is "material" and (b) that, when considering Brown's confession with all the other evidence in the current record, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."[2] Code §§ 19.2-327.11(A)(vii), -327.13.

In analyzing Turner's petition, we must first determine whether Brown's statement is "material." In order to be "material" within the meaning of Code § 19.2-327.11(A)(vii), "evidence

---

[2] This confession qualifies as a recantation because it unequivocally repudiates the version of events implicating Turner that Brown gave both to investigators around the time of his arrest in 1995 and under oath at his own trial in 1996. See Black's Law Dictionary 1295 (8th ed. 2004) (defining the term "recant" as "[t]o withdraw or renounce *prior statements* or testimony formally or publicly" (emphasis added)). It is irrelevant that Brown did not testify at Turner's trial, especially in light of the sworn testimony Brown had just given at his own trial, which clearly demonstrated Brown's intent to incriminate Turner. Brown's recantation testimony was unavailable at the time of Turner's original trial, and the Commonwealth does not contend otherwise.

supporting a petition for a writ of actual innocence based on non-biological evidence must be true."

Carpitcher, 273 Va. at 345, 641 S.E. 2d at 492. If the circuit court cannot determine whether the

original testimony, the recantation testimony, or some other version of events is true, the petitioner has

not met his burden of proving materiality because "the General Assembly intended to provide relief

only to those individuals who can establish that they did not, as a matter of fact, commit the crime for

which they were convicted" and not to those "who merely produce evidence contrary to the evidence

presented at their criminal trial." Id. "Because the Court of Appeals cannot hold its own evidentiary

hearing to assess a witness' credibility, but must ultimately determine whether a recantation is true,

Code § 19.2-327.12 provides a mechanism to assist the Court of Appeals in this task." Johnson v.

Commonwealth, 273 Va. 315, 322, 641 S.E. 2d 480, 484 (2007). Pursuant to that code section,

> If the Court of Appeals determines . . . that a resolution of the case
> *requires* further development of the facts, the court may order the circuit
> court in which the order of conviction was originally entered to conduct a
> hearing . . . to certify findings of fact with respect to such issues as the
> Court of Appeals shall direct.

Code § 19.2-327.12 (emphasis added). "The statute does not place any restrictions on the subject matter

of such referral orders." Johnson, 273 Va. at 322, 641 S.E. 2d at 484.

Before determining whether further factual development is required, this Court should

determine whether the recantation, if believed, will "prove that no rational trier of fact could have found

proof of guilt beyond a reasonable doubt." Code § 19.2-327.11(A)(vii). If, assuming the recantation is

found to be credible by the circuit court, a rational trier of fact could still conclude all the evidence

proves guilt beyond a reasonable doubt, then a referral to the circuit court for determining the credibility

of the recantation is not "*require[d]*" under Code § 19.2-327.12. (Emphasis added). If this Court orders

the circuit court to evaluate the credibility of the recantation, however, the holding in Carpitcher applies,

and the circuit court's determination of the credibility of the recantation testimony is binding in this

Court. Carpitcher, 273 Va. at 342-43, 641 S.E.2d at 490.

-11-

In order to determine the credibility of Brown's statement, we ordered the circuit court in which the order of conviction was originally entered to conduct a hearing on the credibility of Brown's recantation testimony and issue certified findings of fact. See Code § 19.2-327.12; see also Johnson, 273 Va. at 322-23, 641 S.E. 2d at 484 (involving a referral of the recantation of a co-defendant, which the circuit court found was not credible). After conducting an evidentiary hearing, as well as reviewing in detail the evidence that was presented in the prior trials of both Brown and Turner, the circuit court expressly found Brown credible both in his assertion that he testified falsely to a "material" fact at his own trial and in his present statement that "he acted independently in murdering [Evans] and that Turner played no role in the murder or any restraint of the victim."

The Commonwealth asserts that this Court owes no deference to the factual findings of the circuit court. Much like a criminal trial does not incorporate the findings of fact adduced in a preliminary hearing unless specifically agreed to by the parties, the Commonwealth urges this Court to disregard the factual findings adduced in an evidentiary hearing pursuant to Code § 19.2-327.12. This approach is contrary to the statutory standard of review and is unsupported by any controlling or persuasive authority.

In explaining how the "factual findings certified by the circuit court in response to the Court of Appeals' order referring certain factual issues pursuant to Code § 19.2-327.12" should be treated by Virginia's appellate courts, the Supreme Court clarified that "[s]uch factual findings are similar to circuit court findings made under Code § 8.01-654(C) in habeas corpus cases in which [the Supreme Court] ha[s] original jurisdiction and ha[s] referred certain factual issues to the circuit court for an evidentiary hearing." Carpitcher, 273 Va. at 342-43, 641 S.E.2d at 490 (citations omitted). In habeas corpus cases, "[t]he circuit court's factual findings . . . are entitled to deference and are binding upon [the Supreme] Court unless plainly wrong or without evidence to support them." Hedrick v. Warden of the Sussex I State Prison, 264 Va. 486, 496, 570 S.E.2d 840, 847 (2002). We adhere to the familiar principles giving deference to factual findings as enunciated in Carpitcher.

-12-

The Commonwealth's argument that Brown's account defies the medical evidence does not persuade us that the circuit court's findings were plainly wrong because such a view ignores significant portions of the medical expert's testimony. Dr. Bush could not conclusively determine the cause of death and described multiple scenarios that could explain how Evans died. See Code § 19.2-327.11(A)(vii) (directing this Court to "consider[] . . . *all of the other evidence* in the current record" when determining whether a petitioner has met his statutory burden (emphasis added)). Indeed, Brown's version of Evans' death aligns with Dr. Bush's opinion regarding the bar-arm chokehold. It is entirely plausible that Brown used his left forearm to crush Evans' airway, thereby restricting both the oxygen and blood flow to cause a quick death, especially considering that Brown weighed over 200 pounds and was fit to endure the rigorous training regimen of a Navy SEAL.

We also reject the Commonwealth's contention that the circuit court's factual findings were fatally incomplete and conclusory. On referral to the circuit court for factual findings,

> There is no mandatory formula for a circuit court's consideration of the credibility of a particular witness. As the trier of fact, the circuit court is charged with the responsibility of considering various factors, including the witness' demeanor, his opportunity for knowing the things about which he testified, his bias, and any prior inconsistent statements relating to the subject of his present testimony. In addition, the circumstances of a particular case may raise other factors that the circuit court deems relevant in assessing a witness' credibility.

Johnson, 273 Va. at 323, 641 S.E. 2d at 485 (citations omitted).

Here, the circuit court clearly answered, albeit briefly, the four questions ordered from this Court and thus fulfilled its obligations under Code § 19.2-327.12. Having fully considered the record in this case, we cannot say that the circuit court's factual findings are plainly wrong or without evidence to support them and, therefore, we are bound by these findings.

## TURNER'S PARTICIPATION IN THE CRIMES

Next, we must consider whether Brown's credible confession, "when considered with all of the other evidence in the current record, . . . prove[s] that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Code § 19.2-327.11(A)(vii). Turner was convicted of abduction with intent to defile, in violation of Code § 18.2-48, and murder, in violation of Code § 18.2-32, under the felony-murder doctrine. Thus, not only must Brown's recantation negate Turner's participation in killing Evans, but it must also sever the causal connection between his conduct and the underlying crime that gave rise to the murder.

Turner argues that we cannot arbitrarily disregard Brown's recantation and that all other evidence must be viewed in the context of Brown's assuming sole responsibility for the murder. To that end, Turner asserts that the Commonwealth's evidence is merely circumstantial and does not exclude the reasonable hypothesis of innocence that Brown acted independently in murdering Evans and that Turner had no role in the murder or restraint of Evans.

In opposition, the Commonwealth contends that a rational trier of fact could conclude Brown's recantation is unreliable and, thus, Turner has failed to carry his statutory burden.[3] Alternatively, the Commonwealth argues that Brown's recantation cannot be reconciled with the evidence established at Turner's trial. Fitzgibbons' testimony, according to the Commonwealth, demonstrates Turner's intent to engage in group sex with Brown and Evans, which presumably supports the conclusion that the two men acted in concert to abduct Evans with the intent to defile her.

_____

[3] As explained above, this credibility determination is not plainly wrong and has been approved by this Court in its entirety. See supra Part II.A. Thus, the hypothetical "rational trier of fact" posited by Code § 19.2-327.11(A)(vii) may not reassess the credibility of the recantation testimony and must accept this testimony as true. See Commonwealth v. Jackson, 276 Va. 184, 196, 661 S.E.2d 810, 816 (2008); Blount v. Commonwealth, 213 Va. 807, 809, 195 S.E.2d 693, 695 (1973). We must view the whole record within the context of Brown's recantation, already found to be credible by the circuit court, to determine whether Turner has met his statutory burden. See Code § 19.2-327.11(A)(vii). To

A defendant is guilty of first-degree murder under Code § 18.2-32 where the killing occurs "in the commission of, or attempt to commit, arson, rape, forcible sodomy, inanimate or animate sexual penetration, robbery, burglary or abduction." The statute codifies the common law doctrine of felony murder and "elevate[s] to murder a homicide committed during the course of a felony by imputing malice to the killing." King v. Commonwealth, 6 Va. App. 351, 354, 368 S.E.2d 704, 705 (1988).

Where two or more parties engage in criminal concert of action, one who participates in the initial felony giving rise to the homicide may be found guilty of murder whether or not he was the one who actually dealt the killing stroke. See Rollston v. Commonwealth, 11 Va. App. 535, 543, 399 S.E.2d 823, 828 (1991) (recognizing the application of concert of action in felony-murder cases); see also Wooden v. Commonwealth, 222 Va. 758, 762, 284 S.E.2d 811, 814 (1981); Berkeley v. Commonwealth, 19 Va. App. 279, 286-87, 451 S.E.2d 41, 45 (1994) (holding that the victim's death resulted from her abduction so that the defendant's participation in the continuing transaction provided sufficient evidence to affirm his conviction of first-degree murder). "Concerted action is defined as '[a]ction that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme.'" Rollston, 11 Va. App. at 542, 399 S.E.2d at 827 (quoting Black's Law Dictionary 262 (5th ed. 1979)).

"[W]hen the homicide is within the *res gestae* of the initial felony and is an emanation thereof, it is committed in the perpetration of that felony." King, 6 Va. App. at 354, 368 S.E.2d at 705 (1988). Our courts have interpreted this concept to prohibit application of the felony-murder doctrine where the killing merely coincided with the underlying felony and was not a consequence thereof. See id. at 356, 368 S.E.2d at 707 (citing Commonwealth v. Redline, 137 A.2d 472, 476 (Pa. 1958)); see also Griffin v. Commonwealth, 33 Va. App. 413, 425, 533 S.E.2d 653, 659 (2000) (requiring evidence that the killing

---

disregard the circuit court's credibility determination would render the entire evidentiary hearing meaningless.

-15-

"resulted from an act which was an *integral* part of the felony or an act in *direct* furtherance of or *necessitated* by the felony" (emphasis added)).

The underlying crime used to support Turner's conviction for felony murder is abduction with intent to defile. "Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such other person of his personal liberty . . . shall be guilty of 'abduction.'" Code § 18.2-47. Code § 18.2-48 provides an enhanced penalty "for the abduction of any person with intent to defile such person."

As a result of Turner's petition for a writ of actual innocence, this Court ordered the circuit court to make factual findings on four questions, only one of which related directly to the specific offenses for which Turner had been convicted, murder and abduction with intent to defile: "4) [I]s Brown credible in his assertion that he acted independently in murdering the victim and that Turner had no role in the murder or *any* restraint of the victim?" (Emphasis added). In response to that question, the circuit court determined Brown was "credible in his assertion that he acted independently in murdering the victim and that . . . Turner played no role in the murder *or* in the restraining of the victim." (Emphasis added).

Both the question and answer must be viewed in the context of the convictions Turner challenges—for murder and abduction with intent to defile. The circuit court, by referring to the murder and the restraint in the disjunctive, contemplated Brown's recantation in light of both the actual killing and the underlying crime of abduction. "Restrain" means "'[t]o control'" or "'[t]o take away freedom or liberty of.'" United States v. Stokely, 881 F.2d 114, 116 (4th Cir. 1989) (quoting Webster's Second New Riverside University Dictionary (1984)); see also Black's Law Dictionary 1340 (8th ed. 2004) (defining "restraint" as "[c]onfinement," "limitation," or "[p]rohibition of action"). The legislature has provided that abduction as defined in Code § 18.2-47 is synonymous with kidnapping, see Code § 18.2-47(C), which is not separately defined in the Virginia Code. At common law, kidnapping required proof of both "an unlawful restraint" and an asportation. See State v. Dix, 193 S.E.2d 897, 899 (N.C. 1973). Although our legislature, like many others, now permits a conviction for abduction upon

-16-

proof of a detention without any asportation, see, e.g., Scott v. Commonwealth, 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984), the statutory language provides no indication the legislature has removed the "restraint" requirement. To the contrary, one who "seizes, takes, transports, detains or secretes the person of another," as those terms are used in Code § 18.2-47, "restrains" that person under the accepted legal definition of the term. The Supreme Court has recognized that a conviction for abduction under Code § 18.2-47 requires proof of restraint of the victim either by asportation or detention and that the asportation or detention may be accomplished by force, intimidation or deception. Jerman v. Dir. of the Dep't of Corr., 267 Va. 432, 439, 593 S.E.2d 255, 259 (2004); see John L. Costello, Virginia Criminal Law and Procedure § 5.1[6] (2009) ("[A]bduction consists of *restraints* on the personal liberty of another." (Emphasis added)). Thus, an asportation by force or deception is a type of restraint[4] and, if the other statutory elements are proved, constitutes an abduction in violation of Code § 18.2-47.

Based on the crimes for which Turner was convicted, the wording of the question posed by this Court to the circuit court, and the accepted "assum[ption] that trial judges have knowledge of the Commonwealth's laws and properly apply those laws" absent clear evidence to the contrary, Wilson v. Commonwealth, 23 Va. App. 318, 326 477 S.E.2d 7, 10 (1996), we conclude the circuit court's use of the word "restraint" constitutes a finding that Turner did not participate with Brown in an abduction by either force or deception. The circuit court's ruling therefore compels a rejection of the theory that

---

[4] Other states have incorporated such definitions into their statutes. See, e.g., State v. Wilcox, 758 A.2d 824, 838 (Conn. 2000) (noting that Conn. Gen. Stat. § 53a-91 requires proof of restraint to support a conviction of abduction and defines "'restrain' . . . as 'restricting a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty [either (1)] by moving him from one place to another [asportation], or [(2)] by confining him either in the place where the restriction commences or in a place to which he has been moved [detention], without consent'"); People v. Valero, 521 N.Y.S.2d 527, 528 (N.Y. App. Div. 1987) (holding an abduction is a "serious form of restraint" under New York law); Romero v. State, 34 S.W.3d 323, 325 (Tex. Crim. App. 2000) (noting that under Tex. Pen. Code Ann. § 20.01 abduction requires proof of restraint, which means "to restrict a person's movements without consent, so as to interfere substantially with her liberty, [(1)] by moving her from one place to another [asportation] or [(2)] by confining her [detention]").

Turner and Brown engaged in any criminal concert of action and prevents a finding that any causal connection existed between Turner's conduct and Evans' death.

In light of the circuit court's acceptance of Brown's testimony that Turner did not participate in the murder or the abduction leading to the murder, the record affirmatively proves no agreement between Turner and Brown existed to undertake these acts.[5]  In the absence of such an agreement, no rational trier of fact could find the men acted in concert to abduct or kill Evans.  Because the two men each acted of their own volition, Turner's conduct and Brown's entry into the vehicle and subsequent killing were not "interdependent objects of a common criminal design."  Edmonds v. Commonwealth, 229 Va. 303, 310, 329 S.E.2d 807, 813 (1985).  Indeed, Turner's waiting with Evans in his vehicle merely accounted for his "presence at the location of the [murder], and nothing directly related to the commission of the felony that caused the [murder]."  King, 6 Va. App. at 358, 368 S.E.2d at 708 (finding no causal connection between flying a plane containing marijuana as part of a drug smuggling operation and the death of a co-felon caused by crashing the plane into a mountain); see Rollston, 11 Va. App. at 542, 399 S.E.2d at 827 ("Mere presence during the commission of a crime is not sufficient to render one criminally liable.").  Whatever intentions Turner possessed when he left the club with Evans, he did not act in concert with Brown to lure her into leaving the club for the purpose of engaging in sexual intercourse against her will.  Instead, Brown, acted as an independent and superseding force so that his actions constituted a separate—and completely coincidental—enterprise with no causal connection to Turner's own conduct.

While Brown's recantation has severed Turner from the criminal enterprise leading to Evans' murder, we must still answer the question whether, in light of the circuit court's acceptance of Brown's

---

[5] As the circuit court noted, the evidence establishing Turner's guilt was largely circumstantial. Brown did not testify at Turner's trial and did not provide his false inculpatory testimony to the jury. All of the Commonwealth's eyewitness testimony confirmed that Evans was last seen with Turner on the night of her death, a fact Turner readily concedes.  There are, however, no eyewitnesses—besides the two convicted men—who identified the actual killer.

-18-

recantation, a rational trier of fact could have concluded beyond a reasonable doubt that Turner abducted Evans with intent to defile prior to and separate from Brown's acts of restraint and murder.

Under Code § 18.2-47, abduction requires proof of an asportation or detention. See Scott, 228 Va. at 526, 323 S.E.2d at 576. The accused need not have used any actual force or restraint against the victim in order to sustain a conviction. Kent v. Commonwealth, 165 Va. 840, 841-42, 183 S.E. 177, 177-78 (1938). Instead, restraint for purposes of abduction includes a taking away or detention induced by fraud or deception. See Code § 18.2-47; Jerman, 267 Va. at 439, 593 S.E.2d at 259; Kent, 165 Va. at 841-42, 183 S.E. at 177-78; Costello, supra, § 5.1[6]. However, the evidence must show that the accused effected such deception with the specific intent to defile the victim. See Johnson v. Commonwealth (Johnson II), 221 Va. 872, 879, 275 S.E.2d 592, 597 (1981); see also Simms v. Commonwealth, 2 Va. App. 614, 617, 346 S.E.2d 734, 735 (1986) (equating "defile" with "sexually molest"). Unless the victim is legally unable to consent due to age or infirmity, an allegation not advanced in this case, the intent-to-defile element requires proof of an intent to engage in sexual contact against the will of the claimed victim. See, e.g., Code §§ 18.2-61 (rape), -67.1 (forcible sodomy), -67.3 (aggravated sexual battery), -67.4 (sexual battery).

"'Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case.'" Hughes v. Commonwealth, 18 Va. App. 510, 519, 446 S.E.2d 451, 457 (1994) (quoting David v. Commonwealth, 2 Va. App. 1, 3, 340 S.E.2d 576, 577 (1986)). The state of mind of an accused may be shown by his conduct and by his statements. Long v. Commonwealth, 8 Va. App. 194, 198, 379 S.E.2d 473, 476 (1989). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided [the evidence as a whole] is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). In its role of judging witness credibility, the fact finder is entitled to disbelieve, in whole or in part, the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt. Speight v. Commonwealth, 4 Va. App. 83, 88,

354 S.E.2d 95, 98 (1987) (en banc). The rejection of that testimony, however, does not provide substantive evidence that the opposite is true. Tarpley v. Commonwealth, 261 Va. 251, 256-57, 542 S.E.2d 761, 764 (2001).

In Jerman, 267 Va. 432, 593 S.E.2d 255 (2004), the defendant argued that the detentions were merely incidental to the assault and murder of the victim. The Supreme Court of Virginia disagreed, holding that the abductions were distinct from the assault and that one of the abductions was accomplished through asportation by deception. Id. at 439, 593 S.E.2d at 259. Specifically, the defendant's co-conspirator drove the victim, a drug dealer, to her house for the stated purpose of purchasing drugs for some of her friends. Instead, her actual purpose was to lure the victim to the house for the purpose of confronting him about an earlier drug transaction. The Court held that this conduct proved the defendant committed abduction by deception as a principal in the second degree. Id. at 440, 593 S.E.2d at 260.

Similarly in Kent, 165 Va. 840, 183 S.E. 177 (1936), the defendant kidnapped the victim with intent to extort money for pecuniary benefit. The evidence showed that the defendant induced the victim to accompany him to Washington, D.C., on the assurance that he would obtain money to satisfy a debt he owed her. Id. at 842, 183 S.E. at 177-78. The victim was found murdered shortly after accepting the defendant's invitation. The evidence further demonstrated that the defendant would have benefited financially upon the victim's death. The Court held that "such circumstances amounted to fraud and coercion on [the defendant's] part and for the purpose of pecuniary benefit . . . ." Id. at 842, 183 S.E. at 178.

In both Kent and Jerman, the Court determined that the abductions occurred when the defendants told a specific lie that induced or coerced their respective victims into going places they would not otherwise have gone. In this case, by contrast, the evidence is insufficient to support a finding beyond a reasonable doubt that Turner made any statement or engaged in any act showing an intent to deceive Evans for the purpose of sexually molesting her against her will. Although the evidence does not

preclude the *possibility* that Turner had such an intent, reasonable hypotheses of innocence flow from the evidence, thereby precluding any rational trier of fact from finding Turner guilty beyond a reasonable doubt of abduction with intent to defile.

Turner's stated purpose for leaving the club with Evans was to wait with her in his vehicle for Burdette and McCammon to return. Although a rational fact finder could have rejected Turner's testimony regarding his purpose, such a rejection does not support a finding that he acted instead with the requisite criminal intent to abduct Evans with an intent to defile. See Tarpley, 261 Va. at 256-57, 542 S.E.2d at 764.

Fitzgibbons' testimony also does not support such a finding. According to Fitzgibbons, Turner said that he and Brown were going to engage in group sex. However, before Turner spoke to Fitzgibbons, he had made arrangements with Bishop to take Brown home if Turner did not return to the club in time to do so himself. Further, Brown testified at the evidentiary hearing that his primary purpose that night was to drink excessively and not socialize with women.[6] This evidence supports the reasonable inference that Turner's statement to Fitzgibbons about group sex was nothing more than an allusion to a prior incident in which Turner and Brown had engaged in group sex with an unrelated, willing female participant while stationed in California. Brown was standing near Turner and Fitzgibbons at the time, and whether or not Fitzgibbons was aware of the prior incident does not negate the reasonableness of this inference.

Perhaps most importantly, even if the evidence supported a finding that Turner lied to Evans about his purpose in going with her to his car and that he actually hoped to have some form of sexual

---

[6] The scope of the circuit court's credibility assessment of Brown's recantation is unclear. See Rollston, 11 Va. App. at 547, 399 S.E.2d at 830 (permitting a fact finder to believe or disbelieve in part or in whole the testimony of any witness). However, as already discussed, the circuit court expressly found Turner "played no role" in any "restraining of the victim," and restraint can be achieved through fraud or deception. See Wilson, 23 Va. App. at 326, 477 S.E.2d at 10 (holding the trial court is presumed to know the law absent clear evidence to the contrary). Thus, in finding Turner had "no role . . . in the restraining of the victim," the circuit could necessarily concluded Turner and Brown had no agreement to lure Evans from the club to Turner's car to facilitate forcible sexual contact.

contact with her, the record contains no indication that Turner acted with the intent to have that sexual contact by force if Evans had refused. In Johnson II, the Supreme Court of Virginia reversed the defendant's conviction of abduction where his acts of restraint were "done in furtherance of his sexual advances and not with the intent to deprive [the victim] of her personal liberty."[7] 221 Va. at 879, 275 S.E.2d at 597. In that case, the defendant followed the victim into her kitchen after knocking on her door. He grabbed the victim from behind, attempted to kiss her, and rubbed his hips against her buttocks. When the victim's landlady responded to her cries for help, the defendant released the victim and walked rapidly out of the apartment. The Court held that the defendant clearly "entered the apartment with the intention of having sexual intercourse with the [victim] and that the advances he made, however limited and fleeting, were designed to accomplish that purpose. However, his assault was frustrated by her resistance and stopped short of constituting an attempted rape." Id. at 879, 275 S.E.2d at 596-97. On those facts, the evidence did not prove the defendant acted with the separate intent to deprive the victim of her personal liberty with the intent to defile.

Here, the circumstantial evidence "fails 'to form an unbroken chain which links [Turner] to the crime beyond a reasonable doubt,'" Hickson v. Commonwealth, 258 Va. 383, 388, 520 S.E.2d 643, 645 (1999) (quoting Bishop v. Commonwealth, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984)), because a rational trier of fact could find Turner acted with an intent to defile Evans only by "resorting to speculation and surmise," Patterson v. Commonwealth, 215 Va. 698, 699, 213 S.E.2d 752, 753 (1975). There is no evidence that Turner overbore Evans' will at any point in the night. Turner did not force Evans to stay behind; she willingly agreed to remain with him at the club and to meet her friends later during the night. Turner did not make Evans uncomfortable; to the contrary, she appeared to have

---

[7] The defendant in Johnson II was charged with abduction with intent to defile, but the jury convicted him of abduction. 221 Va. at 873, 877, 275 S.E.2d at 593, 595. The Court clarified its ruling by stating that "the evidence did not support a finding that Johnson intended either to defile his victim or to deprive her of her personal liberty." Scott, 228 Va. at 525, 323 S.E.2d at 576 (footnote omitted).

enjoyed his company. Moreover, Turner's reputation for engaging in group sex is insignificant because no evidence indicates that the alleged prior group encounter was nonconsensual. The evidence of the condition in which Evans' body was found supports a finding that she had been sexually molested because her pants and underwear had been removed and her vest had been pushed up. However, Brown's recantation accounts for this because he fully admitted to defiling Evans' body after he had killed her.

In light of Brown's recantation, the evidence proves beyond a reasonable doubt, at most, that when Turner invited Evans to wait in his vehicle for her friends, he did so with the hope of persuading her to have consensual sexual contact. Other than Turner's statement to Fitzgibbons about "hav[ing] a threesome," implicitly rejected by the circuit court as a basis for convicting Turner of the murder and abduction committed solely by Brown, the record was devoid of evidence supporting a finding that Turner acted with the intent to force Evans into having sex against her will. Brown's recantation negates the inculpatory evidence against Turner to such an extent that no rational trier of fact could have found him guilty beyond a reasonable doubt of abduction with intent to defile.

The dissent suggests that, notwithstanding Brown's recantation, the circumstantial evidence would allow a rational trier of fact to conclude Turner was guilty of abduction with intent to defile. In doing so, the dissent, in effect, analyzes the evidence as a typical appeal challenging the sufficiency of the evidence, in which a single fact finder, here the jury, has made all relevant factual determinations and this Court, on review, considers all the evidence in the light most favorable to the Commonwealth.[8]

---

[8] This Court, in fact, applied that standard when it denied Turner's petition for direct appeal of his convictions, concluding "[t]he totality of the Commonwealth's evidence, though circumstantial, . . . was sufficient to prove beyond a reasonable doubt that appellant was guilty of abduction and murder" as a principal in the first or second degree. Turner v. Commonwealth, No. 0381-97-1 (Va. Ct. App. Sept. 24, 1997) (order of denial on one-judge review); see Turner v. Commonwealth, No. 0381-97-1 (Va. Ct. App. Jan. 23, 1998) (order of three-judge panel adopting the reasoning of the one-judge denial order). Had Brown's recantation been introduced at Turner's original trial, the jury would have been free to assess Brown's credibility in conjunction with all the evidence, and the dissent's reasoning in the present proceeding would have supported an affirmance of Turner's convictions in that direct appeal.

-23-

However, to adjudicate a petitioner's writ of actual innocence following a jury trial, we view all the evidence from the perspective of the hypothetical "rational trier of fact" because we must take into account the impact of the evidence adduced at a subsequent proceeding, the credibility of which has been determined by a different fact finder, the circuit court. Without the aid of a singular point of view, we must supplant the original jury verdict and then consider anew, from the perspective of the hypothetical rational fact finder in a backward-looking fashion, whether the newly-discovered evidence, in combination with the evidence adduced at trial that is not in conflict with the credible new evidence, could support a finding of guilt beyond a reasonable doubt. This subsequent evidentiary interpretation cannot conflict with the findings of the circuit court.

The dissent emphasizes that a rational trier of fact "*could* have found Turner guilty beyond a reasonable doubt" because "the [original] jury did." However, as mentioned above, we must supplant the original verdict with this credible recantation. To say that a rational trier of fact could have found the petitioner guilty because the original jury did would mandate the dismissal of every petition for a writ of actual innocence.

In summation, the dissent makes a fatal leap in logic from Turner's possible desire to engage in sexual intercourse to his alleged intent to defile Evans. Turner's talk of engaging in a threesome, however crass and distasteful, does not establish an intent to defile because no evidence indicates Turner would have forced Evans to engage in such an act against her will. We conclude as a matter of law that no rational trier of fact could make such an inferential leap on this record.

III.

RELIEF UNDER WRIT

Pursuant to Code § 19.2-327.13:

> in the event that the Court finds that no rational trier of fact could have found sufficient evidence beyond a reasonable doubt as to one or more elements of the offense for which the petitioner was convicted, but the Court finds that there remains in the original trial record evidence sufficient to find the petitioner guilty beyond a reasonable doubt of a

-24-

lesser included offense, the court shall modify the order of conviction accordingly and remand the case to the circuit court for resentencing.

Our task is to determine whether under the statutory framework, Turner is guilty of a lesser-included offense, namely of being an accessory after the fact. Turner concedes that if accessory after the fact is a valid lesser-included offense, the evidence is sufficient to find him guilty pursuant to Code § 19.2-327.13.

After the presentation of the evidence, the parties agreed on the jury instructions, including Instruction 11, which states:

> The Court instructs the jury that the defendant is charged with the crime of first-degree murder. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> If you find that the Commonwealth has failed to prove beyond a reasonable doubt that the defendant is guilty of felony murder but if you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the following elements:
> 1. That Billy Joe Brown committed the crime of murder against Jennifer L. Evans; and
> 2. That the defendant knew that Billy Joe Brown had committed the murder of Jennifer L. Evans; and
> 3. That the defendant comforted, relieved, hid or in any other way assisted Billy Joe Brown, with the intent of helping Billy Joe Brown escape or delay capture, prosecution or punishment;
>
> then you shall find the defendant guilty of being an accessory after the fact to the crime of murder and fix his punishment at:
> 1. Confinement in jail for a specific time, but not more than twelve (12) months; or
> 2. A fine of a specific amount, but not more than $2,500.00;
> 3. Confinement in jail for a specific time, but not more than twelve (12) months, and a fine of a specific amount, but not more than $2,500.00.
>
> If you find that the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the above elements of the offense, then you shall find the defendant not guilty.

Code § 19.2-327.13 makes clear that this Court may "modify the order of conviction accordingly and remand the case to the circuit court for resentencing" only where there is sufficient evidence "to find

the petitioner guilty beyond a reasonable doubt of a *lesser-included offense*." (Emphasis added). In Commonwealth v. Dalton, 259 Va. 249, 254, 524 S.E.2d 860, 863 (2000), the Supreme Court of Virginia expressly held that "the crime of being an accessory after the fact is not a lesser-included offense of the crime of murder." The Court further held that "before a defendant can be tried and convicted of being an accessory after the fact, he must be charged with that offense."[9] Id. at 255, 524 S.E.2d at 863.

The question we must decide is whether the instruction allowing Turner to be convicted of being an accessory after the fact, generally treated as a lesser-included offense to murder at the time of Turner's conviction, became the law of the case. "It is well settled that instructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review." Ludwig v. Commonwealth, 52 Va. App. 1, 12, 660 S.E.2d 679, 684 (2008) (quoting Owens-Illinois v. Thomas Baker Real Estate, 237 Va. 649, 652, 379 S.E.2d 344, 346 (1989)). Here, both parties agreed to include the crime of being an accessory after the fact as a lesser-included offense in the instruction. To that extent, Turner was on notice that he faced the possibility of criminal liability as an accessory after the fact. Cf. Dalton, 259 Va. at 255, 524 S.E.2d at 863 ("*Unless such a charge is specifically made*, neither the Commonwealth nor an accused is entitled to an accessory-after-the-fact instruction." (emphasis added)). Turner further concedes that, as a result of these jury instructions, law-of-the-case principles require us to treat the crime of being an accessory after the fact as a

---

[9] In so ruling, the Court did not "change[] the quantum of evidence necessary to sustain a conviction," Carmell v. Texas, 529 U.S. 513, 530, 120 S. Ct. 1620, 1631, 146 L. Ed. 2d 577, 593 (2000), but instead merely clarified an existing procedural practice of instructing the jury on lesser-included offenses, see Pilcher v. Commonwealth, 41 Va. App. 158, 164-65, 583 S.E.2d 70, 73 (2003) (explaining that changes in procedural laws only violate *ex post facto* principles "when one of four recognized categories of *ex post facto* law is implicated"). See generally Hopt v. Utah, 110 U.S. 574, 590, 4 S. Ct. 202, 210, 28 L. Ed. 262, 269 (1884) ("[A]lterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt . . . relate to modes of procedure only . . . .").

lesser-included offense of murder. Thus, the rule in Dalton does not apply, and we accept Turner's concession that he is guilty of being an accessory after the fact.

Code § 18.2-19 defines the crime of accessory after the fact as a Class 1 misdemeanor. The maximum punishment for an accessory after the fact is twelve months. Code § 18.2-11 further defines the punishment for this misdemeanor as "confinement in jail for not more than twelve months and a fine of not more than $2,500, either or both." As of this date, Turner has served more than thirteen years in prison. Thus, he has served the statutory maximum for being an accessory after the fact, and remand for resentencing is unnecessary.

IV.

CONCLUSION

For these reasons, we hold that Turner has met his burden of proving, by clear and convincing evidence, that the recantation is truthful, and that, had the statement been produced at trial, "no rational trier of fact could have found proof of guilt [of felony murder and abduction with intent to defile] beyond a reasonable doubt." Code § 19.2-327.11(A)(vii). Further, we hold the evidence sufficient to find Turner guilty beyond a reasonable doubt of being an accessory after the fact, a conviction allowed under the instructions agreed to at his trial, but do not remand for resentencing. Accordingly, we grant his petition for a writ of actual innocence and vacate Turner's convictions for first-degree murder and abduction with intent to defile. We further remand this matter to the circuit court with instructions to modify the order of conviction to reflect Turner's conviction of being an accessory after the fact.

_____

Powell, J., dissenting.

I agree with the majority's analysis of the applicable standard of review in this case. But before this Court may properly grant the writ of actual innocence that petitioner seeks, petitioner must demonstrate by clear and convincing evidence that based on all of the evidence in the record, "*no rational trier of fact could* have found proof of guilt beyond a reasonable doubt." Code

-27-

§ 19.2-327.11(A)(vii) (emphasis added); accord Carpitcher v. Commonwealth, 273 Va. 335, 344, 641 S.E.2d 486, 491 (2007).  It is this Court's statutory duty to examine the entire record, including Brown's credible confession to murder, to determine whether Turner has met his burden.  See Code §§ 19.2-327.11 to 19.2-327.14.  This analysis is not as simple as merely accepting the circuit court's determination that Brown testified credibly that he acted alone when he physically committed the murder and that Turner played no role in the restraint of Evans as clear and convincing evidence that Turner did not abduct Evans with the intent to defile her or that he is not guilty of felony murder.[10]  Unlike, the majority, I do not find that Turner has met his statutory burden.  Therefore, I would dismiss petitioner's request for a writ of actual innocence, and I respectfully dissent.

## I.  ABDUCTION WITH INTENT TO DEFILE

At the evidentiary hearing, the circuit court found that "Brown is credible in his assertion that he acted independently in murdering the victim and that . . . Turner played no role in the murder or in the restraining of the victim."  The relevant question is not whether Brown acted alone in killing Evans, but whether Turner abducted her with the intent to defile her.  If he did, the fact that Brown may have acted alone in committing the murder does not absolve Turner of his guilt.  I find that the facts and the law indicate that Turner is guilty of abduction with the intent to defile and therefore is also guilty of the felony murder.

Turner was convicted of abduction with intent to defile pursuant to Code §§ 18.2-47 and 18.2-48.  Code § 18.2-47 provides in relevant part

> [a]ny person who, by force, intimidation or deception and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such person of his personal liberty . . . shall be guilty of abduction.

---

[10] The majority, in footnote 3, states that "[t]o disregard the circuit court's credibility determination would render the entire evidentiary hearing meaningless."  To accept the circuit court's factual determinations divorced from their place in the entire record would render meaningless the role of this Court and the statutory scheme providing for a writ of actual innocence.

The majority opines that because the circuit court found that Brown was "credible in his assertion that he acted independently in murdering the victim and that . . . Turner played no role in the murder or in the restraining of the victim," the circuit court addressed the question as to whether Turner abducted Evans with the intent to defile in the negative. The majority further opines that because the circuit court so found, Turner is entitled to have his petition granted. I find that a clear reading of Code §§ 18.2-47 and 18.2-48 indicates that the circuit court did not address the issue of whether Turner abducted Evans with the intent to defile. Because the circuit court did not address that issue, this Court must. Moreover, because Turner is unable to prove by clear and convincing evidence that no rational finder of fact could have found him guilty, his petition should be dismissed.

I agree with the majority that kidnapping, which our legislature has declared is synonymous with abduction, is not defined in the Virginia Code. The majority relies on State v. Dix, 193 S.E.2d 897, 898 (N.C. 1973) for its position that at common law, kidnapping required proof of both "an unlawful restraint" and "an asportation." Dix recognized that kidnapping was defined generally as the unlawful taking and carrying away of a human being against his will by force, threats or fraud. Id. A related offense, false imprisonment was defined as the illegal restraint of a person against his will. Id. The court in Dix went on to recognize that their jurisprudence held that the unlawful detention of a human being against his will was false imprisonment, not kidnapping. Id. (citing State v. Ingland, 78 S.E.2d 577, 582 (N.C. 1911)). "The element of carrying away was the differentiating factor between the two offenses." Id. at 899. Thus, the court recognized that there was some degree of tension in the definition of kidnapping, specifically with regard to the degree of asportation required to turn a false imprisonment into a kidnapping. The court reconciled the tension by holding that in addition to unlawful restraint, the taking, carrying away, transportation or asportation of the victim from the place where seized to some other place is an essential element of common law kidnapping. Id. at 904. I agree with the majority that *at common law* every kidnapping involved some degree of restraint.

-29-

However, in both Virginia and North Carolina, abduction has since been modified by statute. Our Supreme Court has recognized that Code § 18.2-47 supersedes the common law. Scott v. Commonwealth, 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984).

To the extent that the majority would limit Code § 18.2-47 such that the only difference from the common law is that Code § 18.2-47 now allows a conviction for abduction upon proof of a detention without any asportation, stating that the statutory language provides no indication that the legislature has removed the "restraint" requirement, the majority construes the statute too narrowly. Indeed, our Supreme Court has specifically stated "we shall construe [Code § 18.2-47] according to its plain meaning and evident intent. Because [Code § 18.2-47] casts its several prohibited acts in the disjunctive, each is independently sufficient to support a conviction." Scott, 228 Va. at 526, 323 S.E.2d at 576; see also John L. Costello, Virginia Criminal Law and Procedure § 7.1 (2009) ("This codal section supercedes [sic] the common law, but includes its several offenses [false imprisonment, kidnapping and abduction] by virtue of the disjunctive presentation of the parts of each of the elements").

Our Supreme Court arrived at the holding in Scott in reliance on another North Carolina case: State v. Fulcher, 243 S.E.2d 338 (N.C. 1978). In Fulcher, the North Carolina Supreme Court considered whether one could be convicted of kidnapping where there was no asportation. 243 S.E.2d at 351. In doing so, the court interpreted a statute very similar to Virginia's. As our Supreme Court stated in Scott, the North Carolina statute provided, in pertinent part, "[A]ny person who shall unlawfully confine, restrain or remove from one place to another, any other person . . . without the consent of such person, shall be guilty of kidnapping . . . ." 228 Va. at 525-26, 323 S.E.2d at 576 (quoting N.C. Gen. Stat. § 14-39(a)). The North Carolina Supreme Court held that their legislature rejected their previous decisions holding that there must be both detention and asportation of the victim, because the statute plainly stated confinement, restraint *or* removal. Fulcher, 243 S.E.2d at 351.

-30-

That court went on to define the terms used in its statute as follows:

> [T]he term "confine" connotes some form of imprisonment within a given area, such as a room, a house or a vehicle. The term "restrain" while broad enough to include restriction upon freedom of movement by confinement, connotes also such a restriction by force, threat or fraud, without a confinement. Thus, *one who is physically seized and held, or whose hands or feet are bound, or who, by the threatened use of a deadly weapon, is restricted in his freedom of motion is restrained . . . .*

Id. (emphasis added). Throughout the opinion, asportation was defined as the carrying away of the victim. See id. at 350.

The reasoning of the North Carolina Court in Fulcher, which was found persuasive by our Supreme Court in Scott, is equally applicable to the interpretation of our statute. Because our statute is plainly written in the disjunctive, it is clear that restraint is no longer a requirement of abduction as the legislature has declared one who seizes, takes, transports, detains,[11] *or* secretes for any one of the prohibited purposes commits an abduction, as each action is independently sufficient to support a conviction.

Therefore, because restraint need not be an element of an abduction, the majority incorrectly concludes that because we presume that the circuit court knows and correctly applied the law, we can presume that the circuit court's conclusion that Turner did not restrain Evans means that Turner did not abduct her with the intent to defile. However, the circuit court was not asked to determine whether Turner abducted Evans with intent to defile. Thus, the majority's presumption is based on their assumption that the circuit court knew and correctly applied the law to a question that was not asked.

Our case law is clear that, under Code § 18.2-47, an abduction occurs where the perpetrator detains or moves his victim "by force, intimidation, or deception." Scott, 228 Va. at 526, 323 S.E.2d at

---

[11] Clearly the word "detains" is synonymous with "restrains." The majority defines "restrain" as "to 'control' or 'to take away freedom or liberty of.'" Webster's defines "detain" as "to hold or keep in . . . as if in custody, to keep back, to restrain." Webster's Third International Dictionary 616 (1993). The use of the word "detain" further indicates that "restraint" is no longer an element of kidnapping in addition to each of the enumerated acts. To so hold would mean that the Commonwealth would have to prove not only that the victim was "detained" but also that the victim was "restrained."

-31-

576. In Jerman v. Dir. of the Dep't. of Corr., 267 Va. 432, 439, 593 S.E.2d 255, 259 (2004), the Supreme Court of Virginia found that an abduction occurred where the evidence proved that one of the petitioner's confederates convinced the victim to come with her under the ruse of selling illegal narcotics to her and petitioner when their true intent was to harm the victim. See also Taylor v. Commonwealth, 260 Va. 683, 688, 537 S.E.2d 592, 595 (2000) (holding that the appellant accomplished the abduction through the use of both deception and intimidation). Our Supreme Court made no mention of any "restraint" upon the victim in the first abduction in Jerman; rather, the fact that the victim was tricked into getting into the vehicle and traveling with the co-conspirator was enough to prove abduction. Thus, if based on all of the evidence before this Court, any rational fact finder could have concluded that Turner deceived Evans into leaving the club while at the same time intending to defile her, then a writ of actual innocence should not issue.

The majority refers to Kent v. Commonwealth, 165 Va. 840, 841-42, 183 S.E. 177, 177-78 (1936), and Jerman as cases where the appellants told "specific lies" to accomplish the abductions. Supra § II.B. However, Code §§ 18.2-47 and 18.2-48 do not require that the deception be verbalized and, certainly, it is well settled that one's intention, such as the intent to deceive, may and often must be proven through the use of circumstantial evidence. Williams v. Commonwealth, 278 Va. 190, ___, 677 S.E.2d 280, 282 (2009) (reiterating that "[a]bsent a direct admission by the defendant, intent . . . must necessarily be proved by circumstantial evidence"). To prove that Turner abducted Evans with the intent to defile, the Commonwealth was required to prove that he had the specific intent to sexually molest her. Simms v. Commonwealth, 2 Va. App. 614, 617, 346 S.E.2d 734, 735 (1986). "Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case." Ridley v. Commonwealth, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979). Petitioner's acts, conduct, and statements may be considered to discern his state of mind. Id.; accord Long v. Commonwealth, 8 Va. App. 194, 198, 379 S.E.2d 473, 476 (1989). "The [trier of fact] may consider the conduct of the person involved and all the circumstances revealed by the evidence."

-32-

Hughes v. Commonwealth, 18 Va. App. 510, 519, 446 S.E.2d 451, 457 (1994) (quoting Wynn v.

Commonwealth, 5 Va. App. 283, 292, 362 S.E.2d 193, 198 (1987)).

> When weighing the evidence, the fact finder is not required to accept
> entirely either party's account of the facts.  The fact finder may reject that
> which it finds implausible, yet accept other parts which it finds to be
> believable.

Barnes v. Commonwealth, 33 Va. App. 619, 630, 535 S.E.2d 706, 711-12 (2000) (citing Barrett v.

Commonwealth, 231 Va. 102, 107, 341 S.E.2d 190, 193 (1986)).

Because it is Turner's intent that is relevant, Brown's credible confession to killing Evans cannot

be found to be dispositive of what Turner was thinking when he left the club with Evans.  Indeed,

Brown's confession only establishes what occurred after he got into the car with Turner and Evans.[12]

Thus, it does not change the evidence of Turner's intent to defile that was before the jury in Turner's

trial.  That jury was instructed that abduction with the intent to defile could be accomplished by,

*inter alia*, deception and could have found that Turner deceived Evans into leaving the bar, his nefarious

intent unbeknownst to her.[13]  Thus, it cannot be said that *no* rational trier of fact *could* have found

Turner guilty beyond a reasonable doubt as the jury did.

---

[12] In his confession, Brown reiterates his prior statements that he did not intend to have sex that night.  His recent confession, however, has no bearing on what a reasonable fact finder could find about Turner's and Brown's sexual intent prior to Brown joining Evans and Turner in Turner's car because Brown's confession focused on the details of how he killed Evans and what followed after he met them in the car.  Specifically, this was not part of what the trial court was asked to decide, nor is this issue of Brown's sexual intent part of the circuit court's findings.  Indeed, Brown's protestations that he was not sexually interested in Evans are belied by his interview with Turner's attorney and by his own testimony at the evidentiary hearing where he recounts his sexual overtures toward Evans immediately upon getting into Turner's car and admits to trying to have intercourse with Evans' corpse twice, once before they even left the parking lot and again in the woods where they disposed of Evans' body.

[13] Though the record, unfortunately, is devoid of the closing arguments made to the jury in Turner's trial, it is clear from the trial court's ruling on Turner's motion to strike and from the jury instructions that the abduction by deception theory was advanced in the trial court.  In ruling on Turner's motion to strike, the trial court held that there was sufficient evidence from which a fact finder could conclude that Evans did not

> knowingly and willingly [go] with . . . Turner to the parking lot or
> to his car for the purposes of engaging in a threesome or what has

Moreover, a review of the entire record before this Court reveals that it is replete with evidence from which a rational finder of fact could reach a conclusion that Turner deceived Evans into leaving the club with him for stated innocent purposes while his true intent was to defile her. Turner avowed that he only wanted to talk with Evans and that he had no sexual interest in her. Turner's actions and, more tellingly, his own words on the night Evans was murdered belie his claim that he did not intend to have sex with Evans. Turner went out of his way to arrange for Karen Bishop, Brown's ex-girlfriend, to give Brown a ride home if Turner did not return to the club by closing time. During that conversation, Bishop asked Turner if she needed to give Brown a ride home because Turner "was going home with [Evans], and [Turner] said yes." Bishop warned Turner that "if that's what [he's] going to do, use a condom." Turner just smirked and laughed in response.

The most telling piece of evidence is a conversation that occurred after Turner arranged for Bishop to give Brown a ride home and after he professed his intent to have sex with Evans to Bishop. Julio Fitzgibbons, a Navy SEAL, met Turner and Brown the night Evans was murdered and they talked about the SEAL training program for some time before parting ways. Toward the end of the night and after Turner had arranged a ride for Brown, Fitzgibbons approached Turner and Brown to see whether they had any plans for that night. While Evans was standing approximately fifteen yards away, Turner told Fitzgibbons that he and Brown were going to have a "threesome" with Evans.[14] Within a few

---

> been discussed as group sex with [Turner] and . . . Brown; but we certainly know from the evidence in this case that that was the defendant's intent. . . . It's clear from all the circumstances in evidence in this case that the defendant had a sexual mode; and, of course, his specific intent to defile or sexually molest . . . can be derived not only from his conduct *but from his statements as well*."

(Emphasis added).

[14] Fitzgibbons testified that he understood "threesome" to mean a sexual encounter involving Turner, Brown, and a woman, in this instance, Evans. Though the majority suggests that this may have been an allusion to a prior incident in which Turner and Brown engaged in a "threesome," the argument makes no sense given that Fitzgibbons did not know Brown and Turner or their sexual histories. Such an allusion would certainly have been lost on Fitzgibbons.

-34-

seconds of this, Evans approached and Turner introduced her to Fitzgibbons as she stood next to Brown.

Before leaving, Fitzgibbons gave them the thumbs up sign, which Turner returned. Turner had a smile on his face.[15]

While Turner denies having made this statement, his petition for a writ of actual innocence supports this sequence of events and the fact that there was an exchange with him, Brown, and Fitzgibbons regarding a "threesome." In paragraph forty-seven of his petition, Turner states under oath

> Petitioner was happy with Bishop's response and he went to tell Brown about the arrangements. Petitioner remarked that the plan was if he wasn't back by 2:00 a.m., Bishop should take Brown home. Brown asked Petitioner where he was going with "that chick," and Petitioner explained. Brown was slurring his words and asked Petitioner what the chances were for him to "get it on with her *too*." At that moment, [Fitzgibbons] walked up to them and asked what their plans were for the night. Brown said something to the effect, "I'm going to get a threesome going."

(Emphasis added).

Turner confirms that he talked with Brown after the arrangements were made with Bishop to take Brown home. Based on his version of Brown's response to Turner's description of his plans with Evans, it is clear that Turner planned to have a sexual encounter with Evans as Brown's response was to inquire about the chances of him "getting it on with her *too*." (Emphasis added). The evidence is also clear that the plan was formulated for both Turner and Brown to have sex with Evans as Fitzgibbons was told that they were going to have a "threesome." While Turner tries to attribute the "threesome" comment to Brown, Fitzgibbons was clear that it was a declaration made by Turner. Clearly, Brown and Turner made a plan before either left the club to have sex with Evans.[16]

---

[15] Several other witnesses also testified that Turner and Brown had a history of engaging in "threesomes."

[16] While the majority contends that Turner's statements regarding a threesome were implicitly rejected by the circuit court and negate the inculpating evidence against Turner, this simply is the case. For all of the previously stated reasons, the circuit court was never asked to reach, nor did it reach the issue of whether Turned abducted Evans by deception with the intent to defile.

-35-

Finally, Turner's intent to have sex with Evans, even though not even he believed Evans would agree, is clear from what was not said. Evans' friend, Burdette, described Evans as a woman who would not speak to anyone using sexual overtures. Burdette also testified that she believed that Evans would not have been speaking to Turner had he made any sexual invitations to Evans. Evans' other friend, McCammon, similarly believed that Evans had no intent to have a "romantic interlude" that night. As further proof of his intent to defile Evans, Turner confirms these descriptions of Evans. He testified that during the course of the evening, he never discussed sex with her. He also echoed Evans' friends with regard to her character. Specifically, he stated that in the short time he spent with her, Evans was not the kind of woman who would have engaged in a "threesome." Yet, he spoke to two different people about having sex with her, although she and he had not discussed it. Moreover, he unreservedly declared that he was going to have a "threesome" with Evans and Brown, even though he did not believe she would have willingly engaged in a "threesome." From this, a rational trier of fact could conclude that Evans was unaware of Turner's sexual plans for her, and would not have willingly engaged in a "threesome," but that that was his intention.

The record also contains evidence of Turner's aggressive nature, especially when things were not going his way. Burdette testified that Turner was "exceptionally rude" to her and McCammon, that he spoke to them in a "horribly belligerent tone[,]" and that he "pulled the [car] door open with surprising force" when he and Evans finally prevailed and the plan was devised for Evans to stay with Turner for one additional hour.

Turner's callous disregard for Evans, displayed after her murder, is consistent with a finding that he intended to defile her before she was murdered. Within minutes of Brown killing Evans, Turner took the lead in finding an isolated spot to dispose of her body. Both men testified that Brown passed out within seconds of killing Evans. However, rather than making known what occurred, Turner drove from Virginia Beach to a secluded area in a Newport News park where it was unlikely that Evans' body would be found. After finding the appropriate spot, he then woke Brown up to assist him in moving and

-36-

covering Evans' body. The day after Turner claimed to have witnessed Brown end a young woman's life without any provocation, Turner still desired to rent an apartment with Brown. When lying to police and Federal Bureau of Investigation officials about leaving the club separately from Evans, an FBI officer interviewing Turner found him to be "very calm, very collected." Another police officer present for the interview said that Turner "seemed calm, cool. Had his thoughts about him and talked very straightforward." A few days after the police and FBI officers visited Turner and Brown at the naval base to interview them, the men went to Pizza Hut with Matt Novello, a Navy boatswain mate. Brown had brought the current, local newspapers with him. One of the newspapers contained a composite sketch purportedly of Turner. Throughout the meal, Turner and Brown repeatedly laughed and joked that the sketch looked nothing like Turner.

Thus, the record provides ample evidence of Turner's determination to spend time with Evans, his aggressive demeanor toward her friends, and his unremorseful reaction after witnessing Brown end Evans' life. There is also significant, contradictory evidence of Turner's claim that he had no interest in having sexual relations with Evans and his attempts to facilitate such relations. The evidence further proves that Turner walked Evans to his car on the pretext of waiting for her friends. He did not disclose to her his stated intention to Fitzgibbons to have a "threesome" with her and Brown. Certainly, the act of engaging in a "threesome" does not, in and of itself, provide evidence of Turner's intent to defile Evans. However, the evidence in the record when considered as a whole—including Turner's belief that Evans would not be receptive to sexual advances, Turner's claim to police and at trial that he had no interest in having sexual relations with Evans, and his declaration to Fitzgibbons that he intended to have a "threesome" with Evans—enables a rational trier of fact to infer that Turner intended to have sexual relations with Evans against her will.

## II. FELONY MURDER

"[M]urder for purposes of the felony-murder statute is common-law murder coupled with the contemporaneous commission or attempted commission of one of the listed felonies[,]" including

abduction with intent to defile. Wooden v. Commonwealth, 222 Va. 758, 761, 284 S.E.2d 811, 813 (1981). "[T]he felony-murder statute applies where the killing is so closely related to the felony in time, place, and causal connection as to make it a part of the same criminal enterprise." Haskell v. Commonwealth, 218 Va. 1033, 1044, 243 S.E.2d 477, 483 (1978).

> In adjudging a felony-murder, it is to be remembered at all times that the thing which is imputed to a felon for a killing incidental to his felony is *malice* and *not the act of killing*. The mere coincidence of homicide and felony is not enough to satisfy the requirements of the felony-murder doctrine . . . . "Death must be a consequence of the felony . . . and not merely coincidence."

King v. Commonwealth, 6 Va. App. 351, 356, 368 S.E.2d 704, 707 (1988) (quoting Commonwealth v. Redline, 137 A.2d 472, 476 (Pa. 1958)). Abduction is a continuing offense and "'it [is] for the fact finder to determine in each case . . . whether the [abduction] had been terminated within the purview of [Code § 18.2-32].'" Barnes, 33 Va. App. at 629, 535 S.E.2d at 711 (quoting Haskell, 218 Va. at 1043, 243 S.E.2d at 483).

As discussed above, the record *in toto* provides sufficient evidence from which the trier of fact could conclude that Turner deceived Evans into going to his car with the true intent of both he and Brown having a "threesome" with Evans against her will. The evidence further shows that when Brown joined Evans and Turner in Turner's car, Brown asked Evans whether she was a virgin and whether she had ever had sex with a "frogman" immediately before "snapping" and killing her. Moreover, Brown was present when Turner told Fitzgibbons that he and Brown intended to have a "threesome" with Evans. From this evidence, a rational trier of fact *could* conclude that Brown and Turner intended to forcibly have sexual relations with Evans and that Brown killed Evans when she rebuffed his advances. The trier of fact could have found that because of this shared sexual desire, the abduction had not ended.[17] Thus, I do not believe that this Court can find that Brown's credible recantation provides this

---

[17] The majority's determination that "[t]he circuit court, by referring to the murder and the restraint in the disjunctive, contemplated Brown's recantation in light of both the actual killing and the underlying crime of abduction" is unsupported and requires an inferential leap.

-38-

Court with clear and convincing evidence that no rational fact finder could have found that Turner used deception to abduct Evans with the intent to have sexual intercourse with her against her will and, therefore, I dissent.

_____

Because the issues addressed herein are of first impression and potential litigants and members of the bar may benefit from the directives herein, we direct the Clerk to publish this order.

A Copy,

Teste:

*original order signed by the Clerk of the*
*Court of Appeals of Virginia at the direction*
*of the Court*

Clerk